**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**


UNITED STATES OF AMERICA       *       4:10-CR-459
                               *       Houston, Texas
VS.                            *
                               *       9:32 a.m.
WILMAR RENE DURAN-GOMEZ        *       July 29, 2015


**STATUS CONFERENCE**


**BEFORE THE HONORABLE KENNETH M. HOYT**
**UNITED STATES DISTRICT JUDGE**

**APPEARANCES:**

**FOR THE GOVERNMENT:**
Ruben R. Perez and Joseph C. Magliolo, Jr.
OFFICE OF THE U.S. ATTORNEY
1000 Louisiana, Suite 2300
Houston, Texas 77002
713.567.9347

**FOR DEFENDANT WILMAR RENE DURAN-GOMEZ:**
Wendell Odom
LAW OFFICES OF WENDELL ODOM & NEAL DAVIS, III
440 Louisiana, Suite 200
Houston, Texas 77002
713.223.5575

**FOR DEFENDANT JOSE ALBERTO BOLANOS-GARZA:**
Mervyn Milton Mosbacker, Jr.
Attorney at Law
2777 Allen Parkway, Suite 1000
Houston, Texas 77019
713.526.2246


**FOR DEFENDANT JOSE FUENTES:**
Kenneth W. McGuire
McGuire Law Firm
P.O. Box 79535
Houston, Texas 77279
713.223.1558

**FOR DEFENDANT EFRAIN RODRIGUEZ-MENDOZA:**
Thomas S. Berg
Attorney at Law
4306 Yoakum Blvd., Suite 400
Houston, Texas 77006
713.236.1900


**FOR DEFENDANT MAURICIO MERCADO:**
Charles Thomas Flood
FLOOD AND FLOOD
914 Preston, Suite 800
Houston, Texas 77002
713.223.8877


Court Reporter:
Johnny C. Sanchez, RPR, RMR, CRR
515 Rusk, #8004
Houston, Texas 77002
713.250.5581

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-assisted transcription.

THE COURT:  Good morning, gentlemen.  Let's see who we've got present this morning.

This is Cause Number 2000 -- I think it's 2000.  Yes.  What is the case number?  2010-459, United States of America versus Wilmar René Duran-Gomez and other defendants.

Who is here in behalf of Gomez Duran-Gomez.

MR. ODOM:  Your Honor, Wendell Odom on behalf of Duran-Gomez.

THE COURT:  And we've got some other defendants who may or may not need to be here, but I saw their attorneys.  So let's see who we have here for Bolanos-Garza?

MR. MOSBACKER:  Mervyn Mosbacker Mervyn Mosbacker for Mr. Bolanos-Garza, Your Honor.

THE COURT:  And Efrain Rodriguez-Mendoza.

MR. BERG:  Tom Berg, Your Honor.

THE COURT:  And let's see who else.  Anyone for José Fuentes?

MR. McGUIRE:  Your Honor, Ken McGuire.  Mr. Friesell asked me to stand in for him today.

THE COURT:  All right.  And then Mercado, Mr. Flood?

MR. FLOOD:  Good morning.  Yes, Charles Flood.

THE COURT:  Did I get an announcement from the

government?

MR. PEREZ:  Ruben Perez and Joe Magliolo for the United States, Your Honor.

THE COURT:  All right.  Gentlemen, where are we?  I asked for a status report for June 30th and I didn't get -- I did get some paperwork from the defense, but I did not receive anything from the government.  So what do I need to do, dismiss your case?

MR. MAGLIOLO:  As the Court knows, there's three defendants charged with capital, and then there's three additional defendants charged as survivors.

THE COURT:  Right.

MR. MAGLIOLO:  Two -- we pretty much reached an agreement with two of the defendants, driver charged defendants, and just trying to decide if that mechanism should we plead them before, or to plead afterwards, plead it -- put on sentencing prior to trial.  And that's -- I don't think that will be a problem.

Third defendant driver, we were having some difficulty with.  He has just retained a new attorney, Mr. Flood, and we've -- we're going to meet together and bring in the agent and bring him up to speed on all our stuff that we have presenting the evidence against his client, so then he can advise his client what would be best.  That covers the three non-capital drivers.

As far as the capital drivers, as the Court knows, Mr. Duran has been certified for the death penalty. Mr. Balonos is not, and he's going to cooperate with the government.

Third defendant is the one who still --

THE COURT: Rodriguez-Mendoza.

MR. MAGLIOLO: -- in somewhat of a limbo.

Where we are is we have completed our paperwork and given it to the United States Attorney. Defense lawyer then and presented his information to the United States Attorney.

That information, I think it's fair to say, is that they have found him to be of low IQ, but their doctor recommend a adaptive functioning test. Apparently low IQ is -- are composed of two things, as far as it would affect the death sentence. And that is, how you test out, and then what your adaptive functioning is. You may test very low on an IQ scale if you haven't been taught things, but you could be very, I guess, adaptive functioning. It's like street smart.

THE COURT: Right.

MR. MAGLIOLO: So the United States Attorney, in deciding what he was going to recommend then to the DOJ, was interested in how this adaptive functioning was going to play out. Is it something that he should send up first

and then let it play out later, or should he see if that's going to happen anytime soon we get some adaptive functioning result which will help us determine.

It's my understanding that even a low IQ, or what they used to call, I guess, mental retardation, it really doesn't prevent someone from getting the death penalty, but it does prevent them from being executed.

So practically speaking, I think the government's position might be that, if everybody is in agreement that he can't be executed, then why?

THE COURT:  Why would we want to spend the time?

MR. MAGLIOLO:  Exactly.  So we've been talking to Mr. Berg and Mr. Berg is trying to decide what to do that's the best interest of his client, as far as the adaptive functioning.

Adaptive functioning, from Mr. Berg's perspective I think is generally right, as much as it's difficult for me to say, is going to require quite a bit of time, I guess, and effort, because you have to -- you can't just do only now it has to be adaptive functioning as to what he was when he was little, because it has to do with when certain things, the onset is, is determinative of how it comes out, not only standing.

But anyway, the government offered to do --

and it's going to cost a lot of time and money -- so the government offered to present our expert to perhaps do that.  Mr. Berg is considering that, and he's considering if he's going to do it, when he's going to do it, how he's going to pay for it, and all those things, and that's, I think, where we are.

And I'll turn it over to Mr. Berg to see if I was even remotely close.

THE COURT:  All right.

MR. BERG:  Sort of.

MR. MAGLIOLO:  That's what I thought.

MR. BERG:  I concede sort of close.

MR. MAGLIOLO:  Everything but Mr. Berg's client, I think everybody is pretty much in agreement.

THE COURT:  Okay.

MR. BERG:  We did get our client evaluated, and on May 18th we submitted our confidential memorandum to the government, which incorporated in the report from the psychological expert.  We did conclude intellectual disability of an IQ of 57.  In the concluding paragraph --

THE COURT:  That's -- for the Fifth Circuit, I guess, that's not borderline.

MR. BERG:  It's not even close.  It's not even close.  But in the last paragraph of the doctor's report, he said, "You would confirm this conclusion with what's

called an adaptive functioning test." And what adaptive functioning is, it's a way of confirming that the onset of this intellectual disability was before adulthood, because that's another one of the requirements. And the way you do that is you go back to people who have known the individual at earlier life stages and determine that, yes, he was injured, and as a child he couldn't go to school.

In other words, you interview and you document the statements of all these individuals who have known him up to the time that he becomes an adult, to show that that is not a recent onset or something that's been fabricated or learned.

We did that with our mitigation expert who went to Mexico and interviewed all these people, and the doctor used that information in coming to his conclusion. In other words, he didn't --

THE COURT: What conclusion did he come to?

MR. BERG: That he's intellectually disabled.

THE COURT: Yes. But does that have anything to do with the historic part of it?

MR. BERG: It does. Because rather than rely on an individual's narrative, which is often the way it's done when the doctor does an analysis, he relied on the data that was gathered by our mitigation expert in Mexico. So, actually, she was one of the primary sources. The

school, parents, the neighbors, everybody else.  And so, he makes reference to this one test that would be the confirming test.

Now, he is comfortable in his conclusion, and he's told us he's prepared to testify he's intellectually disabled, without qualification.  But he made reference to this one test, and that if we had to go to trial, that would be the test that we would have to do.

But, again, it would require going basically in redoing everything our mitigation expert did, re-interviewing all those people only in the presence of the doctor we'd have them fill out forms because that's part of the --

THE COURT:  They have to interview these witnesses in the presence of the doctor?

MR. BERG:  The doctor would administer --

THE COURT:  Have to be present during the interviews?

MR. BERG:  He would administer the evaluation, and then he would draw his conclusions based on those reports.  So, yeah.

THE COURT:  Are these witnesses that are known and available?

MR. BERG:  They are known, but they're in central Mexico.  And not all of them are literate.  And

there's a slew of them, because that's why we sent our mitigation there.

THE COURT:  So how did the mitigation expert get to them?  Was she able, or he able to draw them to -- who is it, a woman?

MR. BERG:  I'm sorry?

THE COURT:  Mitigation expert, female?

MR. BERG:  She's a female.

THE COURT:  That's what I thought I remembered.

MR. BERG:  We haven't.

THE COURT:  How did she get them to her?  Did she --

MR. BERG:  She went there.

THE COURT:  I know.  But what I'm saying is she didn't get in some Land Rover or something, scoured the country side.  Somehow she had to gather them together; right?

MR. BERG:  We had the collaboration of the Mexican government.

THE COURT:  Okay.  That's what I mean.

There is a way to bring these people, at least theoretically, bring these people to a central point.

MR. BERG:  They're actually mostly close to the City of Cuernavaca, south of Mexico City.

THE COURT:  So what is it that you need to do?

I mean, this is a government -- it seemed to me the government is shifting the burden here, to some extent -- and maybe y'all are in agreement on this -- but what is it that has to be done in order to move this case forward?

MR. MAGLIOLO:  I think we need to find out if, if this could be done in a reasonable amount of time, because it is getting old, then I think the United States Attorney's preference -- and I hate to speak for him because I hate to -- would be to have that information before he forwards his recommendation up to --

THE COURT:  Well, he has not forwarded his recommendation.

MR. BERG:  He has not.

THE COURT:  Okay.  What they have is the mitigation expert's report as a part of the package that's already gone up.

MR. MAGLIOLO:  Yes, Your Honor.

So if it could be done within a reasonable amount of time that was agreeable with the Court and not delay the case anymore than it's kind of already been delayed --

THE COURT:  Well, my concern is perhaps not so much that report, but even with that report, it sounds as though there's going to be another layer or period of bureaucratic consideration that might a month, or maybe

two months, or whatever length of time.

MR. MAGLIOLO:  At least, because then we have to have our expert then.

THE COURT:  Opine and everybody agrees.

MR. MAGLIOLO:  And interview I suppose at least the -- perhaps the defendant and -- because the -- what's the word?  The reservation the government has is we don't know too much about him as a child defendant.  We know about him as an adult, and he seemed to function perfectly in the world as an adult, a little different than you would expect a 57.  And, in fact, when they were determining, trying to determine who set the fire in the warehouse that led to this whole mess, he took on that obligation.  None of our witnesses have said, who interacted with him, have said anything about him exhibiting something that would be consistent with the 57 score.  So that's kind of where we are.

So I think -- again, not speaking for the U.S. Attorney -- that if we can't get that information pretty quickly and we're running out of quickly and based on counsel for defense, we're not going to get it very quickly.  He's not going to let -- they're not going to agree to let the government try to get an opinion from our expert on him who may or may not agree, but obviously if he agreed with defense counsel's position, then that would be

a lot easier to resolve.

So if those two things aren't going to happen, then I think the next move is for the United States Attorney make his recommendation based on the information he's had, including counsel's report at this time, send it up and see what happens.  Obviously, if they don't authorize -- well, he could request a seek or not request a seek.  They're going to do what they want to do.

THE COURT:  Well, I would rather the Department of Justice make a determination.  Period.

MR. MAGLIOLO:  Yes, Your Honor.

THE COURT:  If it's going forward, go forward, and I then I can -- I then think that I would have some authority.  The point is that for me to get some authorization from the Circuit court to do something that we don't even have the limitations and parameters of, is a difficult thing.  And I suspect that -- I mean, I could get on the phone, we could -- I could talk to the Circuit representative, I could tell them all this stuff, but it really has to, in my opinion, be a specific, not a shotgun approach "we need more money," but it has to be something that says, "This is the person who's going to be paid. This is the doctor.  This is what needs to be done."  This is a special and different request from other kinds of requests that are being made under this complex maze of

litigation so that we can get something done on this quickly.

It might take 30 or 40 days to get that approved. Now, if I was a doctor, I would not want to go down to South America and start this process without knowing that I'm going to get some money this year, not next year, or in 2017.

MR. MAGLIOLO: And if not certified, Your Honor, then all of this is kind of -- it's not as important as it is if it were to be certified.

I think the trial team's recommendation to the United States Attorney is we have all the information that we're going to have in a reasonable period of time, make a decision based on the recommendation and send it up.

THE COURT: If you make a decision to seek death, then I'm going to be obligated then to give the defense counsel whatever money they need to go down and get that done, not so much to discourage you from proceeding, because you're going to proceed, but to have that testimony available for the Court and/or the jury.

It may be a law question that needs to be decided. I might just need to decide that issue myself, even of the jury comes back, for example, and says that death is available. I might have to just say it ain't going to happen, based upon the expert testimony. We just

might have to have something like that.

But I hate to forward, to put all that out front, and then the Department of Justice says, "Oh, well, we're not going to go through it."  Or, even worse, "We're going to go through it," and then we end up -- well, we're not going to go through it and get 50-, a hundred thousand dollars of expenses that we wouldn't ordinarily have had to spend.

MR. MAGLIOLO:  There's a mechanism in place if that we -- if it's done later and he finishes his testing, our guy agrees with it, we can send it back up and have them decertify it, so that that's all in the works.  It won't --

THE COURT:  I'd really like to see the government's hand.  I'd like to know where you are.

MR. MAGLIOLO:  Yes, Your Honor.

THE COURT:  Whether or not under the circumstances -- I don't think they've executed in the State of Texas.  I don't believe they're executing people who score a 57.

MR. MAGLIOLO:  No, they do not.

THE COURT:  I think the last one I had was in the mid '60s or something like that.

MR. BERG:  I will tell that when I submitted my recommendation to the government on May 18th, I thought I

had done everything I needed to do for them to make their evaluation and recommendation in Washington, and I still think that's true.

THE COURT:  I think that's where we're going to be.  I think that I'm just going to order -- and you-all tell me how to fashion it to the Department of Justice -- to proceed with the data and information they have, and give us some kind of resolution on this within the next 60 days.

MR. MAGLIOLO:  We're in agreement with that, Your Honor.

THE COURT:  We're not going to have a problem with speedy trial on this, as far as from those that have been worked out.  What about death penalty case?  I guess we can always say that it just isn't ready, it's complex and, therefore, death penalty doesn't -- is not a problem.

MR. MAGLIOLO:  And until this gentleman is not -- defendant is resolved, then we're not going to be able to really know how we're going to try this, who's going to be and they're going to complain about.  I believe the law permits us to try everybody who is death eligible together.  So they need to know that, too, Judge, so they can decide their trial, the death eligible gentleman needs to be -- so he can try his.

THE COURT:  Can I get a proposed order or

something saying that, "We've done our due, and we're ready, and the Department of Justice"?

MR. MAGLIOLO:  We'll do it, Your Honor.  I think --

THE COURT:  Propose and send it to us?

MR. MAGLIOLO:  Yes, sir.  I think what we'll do is say something to the effect that the Court orders that the government give their decision within a period.

THE COURT:  You can leave it blank.  I'm going to put a date certain in there so that there is some desire to move forward, and perhaps by that date we're looking now at sometime the later part of September, we're talking 60 days.  We still have to look at the possibility of modifying the scheduling order, but at least we'll, if that happens, we'll know how the modification ought to occur.  Because there are no pretrial motions pending currently, in a real sense.  Okay?

MR. MAGLIOLO:  Thank you, Your Honor.

THE COURT:  Would you do that gentlemen?

MR. MAGLIOLO:  Yes, sir.

THE COURT:  Yes, sir?  Was there something else, Mr. Berg?

MR. BERG:  No, Your Honor.

THE COURT:  All right.  And I think that, as far as your -- your motion and memorandum to the Court

earlier, I've addressed that, and I'm not sure that's going to solve any or all problems that you-all are going to be having, but I think I have to do this in a way that works us toward the goal of getting this matter piecemeal done, I guess is the right way to say it.

Yes, sir, Mr. Flood?

MR. FLOOD:  Thank you, Your Honor.

We do have motions I believe due next week, in terms of the existing scheduling order.

THE COURT:  Right.

MR. FLOOD:  I do need to sit down with the government and go through, try to get up to speed.  If I do need additional time, I just wanted to give the Court a heads up.  I may file request for additional time to file motions after that meeting, if that's all right.

THE COURT:  All right.  I'll be ready for it.

MR. MAGLIOLO:  And, obviously, the government won't have any problem.

THE COURT:  Yes.  I suspect that.

MR. FLOOD:  Thank you, Your Honor.

THE COURT:  Anything else, gentlemen?

MR. MAGLIOLO:  No, Your Honor.

MR. BERG:  No, Your Honor.

MR. ODOM:  I'd like to briefly address the Court ex parte.

THE COURT:  All right.

MR. ODOM:  Shouldn't take very long.

THE COURT:  Just yourself?

MR. ODOM:  Yes, sir.

THE COURT:  Okay.  Why don't you come up to the bench or around so that we can -- well, might not need to, if they all leave.  Are you-all leaving or what?

MR. MAGLIOLO:  Clear them out.

THE COURT:  Why don't you step right in that vacuum there.  And if you need to come closer, if you're concerned about that.

MR. ODOM:  Yes, sir.

THE COURT:  Is that U.S. Attorney people?

CASE MANAGER:  Interns.

THE COURT:  You-all are not interning with the U.S. Attorney's Office, are you?

UNIDENTIFIED:  No, sir.

THE COURT:  All right.

**(The following was held ex parte)**





MR. ODOM:  Great.  Thank you, Judge.

THE COURT:  Okay.  Thank you.  Have a good day.

**(Recessed at 9:56 a.m.)**

**COURT REPORTER'S CERTIFICATE**

I, Johnny C. Sanchez, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/_____
Johnny C. Sanchez, CRR, RMR