UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

UNITED STATES OF AMERICA                 .
                                         .  Criminal Action
VERSUS                                   .  No. H-10-CR-459
                                         .
WILMAR RENE DURAN-GOMEZ,                 .  Houston, Texas
                                         .  May 8, 2025
                                         .  1:34 p.m.
                     Defendant.          .
. . . . . . . . . . . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE KENNETH M. HOYT

**SENTENCING**

APPEARANCES:

FOR THE UNITED STATES OF AMERICA:

        Ms. Jill Stotts
        Assistant United States Attorney
        UNITED STATES ATTORNEY'S OFFICE
        1000 Louisiana
        Suite 2300
        Houston, Texas  77002
        713.567.9691
        jill.stotts@usdoj.gov


FOR THE DEFENDANT:

        Ms. Julie L.B. Stelzig
        Assistant Federal Public Defender
        FEDERAL PUBLIC DEFENDER'S OFFICE
        District of Maryland
        6411 Ivy Lane
        Suite 710
        Greenbelt, Maryland  20770
        301.344.0600
        julie_stelzig@fd.org

        PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
    TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION


Gayle Dye, CSR, RDR, CRR - 713.250.5582

APPEARANCES

(continued)

FOR THE DEFENDANT:

Mr. James Wyda
Assistant Federal Public Defender
FEDERAL PUBLIC DEFENDER'S OFFICE
District of Maryland
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland  21201
410.962.3962
FAX:  410.962.0872
jim_wyda@fd.org

Mr. Neal Davis, III
Mr. Wendell A. Odom, Jr.
LAW OFFICES OF WENDELL ODOM & NEAL DAVIS, III
440 Louisiana
Suite 200
Houston, Texas 77002
713.223.5575
FAX:  713.224.2815
neal.davis3@sbcglobal.net
wendellodom@aol.com


PROBATION OFFICERS:

Ms. Cynthia Reyes
Ms. Megan Chester


INTERPRETERS:

Mr. Pablo Donatti
Mr. Ramon de Villar, Jr.


COURT REPORTER:

GAYLE L. DYE, CSR, RDR, CRR
515 Rusk, Room 8004
Houston, Texas  77002
713.250.5582


Gayle Dye, CSR, RDR, CRR - 713.250.5582

INDEX OF WITNESSES

Page

FOR THE UNITED STATES OF AMERICA:

**VICTOR MANUEL ESPINOZA-DIAZ**

DIRECT EXAMINATION BY MS. STOTTS                    9
CROSS-EXAMINATION BY MS. STELZIG                   18
REDIRECT EXAMINATION BY MS. STOTTS                 24

**PEDRO ANTONIO PORTILLO**

DIRECT EXAMINATION BY MS. STOTTS                   26
CROSS-EXAMINATION BY MS. STELZIG                   33
REDIRECT EXAMINATION BY MS. STOTTS                 38

**VICTIM IMPACT STATEMENTS:**

Mr. Jorge Sagastume-Madrid                         40
Mr. Victor Manuel Espinoza-Diaz                    42
Mr. Pedro Antonio Portillo                         43

Gayle Dye, CSR, RDR, CRR - 713.250.5582

PROCEEDINGS

THE COURT:  Good afternoon, ladies and gentlemen. This is Cause Number 20 -- I'm sorry, not 20, it's 10 -- 10-459, the United States of America versus Wilmar Rene Duran-Gomez.

Representing the government in this matter?

MS. STOTTS:  Good afternoon, your Honor.  Jill Stotts for the United States.

THE COURT:  And representing and speaking for Mr. Duran-Gomez.

MS. STELZIG:  Good afternoon, your Honor.  Julie Stelzig from the Maryland office of the Federal Public Defender here on behalf of Mr. Duran-Gomez.  And I'm joined at counsel table by Mr. James Wyda also from the Maryland Federal Defender's office, Wendell Odom, and Neal Davis.

THE COURT:  All right.  Very good.  Thank you.

MS. STELZIG:  Thank you.

THE COURT:  All right, ladies and gentlemen, I appreciate your presence here this afternoon; and I believe we're ready to proceed in this matter.  I have a note here from the government in this matter that might require initial address -- may need to address it initially.  Let's go ahead and do that.

Ms. Stotts, what is the status of the witnesses as well as your concerns about the -- about the report?

MS. STOTTS:  Judge, the witnesses -- there are two

Gayle Dye, CSR, RDR, CRR - 713.250.5582

fact witnesses that will be presented for the Court's consideration in sentencing.  They also will give victim impact statements.  So, I'll find out how the Court wants to handle that, whether that's at the end or whether that's at a break after they're done testifying.

There's also one other witness who will just be giving a victim impact statement, not testimony.

THE COURT:  Have you spoken with -- with opposing counsel, with Ms. Stelzig, regarding how she would prefer? Because I'm not sure there's a -- I'm not sure if there's an entitlement to a response by the defense; but, certainly, I don't want to go through a process where we're going back and forth in this.

And if there's a desire by the defense to be able to respond, if it's appropriate, to any victims' impact statements -- witness -- victims' impact statements or any of the other, I would want to know what that is.

MS. STOTTS:  Judge, with regard to the actual factual testimony, the defense does have a right to respond to that. With regard to victim impact, which is why I'm going to make a for sure separation, they do not have a right to respond to that.

THE COURT:  All right.  Now, as far as witnesses are concerned, do you consider -- and I'll take a response, as well, from Ms. Stelzig -- whether or not this is cross-examination

Gayle Dye, CSR, RDR, CRR - 713.250.5582

that is permitted or simply a response to the testimony?

MS. STOTTS:  Judge, I believe she is entitled to cross-examination.

THE COURT:  Okay.

That's the same page that you're on, ma'am?

MS. STELZIG:  Yes, your Honor.

THE COURT:  All right.

MS. STELZIG:  And I don't have a -- I do not have a strong preference how the testimony is presented in terms of whether the factual testimony is presented by itself separated by the victim impact testimony.  I would defer to whatever the witnesses and the government would prefer in that regard.

THE COURT:  All right.

Okay.  Ms. Stotts, what do you anticipate the length of the direct examination to be?

MS. STOTTS:  Ten to fifteen minutes for each.

THE COURT:  Ten to fifteen?

MS. STOTTS:  Yes, your Honor.

THE COURT:  And that's your part?

MS. STOTTS:  Yes, your Honor.

THE COURT:  All right.  And the victim impact -- the number three person, is that something that would just be simply stated for the record or is it in writing?

MS. STOTTS:  He is going to speak, your Honor.  It is not in writing.  And he is the brother of the deceased victim

Abelardo Sagastume.  His name is Jorge Sagastume.

THE COURT:  Okay.  Very good.

All right.  Let me ask defense whether or not there is any particular manner in which you want to proceed in this.  I think probably I should at least get -- I think we have identified the case, as well as the persons -- the lawyers who will be speaking.

I would prefer to have the testimony taken now so that if there is any argument or statement to be made about it, I've got a voluminous volume of material.  It may be that some of what might be testified to is, obviously, going to -- have already been responded to, directly or indirectly, by the defense.

But I really don't want to have, as I say, the back and forth.  So, why don't we do the witness testimony separately or at least out front; and then, we'll move to the -- and cross-examination, certainly.  And then, I'll move to the -- to the sentencing portion of the case.

MS. STOTTS:  Yes, your Honor.

THE COURT:  Okay?  So, who is your first witness?

And may I have the witnesses please stand and raise their right hands at this time, those that will be testifying, the two that will be testifying.

(Two witnesses were sworn.)

MR. VICTOR MANUEL ESPINOZA-DIAZ:  I do.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

THE COURT:  Both respond?

MR. PEDRO PORTILLO:  (Through interpreter Donatti) I swear.

THE COURT:  All right.  Thank you.  You may be seated.

Call your first witness, please, ma'am.

MS. STOTTS:  Victor Espinoza.

THE COURT:  Sir, if you'd come -- yes.

Take the witness stand, please, right here on my left.

If you would make the adjustment in the seat, pull the microphone back to you.

I'm not really sure he needs to speak into the microphone.

INTERPRETER DONATTI:  Correct.

THE COURT:  He'll be speaking through you.  So, turn that toward you, please.

INTERPRETER DONATTI:  Yes, sir.

THE COURT:  And just make sure he hears the questions and hears your answer.

Let's proceed.

MS. STOTTS:  Thank you, your Honor.

//

//

//

//

(The witness, **VICTOR MANUEL ESPINOZA-DIAZ,** called on behalf of the government, was sworn previously and testified through an interpreter.)

DIRECT EXAMINATION

BY MS. STOTTS:

**Q**   Can you state your name for the record, please.

**A**   Victor Manuel Espinoza-Diaz.

**Q**   And how old are you, sir?

**A**   Forty-nine years old.

**Q**   Back in 2006, were you here in Houston in a warehouse?

**A**   Yes.

**Q**   And that was -- do you remember what time of year it was?

**A**   The month of November.

**Q**   How did you get to that warehouse?

**A**   By the "coyotes."

**Q**   When you were there, at some point were there other individuals there?

**A**   Yes.

**Q**   Do you know approximately how many?

**A**   There were many because there were several rooms and each room had approximately 12 to 15 people.

**Q**   At some point in November of 2006, was there an attempted fire in the warehouse?

**A**   Yes.

**Q**   Let's talk for just a second about prior to that.  Prior to

Gayle Dye, CSR, RDR, CRR - 713.250.5582

that fire, how were you treated at the warehouse?

**A**   Well, we arrived to the warehouse.  They put us in the room, and they would give us only one mushroom soup every day.

**Q**   Were you beaten or anything like that prior to the fire?

**A**   No, not before.

**Q**   Who was there as guards or leaders at the warehouse?

**A**   There were three persons, two plus the one who's present here.

**Q**   And could you tell who was in charge out of those three people?

**A**   He was the principal one.

**Q**   The one here today?

**A**   Yes.

**Q**   After the fire, did things change?

**A**   Yes.

**Q**   How did they change?

**A**   They got us out of the warehouse in vans.  They took us out, and they put the fire out.  And then, they brought us back in.

**Q**   When they brought you back in, who was there?

**A**   The three of them, he and two more.

**Q**   What happened after they brought you back into the warehouse after the fire?

**A**   They took our clothes and put us in a room.

**Q**   When you say they took your clothes, what clothing did they

take?

A    The clothes that we were wearing, all of it.

Q    At that point, were you nude?

A    Yes.

Q    Prior to the fire, had you been able to wear clothing inside the warehouse?

A    Yes.

Q    But after the fire, no?

A    No.

Q    Who directed or who told you to undress?

A    The other two who were there.

Q    Okay.  And then, what happened after they told you to undress?

A    They beat them up because of the fire that they had caused.

Q    Did they put you in a room or did they keep you in the main area?

A    In a room.

Q    Approximately, how many people were in that room?

A    Twelve people.

Q    While you were in there -- let's talk about the first day, okay, the day of the fire.  Were you beaten at all that day?

A    No, not that day.

Q    When did that start?

A    Afterwards when they called our families and they said that they had to pay money because of the fire.

**Q**    And if your family didn't pay money, what was going to happen?

**A**    That was the tragedy that happened, that they killed the people.

**Q**    Tell the Court what happened in that room.

**A**    They beat them up and they would have them talk to their families.  And the family told them to stop beating us up, that they were going to call Immigration; and that's when they started beating them up hard.

**Q**    When you say "beating them up," were you a part of those beatings?  Did you get beat?

**A**    Yes.  Also, yes.

**Q**    Was it everyone in that room?

**A**    Everyone.

**Q**    Tell the Court what you mean when you say they were beating you.  What were they doing?

**A**    They beat us up with brooms -- with broomsticks, with electrical wires; and they would kick us up; and they had us on the floor in nylon bags, in plastic bags lying down face down.

**Q**    Who was doing the beatings?

**A**    The three of them.  But he would also give the orders for the other two to beat us up.

**Q**    When you say "he," you mean the man that's here today?

**A**    Of course, yes.

**Q**    And you said he would give orders for the other two to beat

you?

**A**    Yes.  And he also -- he also hit us.  He was -- he broke a bottle and he hit one of the ones who died in the back with the bottle.  He was always drunk.

**Q**    Did he do anything else with the bottle?

**A**    No.  He hit him in the back with it.  That's it.

**Q**    Did you see anyone get set on fire while they were in that room?

**A**    No.  I didn't see it, but they said that supposedly was Hector.

**Q**    Okay.  But you didn't see that part?

**A**    No, no.

**Q**    When you were in the room, how often would -- the man who's here today, Duran, how often would he come into the room?

**A**    Often.  Often.

**Q**    And when he came in, what was the purpose?

**A**    To hit us.  And, also, he would tell the others to put us face down so we wouldn't see his face.

**Q**    Could you tell who was actually doing the beatings?

**A**    No.  But we recognized them by their voices, and it was the three of them.

**Q**    Okay.  So, you couldn't see them because you were face down?

**A**    Yes.

**Q**    But you knew who they were?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

**A**  Yes.

**Q**  Would you be beat at times when Duran, the man here today, was not at the warehouse?

**A**  No.

**Q**  He was always a part of that?

**A**  Yes.

**Q**  What types of injuries did you end up with because of these beatings?

**A**  Traumatized and with a sore body.

**Q**  Did you see or could you tell that Hector and Abelardo -- those are two other people who were in the room with you, right?

**A**  Yes.

**Q**  They're the ones that ended up --

**A**  Well, we were 12.

**Q**  Okay.  And they ended up -- they're the ones that ended up dying, right?

**A**  Yes.

**Q**  Were they getting beat the same as you or more than you or do you know?

**A**  More.  Because the family told them to stop beating them up and -- because they were going to call Immigration.  And that's why he ended up killing them.

**Q**  Did that make him mad?

**A**  Yes.

**Q**  At some point, you were removed from that room, right?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

**A**    Yes.  And then, he -- he shot the ground.  I don't know.  Maybe not with the intention of hitting us, but he did that when we were lying face down.

**Q**    Shot at the ground with a gun?

**A**    Yes.

**Q**    And did it hit anybody?

**A**    No, no.

**Q**    But could you hear it?

**A**    Yes.

**Q**    And where did the casing of the bullet go?

**A**    That, I don't know because we were -- our faces were covered with the plastic bag.

**Q**    Why did you have a plastic bag on your face?

**A**    So that we wouldn't recognize the three of them physically.

**Q**    So, when they would beat you, did you always have a bag on your head or were you -- were there other times that you didn't?

**A**    Always, always, yes.

**Q**    Were you sitting up?  Were you laying down?  Or was that both?

**A**    Lying down.  When we were beaten up, it was lying down and they would hit us with their shoes on the head or the back.

**Q**    You were not there when Abelardo and Hector actually died, right?

**A**    I was there.  The only thing is that before that, they took

me out of that room and moved me into another one.

Q    And that's what I meant:  You were in the warehouse, correct, but not in the same room?

A    When they beat us all up, we were there -- I was there; but when they were agonizing, they took all of us out of there.

Q    At the time that you were removed from the group -- or from the room, what was the condition of Abelardo and Hector?

A    Already agonizing.

Q    Did they appear as though they were going to live?

A    No, no.

Q    Did you ever hear them asking the three guys to stop or to not do what they were doing?

A    Sorry.  What?

Q    Did you ever hear Abelardo or Hector begging or asking the man here today, as well as the other two, to stop beating them?

A    Yes, yes.  Of course, yeah.  They were begging -- asking not to be killed, to have compassion.

Q    Were you scared while you were in that room?

A    Oh, yes, yes.

Q    Who at that point, while you guys were in that room, seemed to be in charge?

A    The three of them.

Q    All three of them?  Or was somebody more in charge than others?

A    No.  The one who is present here, he's the one who was in

charge.

**Q**   How did you know that or what made you think that?

**A**   Oh, because the others called him "jefe," boss.

**Q**   After you were released -- you were released when the warehouse was found by officers, right?  That's when you were found?

**A**   Yes.

**Q**   Did you see -- Duran, the man that's here today, did you see him after you were rescued from the warehouse?

**A**   Yes.  And he asked us if we recognize him; and I said, "Yes."  And I said, "Remember the persons that were killed that were begging you --"

**Q**   And what did he said?

**A**   "-- not to be killed?"

And he asked me why had I recognized him, that he was going to get jail time.

**Q**   And then, did you see him again?

**A**   He -- I saw him again talking to another defendant for a long time.  And he said that, well, they were going to give him a good jail time and -- but that he didn't regret it, that what he regretted was not having done a good job.

**Q**   And what did you take that to mean?

**A**   I understood that if he had done a good job, he would have killed me also so I wouldn't be testifying right now.

**Q**   Did you ever see Abelardo and Hector after you left the

room where they were still agonizing?

**A**    Yes.  When they moved them to the other room, there was a window that you could see through; and I saw when they were bringing both of them in a plastic bag.

**Q**    And that would have been after they were dead?

**A**    Yes.

MS. STOTTS:  Your Honor, I'll pass the witness.

THE COURT:  All right.

CROSS-EXAMINATION

BY MS. STELZIG:

**Q**    Good afternoon.

**A**    Hi.

**Q**    You said you were there at the warehouse in November of 2006 when law enforcement first came to the warehouse, correct?

**A**    Yes.

**Q**    And you were there with two other people?

**A**    Two other people.

**Q**    And the three people you mentioned, including Mr. Duran-Gomez here today, were not at the warehouse at that time?

**A**    They were not.  It was just three of us, me and two other immigrants.

**Q**    And you had clothing on when law enforcement arrived at the warehouse, correct?

**A**    Yes, I already had clothing.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Q    And, in fact, law enforcement asked you to remove your clothing to take photographs of you.

Do you remember that?

A    Also that, yes.

Q    And they took photos of your entire body?

A    The whole body.

Q    And there were no injuries in any of those photographs?

A    I don't know.  I felt -- I was in pain.

Q    But you don't recall having any specific injuries on that day?

A    No, no.  They did beat me up but injuries, no.

Q    And they interviewed you on that day, correct, law enforcement?

A    Yes, yes.

Q    And they showed you photographs?

A    (In English) Uh-huh.

Q    And asked you if you recognized people in the photographs, correct?

A    Yes, yes.

Q    And do you recall being shown an array of photographs that included a picture of Mr. Duran-Gomez?

A    Yes.

Q    And you recall that you recognized him when you saw his picture, correct?

A    Yes, yes.

Q    And you made handwritten notes saying, "This is the man who would come to the warehouse and he would call out the names of when it was time for people to leave."

Do you remember that?

INTERPRETER DONATTI:  Could you repeat that.

MS. STELZIG:  Oh, I apologize.

BY MS. STELZIG:

Q    You made a notation that Mr. Duran-Gomez was the man who would come to the warehouse and call out names when it was time for people to leave, correct?

A    Yes, yes.

Q    And you also said -- and this was on November 22, 2006. You also told law enforcement that you did not see Mr. Duran-Gomez hit or beat anyone, correct?

A    No.  He beat us, yes.

Q    So, if I have a report from law enforcement taking notes and writing it up with a statement by you saying that Mr. Duran-Gomez, you had not seen him hit or beat anyone when you spoke to law enforcement on November 22, 2006, are you saying that that's a mistake?

A    How could I not see him if I was a victim?

Q    Sorry.  Maybe my question isn't clear.  According to -- and I'm happy to show you the law enforcement report if that might help refresh your recollection.  But when you were interviewed on November 22, 2006, according to the law enforcement who

interviewed you, you recognized Mr. Duran-Gomez as being at the warehouse?

A    Yes, yes.

Q    But you told law enforcement that day that you did not see him hit or beat anyone.

A    No.  Of course, he beat us.  He beat the three of us.  He beat us all, the three of them did.

Q    So, just to clarify, I understand that in later interviews and here today you have testified and told law enforcement that Mr. Duran-Gomez did beat people, including you.  I'm just talking about the very first time you were interviewed on November 22, 2006.

A    No.  It can't be that I said he didn't beat us because he did beat us.

Q    So, if law enforcement officials put that in their notes and in their report on that day, they made a mistake?  Is that your testimony?

A    Well, I don't know.  Perhaps.

Q    So, after you were interviewed for that first -- after that first time, there were Immigration proceedings that were begun against you, correct?

A    Yes, yes.

Q    And you were in Immigration custody?

A    Yes.

Q    And you had expected that you would be deported from the

country, correct?

**A**    I wasn't thinking that, no.  Nothing came to mind, no.

**Q**    But you have been able to stay in this country because you've been cooperating with the government in this case; is that correct?

**A**    Yes, yes.

**Q**    And you've been able to work?

**A**    Yes, yes.

        MS. STELZIG:  Court's indulgence.

BY MS. STELZIG:

**Q**    Do you remember going for an in-person photo -- I'm sorry, in-person lineup to try to make an identification in 2008?

**A**    Yes, yes.

**Q**    And you did not identify anyone that day, correct?

**A**    Him, it seems, yes.

**Q**    Is it your testimony that you did identify Mr. Duran-Gomez that day?

**A**    Yes, I did.  Him, yes.

        MS. STELZIG:  Brief indulgence.  Sorry.  Briefly.

BY MS. STELZIG:

**Q**    So, I have a report here that I will show you in a moment to refresh your recollection, and it's a report that was prepared by the agent in this case about the lineup that was done in 2008.  And it says that Espinoza-Diaz did not identify anyone in the live lineup.

                Gayle Dye, CSR, RDR, CRR - 713.250.5582

Would you like to see a copy of this report?

**A**   Well, it might be some other time because I was brought twice to see that.

**Q**   There were two times -- I'm sorry.  Your testimony is that you were brought two times to look at a lineup of individuals?

**A**   Yes.

**Q**   And that in one of those lineups you identified Mr. Duran-Gomez?

**A**   Yes.

**Q**   Now, there were other people at this warehouse when you were there.  I'm talking about when there were other people there.  Different people would come and go, correct?

**A**   Other people.  Yes, we were many.

**Q**   And there were people other than immigrants who would also come to that warehouse sometimes, correct?

**A**   Yeah.  There was a woman.

**Q**   And you mentioned that there were times when you had a bag over your head when you were beaten; is that correct?

**A**   Yes.

**Q**   So, it's fair to say you couldn't see what was happening when these events were occurring?

**A**   No.  But I did know the voices of them three.

**Q**   Have you been -- sorry.

MS. STELZIG:  Let me retract the question.

Sorry.  One second.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

BY MS. STELZIG:

Q    And you made an identification of one of the other two men who you said were in the warehouse, correct?

A    Yes.  The two of them.  Him and the two of them.

MS. STELZIG:  No further questions.

THE COURT:  All right.  Thank you very much.

Anything else on redirect?

MS. STOTTS:  Just briefly, your Honor.

REDIRECT EXAMINATION

BY MS. STOTTS:

Q    This case was back in twenty -- this case is almost 19 years old, right?  When this happened to you in 2006, it was almost 19 years ago?

A    Yes, yes.

Q    Is it possible that some of the things that you said or happened back in the beginning that you don't recall completely?

A    I really don't know.

Q    Is there any doubt in your mind about who committed the beatings on you while you were in that warehouse?

A    No, no, no doubts.  I know well that it was him and two more.

Q    And when -- when he, the man here, Duran, and the two others were not in the room beating you, were you allowed to have the bags off of your head at that point?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Espinoza-Diaz - Redirect/Stotts

A    Yes.  It was only when the three of them were present in the room they would cover us with the plastic bag.

Q    Could you see what state the other people in the room were in when you didn't have the bag on your head?

A    Yes, yes.

Q    And what was the condition of Abelardo and Hector?

A    Dead.  In that condition, about to die.

Q    When the beatings were happening, did it appear as though --

THE COURT:  Counsel, I don't know how far you're going and what you're doing.

MS. STOTTS:  I have one other --

THE COURT:  You can argue with me, but I don't want to make this like we're having a trial.

MS. STOTTS:  I have one other question, your Honor.

THE COURT:  All right.

BY MS. STOTTS:

Q    When the beatings were occurring, did it appear that Abelardo and Hector were getting worse than everybody else in the room?

A    Yes, yes.

MS. STOTTS:  That's all the questions I have.

THE COURT:  All right.  Who is your next witness?

MS. STOTTS:  Pedro Portillo.

THE COURT:  You may step down, sir.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Yes, I did swear him in.

Sir, if you'd come forward and have a seat.

(The witness, **PEDRO ANTONIO PORTILLO,** called on behalf of the government, was previously sworn and testified through an interpreter).

THE COURT:  All right.  Proceed.

DIRECT EXAMINATION

BY MS. STOTTS:

Q     Mr. Portillo, will you state your name for the record.

A     Pedro Antonio Portillo.

Q     How old are you?

A     Twenty-four years old.

Q     Were you in the same warehouse that Mr. Espinoza just talked about?

A     Correct.

Q     Can you tell the Court when you were there, approximately when you were there?

A     Do you need an exact date?

Q     No.  Just an approximate date.

A     Talking about the days -- for around 22 days.

Q     And were you also there in November and a little bit of December -- or I'm sorry.  Were you also there in November of 2006?

A     Yes.

Q     Were you there at the same time as Victor Espinoza?

**A**      Yes.  Of course, of course.

**Q**      We talked about the fire, and the Court's heard about that portion of you guys being removed from the warehouse and being brought back into the warehouse, correct?

**A**      Yes, correct.

**Q**      What happened to you after the fire happened in the warehouse?

**A**      They took us out in some vans.  Then, they put out the fire.  They brought us back in.  And when they brought us into the garage, they told us to take our clothes off.

**Q**      Was there a suspicion of who had started the fire?

**A**      Not at that exact time, no.

**Q**      At some point, was there a suspicion of who started the fire?

**A**      Right.

**Q**      Who was it?

**A**      Hector.

**Q**      Did the people who were in charge of the warehouse find out that Hector was involved in starting the fire?

**A**      Yes.

**Q**      Did they also believe that Abelardo Sagastume had been a part of starting the fire?

**A**      Right.

**Q**      What room were you placed in after the fire?

**A**      In a room with all the immigrants.

Q    Was it the same room as Victor Espinoza?

A    Correct.

Q    And Abelardo and Hector?

A    Correct.

Q    Who was at the warehouse once you were moved into that room?

A    "Chino," "Pelon," and Mr. Duran who is present here.

Q    Who was in charge?

A    Mr. Duran.

Q    How do you know that?

A    Because everybody paid attention to what he said.

Q    And what did he say after the fire happened?  Did he give any instructions?

A    Yes.

Q    What were they?

A    To take our clothes off, to be put back in the room where we were, and to have our hands and feet tied and be placed face down.

Q    And that was the same day as the fire?

A    Correct.

Q    Were you hurt in any way that day?

A    Yes.

Q    Tell the Court what happened.

A    We were -- our hands and our feet were tied, and they started hitting us with broomsticks, with electrical wires, with

toe-steel shoes -- boots, toe-steel boots.

Q    Who is "they"?  Who was doing that?

A    Duran, "Chino," and "Pelon."

Q    All three of them?

A    Yes.

Q    How long did that last that day, approximately?

A    Approximately, two hours.

Q    How many people do you remember being in that room?

A    About 12 people.

Q    Was everyone being beat?

A    Yes, correct.

Q    How often were these beatings happening?

A    Every day.

Q    Were they happening while -- or let me ask you this:  Was Duran -- Mr. Duran at the warehouse every day?

A    Yes.  He would always come.

Q    Did he come and go or did he stay there?

A    He would come and go.

Q    What about "Pelon" and "Chino"?  Would they come and go or would they stay?

A    They would stay there.

Q    When Duran was not at the warehouse, what was the environment in your room?  Were you guys being beat?  Were you just sitting there?  What was going on?

A    They would not beat us as much as when Mr. Duran was

present.

Q    What would happen when he was present?

A    When he was present, it was a given that they were going to beat us, they were going to tie our hands and feet.

Q    Would you have -- did you ever have a bag placed over your head?

A    No.

Q    Did others in the room have that occur?

A    Yes.

Q    What about with Abelardo and Hector?  What was happening with them?

A    Since they were mainly the suspects who -- suspects of having started the fire, they were the ones that were beaten more.

Q    Did you see either one of them get set on fire?

A    Hector.

Q    What happened?

A    One day they were beating Hector up.  That's the day that they broke the bottle and introduced it into Hector's rectum. And so, they -- it was an alcohol bottle, and they poured it over his back, and they lit up a lighter, and they burn his back.

Q    Who did those things?  Who inserted the bottle into his rectum and who set his back on fire?

A    Mr. Duran put the bottle up his rectum and "Chino" was the

one who lit up the lighter.

Q    And you saw this happen?

A    Yes.

Q    What type of injuries did you end up with as a part of these beatings -- as being a part of these beatings?

A    I had injuries on my legs, my back, and my face.

Q    You were not there when officers came to the warehouse, correct?

A    Yes, correct.

Q    You had been released by that point?

A    Correct.

Q    Did you have those injuries at the time of your release?

A    Yes.

Q    At some point, you were moved out of the room with Hector and Abelardo into a different room, correct?

A    That they moved us to another room?

Q    Right.

A    Yes.  They moved me to a room separate from where Hector and Abelardo were.

Q    When you left Hector and Abelardo, what did they look like?

A    Very bad.

Q    Could they walk?

A    With great difficulty.

Q    Were they eating?

A    No.

**Q**    Could you hear them talk or make noises?

**A**    The day that they died, I only heard their crying.

**Q**    I know that you've said that you were beaten by the three individuals, "Chino," "Pelon," and Duran, right?  Can you tell the Court specifically what was going on in that room?

**A**    When Mr. Duran arrived -- well, they kept us tied, our hands and our feet tied, because Mr. Duran had given the order they should never release us from our ties.  They would release us only to eat.

But when he was present, they would always beat us up, they would always cause us some type of harm.  He at one point stood up on my ankles with his steel-toed boots trying to break my ankles.

**Q**    And when you say "he," who is that?

**A**    Mr. Duran.

**Q**    You left the room prior to Abelardo and Hector actually dying, correct?

**A**    Right before.

**Q**    Did you ever see them again?

**A**    No.

**Q**    Did you ever see Duran again?

**A**    No.

**Q**    So, after their deaths, you didn't see him again?

**A**    No.

**Q**    Did you see "Pelon" or "Chino" again?

**A**     Only "Chino."

**Q**     How long was it after Abelardo and Hector died that you were released from the warehouse?

**A**     I think it was four days after.

          MS. STOTTS:  I'll pass the witness.

          THE COURT:  All right.

                    CROSS-EXAMINATION

BY MS. STELZIG:

**Q**     Good afternoon.  You were first interviewed by law enforcement in this case in April of 2007, correct?

**A**     Correct.

**Q**     And they found you in California and interviewed you there, correct?

          INTERPRETER DONATTI:  California?

          MS. STELZIG:  In California.

          THE WITNESS:  Correct.

BY MS. STELZIG:

**Q**     And you were interviewed with another individual, Mr. Abraham Melendez, correct?

**A**     Correct.

**Q**     And you were interviewed in Spanish by law enforcement; is that correct?

**A**     Yes, correct.

**Q**     And then, the agent translated what you said into English for someone else who was taking notes, correct?

**A**    Yes, correct.

**Q**    And on that day, you were shown some photographs and asked if you recognized the people in the photographs, correct?

**A**    Yes.

**Q**    And included in those photo arrays was one that included a picture of Mr. Duran-Gomez, correct?

**A**    Yes, correct.

**Q**    And you did not identify him, correct?

**A**    I don't recall.

**Q**    If I can show you what has been --

         MS. STELZIG:  Sorry.  I'll mark this as Defense Exhibit 1.

              Just for purposes of the record, I'm showing the witness documents that had been Bate-stamped 11-24 through 11-41; and these were produced in discovery; and they're Photospreads A through Q.

BY MS. STELZIG:

**Q**    Do you recognize these documents that I've just handed you?

**A**    Yes.

**Q**    And you can see the date.  It says April 16th, 2007?

**A**    Correct.

**Q**    Okay.  And it says, "Viewed by Pedro."

              Do you see that?

**A**    (In English) Uh-huh.

**Q**    And that's you, correct?

**A**    Yes, correct.

**Q**    So, in the first photo array, there's no notation that you identified anyone; is that correct?

**A**    Correct.

**Q**    And if we go to Photospread B, the second page, there's no notation that you recognized anyone on that page either, correct?

**A**    Correct.

**Q**    Now, if we go to the next page, Spread C, there, you do recognize someone who you said was an illegal alien; and you put your initials there, correct?

**A**    Correct.

**Q**    Okay.  And if you go to the next page, page D, there, you recognized Mr. -- well, you recognized an individual on the top left.

Do you recognize who that individual is?

**A**    Yes.

**Q**    And who is that?

**A**    Mr. Victor.

**Q**    Mr. Victor, okay.

And you see this note here that says, "He was beaten once by 'El Chino'"?

**A**    (In English) Uh-huh.

INTERPRETER DONATTI:  Uh-huh.

//

Gayle Dye, CSR, RDR, CRR - 713.250.5582

BY MS. STELZIG:

Q    And he became a cook after the guards fled.

Do you see that?

A    Yes, correct.

Q    I'm not going to make you go through all of these, but I did want to direct your attention to one more.  On the last page, Photospread Q, if you can look at the top middle picture. And you identified that person saying he looks like "El Chino" but you weren't sure; is that correct?

A    Correct.

Q    And that's the same "El Chino" you were just testifying about a little bit ago, correct?

A    Yes, correct.

Q    So, when you were interviewed by law enforcement, you described a person who was hurting you as "El Gordo," correct?

A    Correct.

Q    And you didn't identify in any of these photo arrays the person you were describing as "El Gordo"?

A    Yes, correct.

Q    And then, in March of 2008, you came and you participated in a -- what's called a live lineup where individuals are there in person in front of you and you were asked if you recognized any of the individuals.

A    Yes, correct.

Q    And you did that one time, correct?

**A**      Yes.

**Q**      And do you recall being there with Mr. Victor Espinoza?

**A**      Yes.

**Q**      And you did not identify anyone during that live lineup, correct?

**A**      I don't recall.

**Q**      You mentioned that you left the warehouse and you were -- let me back up.  First, you mentioned that you were moved to another room in the warehouse before you left?

**A**      Correct.

**Q**      And that was after your family had finished paying your smuggling fees, correct?

**A**      Yes.

**Q**      And then, after that, you got a ride to California, correct?

**A**      Yes.

**Q**      And that was in one of Mr. Duran's vans for his transportation company, correct?

**A**      Yes.

**Q**      And you were not harmed during the course of that trip, correct?

**A**      No.

**Q**      Do you recall being interviewed in 2019 in California by an investigator named Ieda (phonetic spelling) Lopez?

**A**      Yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

**Q**    And she's an investigator working on the defense team with Mr. Duran-Gomez?

**A**    Yes.

**Q**    And do you recall telling her that there were two "El Gordos" at the warehouse?

**A**    Yeah.  We described one of them as "El Gordo," and we also described "Pelon" as "El Gordo" because of his body shape.

**Q**    So, just to clarify, there was "Pelon," the nickname, because he had a shaved head, correct?

**A**    Yes.

**Q**    Do you recall telling Ms. Lopez that there were two "El Gordos," a taller one and a shorter one?

**A**    I don't recall.

**Q**    You don't recall telling her that one of the "El Gordos" was associated with the vans?

**A**    Yes.

**Q**    You do recall that?

**A**    Yes.

              MS. STELZIG:  No further questions.

              MS. STOTTS:  I just have one question, your Honor.

              THE COURT:  Sure.

                    REDIRECT EXAMINATION

BY MS. STOTTS:

**Q**    Do you recognize this guy sitting here today?

**A**    Yes.

Q    And is he a guy who was just in charge of the vans or is he a man who beat you for several days, hours a day?

A    He was a man who would beat us up.

MS. STOTTS:  Nothing further.

THE COURT:  You may step down, sir.

All right.  You have an individual you say is the brother, I think, of one of the victims; and you indicate that he has an impact statement.  And I gather this is a verbal statement that he wants to make.  Do you have any idea what the length of it is?

MS. STOTTS:  I do not, your Honor.

THE COURT:  Okay.

MS. STOTTS:  And then, the two witnesses you just heard from would also like to give victim impact statements separate and apart from testimony, just how it has impacted them in their life.

THE COURT:  That's what the testimony was, wasn't it?  Is there something --

MS. STOTTS:  No.  The impact statement is separate and apart where the defense does not get to ask them questions or anything.  It's a true victim impact statement.

THE COURT:  I get it.  All right.  Okay.  So, who do you want to start with?

MS. STOTTS:  We can start with Jorge.

THE COURT:  All right.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

MS. STOTTS:  This is the brother of one of the deceased victims, your Honor, Jorge Sagastume, brother of Abelardo Sagastume.

THE COURT:  All right.  Very good.  I don't know that he needs to take the witness stand.

MS. STOTTS:  However you want to do it.

THE COURT:  I think he can do it right there at the podium.

MR. JORGE SAGASTUME-MADRID:  (Through interpreter Donatti) Good afternoon everybody.  My name is Jorge Sagastume --

THE COURT:  Turn the microphone to you since you're going to --

MR. JORGE SAGASTUME-MADRID:  My name is Jorge Sagastume-Madrid.  I am the brother of Abelardo Sagastume, the victim of this man who is there listening.  As I hear the testimony of the witnesses, I can describe this man as an animal or worse than an animal, I believe.

We were born to an humble family in Honduras, hard workers and dreamers.  We were seven siblings, five women and two men.  Since we were very little, we dreamed about getting ahead one day.  And we always discussed with my brother about getting out of poverty.

I came to this country in 2006 before my brother. But because of life's turns, I went back to Honduras.  While I

Gayle Dye, CSR, RDR, CRR - 713.250.5582

was going back to Honduras and staying back there, my brother arrived in this country.  And unfortunately, he fell in the hands of this beast who's here.

This case has affected my family a lot.  It had a lot to do with my father's death.  He died of heart problems. My father would always cry alone, cry about my brother.  He would always tell me that on the phone.

I remember talking to my brother on the day that he was kidnapped.  I was trying to talk to these people to tell them not to kill him, but they don't have any appreciation for life.  My brother's life cost $1800.

THE COURT:  I'm sorry.  Cost what?

INTERPRETER DONATTI:  $1800.

MR. JORGE SAGASTUME-MADRID:  (Through Interpreter Donatti) You killed a son, a brother.  You killed a friend, a cousin.  When you came in, I saw you smiling as if nothing had happened.  But my family suffers because of that.  My mother suffers.  I suffer because of that.

You killed my brother, my only brother.  I don't think I can think of a number of years for this man to pay for the crime he committed.  I don't think his life is enough to pay for that, listening to the testimony.

At night when I go to sleep, I start thinking about my brother.  I start analyzing, thinking what my life would be with him today.  I always dream about going back in

Gayle Dye, CSR, RDR, CRR - 713.250.5582

time and hugging him and talking to him.

I remember the times when we would be together and talking and working, and we would be also roommates.  I imagine because he asked me for help.  He said, "Help me."

I would ask your Honor to not be compassionate with this man, to give him what the prosecutor is asking for; and I hope that what he cannot pay for in this life he will pay for in the other life because this life won't be long enough to pay for what he did to my brother.

My brother was a simple man.  He was a hard-working man.  He was a very generous man.  He would help with whatever he had to people who had less than him.  It was very painful to me to see my mother's tears when she went to his grave for the first time.  That's why I want the whole weight of the law to fall on him.

And I hope you repent before God and that you ask for forgiveness before God because of the sins you committed on this earth.  Because I'm sure that you're going to die in prison.  And the law will punish you here for that.  And when you die, you'll have the chance to repent.  So, you can go to hell because from everything I hear from the witnesses here, what they saw, you deserve that.

I can't say anymore.  That's all.

THE COURT:  Thank you, sir.

We'll take the next one, Ms. Stotts.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

MS. STOTTS:  Victor Espinoza.

MR. VICTOR MANUEL ESPINOZA-DIAZ:  (Through Interpreter Donatti) Good afternoon.  I want to ask your Honor to apply the full weight of the law to this person who killed two people back then.  Just like me and the other people who went through this and the relatives of the dead, they are living a nightmare, too.

I hope, like the brother of the deceased said, that he will repent in this life, that God will forgive him; but I hope that he will pay for what he did here on this life on earth.  And what I want to tell him is that he deserves life in prison because of the people that he beat up and the two people who are dead because of him.

This problem that we had has caused big trauma for me.  Sometimes I get scared of nothing.  Somebody talks behind my back and I jump.  I hope, Judge, you will apply the full weight of the law to this person.

And that's all the words I have.

THE COURT:  All right.

MS. STOTTS:  The last:  Pedro Portillo.

MR. PEDRO ANTONIO PORTILLO:  (Through Interpreter Donatti)  Good afternoon, your Honor.  I would like to let you know that all of us who are here present as victims, we suffer a lot of trauma because of Mr. Duran, because of this person who is here.  And I was just a young 16 year old when this happened.

I could not sleep at night.  I felt like getting

Gayle Dye, CSR, RDR, CRR - 713.250.5582

away from here and not talking to anybody.  My mother got sick because of that, because of worrying about everything that had happened.  And I ask you, the judge, to make sure that this man never leaves prison because he didn't have the right to decide who lived or who died.

That's all.

THE COURT:  Thank you, sir.

We're going to take about a 10-minute break.  It may be 15 but about 10.  We'll try to stick with 10.  We'll come back and finish the proceedings.

(Court recessed at 2:55 p.m.)

(Court resumed at 3:14 p.m.)

THE COURT:  All right.  Make sure we've got everyone back.

All right.  Is there anything that the defense needs to present other than proceed forward with the sentencing in this matter?

MS. STELZIG:  Your Honor, the defense does have six exhibits that it would like to submit; and we're happy to do that at this time or I can refer to them during --

THE COURT:  Describe those for me.

MS. STELZIG:  Sure.  Defense Exhibit 1, your Honor, is a series of photo arrays.  These were the arrays that were viewed with the government's witness Mr. Portillo.  That's Spread A through Q.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Defense Exhibit 2 are also -- that is three photo arrays that were reviewed by the government's witness Victor Espinoza-Diaz.

Defense Exhibit Number 3 is a report of investigation that was produced in discovery.  It summarizes law enforcement's initial interview with Mr. Espinoza-Diaz.

THE COURT:  All right.  And I take it to -- I'm sorry.  Was that concluding?

MS. STELZIG:  I'm sorry?

THE COURT:  Was that concluding the statement regarding exhibits?

MS. STELZIG:  Oh, no, your Honor.  I'm sorry.  There's three more.

THE COURT:  Okay.  Go ahead.

MS. STELZIG:  Defense Exhibit 4 are some photographs of Mr. Espinoza-Diaz that were taken on the day that law enforcement came to the warehouse on November 21st, 2006.

Defense Exhibit 5 is an email from the case agent regarding Mr. Espinoza's status as a victim.

And, finally, Defense Exhibit 6 is a report -- an investigative report produced in discovery regarding the live lineup that was done that included Mr. Duran-Gomez that was referred to with both witnesses.

THE COURT:  I take that the exhibits to be a, for lack of a better term, challenge as to the identity issue having --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Mr. Espinoza's identity issue having to do with the two or three occasions for which he had an opportunity to identify the defendant as being the person committing some of the beatings.

MS. STELZIG:  That is certainly the relevance for some of them, your Honor.  I'm happy to explain the relevance now or I can address it again in my remarks, whatever the Court would prefer.

THE COURT:  All right.  It may be that you can express it at that time.  I was just trying to make sure I understood where you were going with that.

MS. STELZIG:  Of course, your Honor.

THE COURT:  Okay.  Very good.  And anything else?

MS. STELZIG:  That's it.

THE COURT:  Okay.  All right.  Let's approach, please. I'm going to have the parties come forward, including the defendant; and we'll proceed.

Ms. Stelzig, will you be speaking for and in behalf of the defendant yourself?

MS. STELZIG:  I will be, your Honor.

THE COURT:  Okay.  Very good.

MS. STELZIG:  Mr. Duran-Gomez will have an allocution at the end; but other than that, I would be speaking on his behalf.

THE COURT:  Certainly.

MS. STELZIG:  Would you like me to proceed, your

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Honor?

THE COURT:  No, not yet.  Let me just -- I'm trying to get my bearings here, generally speaking.

We're still back in Cause Number 10-459, the United States of America versus Wilmar Rene Duran-Gomez.

And I'll start with the question -- the questions regarding your client.

What is your name, sir?

THE DEFENDANT (In English)  Wilmar Duran.

INTERPRETER DE VILLAR, JR.:  Wilmar Duran.

THE COURT:  And can you tell me whether or not you've had an opportunity to sit and share with your attorney, and even with the government, dialogue and determined that -- that resulted, should I say, in a plea agreement that you entered into with the government in this matter?  Is that correct?

I'm looking at a document that was filed back in December of 2024.  Is that you?

THE DEFENDANT:  (In English) Yes.

INTERPRETER DE VILLAR, JR.:  Yes.

THE COURT:  And I want to know whether or not -- having entered into that plea agreement, whether or not you are satisfied that you've had enough time before and after entering into the plea agreement to discuss this matter with your attorneys and, particularly, discuss the presentence investigation report that has been prepared in this case.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Have you had that opportunity?

THE DEFENDANT:  (In English) Yes, your Honor.

INTERPRETER DE VILLAR, JR.:  Yes, your Honor.

THE COURT:  And I'm looking at a presentence investigation report dated February 28th of this year, 2025.  I take your response to mean that you've gone over this document as best you -- sufficiently for your own good and to be -- and to be able to say to the Court that you've given -- or explained or stated to your attorney any corrections or objections that you might have to the report itself.

Have you had that kind of time with the report?

THE DEFENDANT:  (In English) Yes, sir.

THE COURT:  And I would also take this to mean you're presenting yourself -- to mean that you are -- you have expressed to your attorney any objections and whatever their objections or corrections are and stated to the Court will be the total of the objections that you might have in this matter.

THE DEFENDANT:  (In English) Yes, your Honor.

THE COURT:  Okay.  Counsel, let me just ask you whether or not in your judgment you and/or your team of lawyers have had a chance to -- or sufficient opportunity, should I say, to discuss the presentence investigation report with Mr. Duran-Gomez.

MS. STELZIG:  Yes, your Honor.

THE COURT:  And are you satisfied to the extent that

you're ready to proceed to sentencing at this time?

MS. STELZIG:  Yes, your Honor.

THE COURT:  For the government, Ms. Stotts, are you prepared and ready to go forward with sentencing at this time?

MS. STOTTS:  Yes, your Honor.

THE COURT:  And I take it that you have -- all of the testimonial and/or other presentations that you need to make have already been made in the record?

MS. STOTTS:  Yes, your Honor.

THE COURT:  And you're ready to allocute at this time, as well?

MS. STOTTS:  Yes, your Honor.

THE COURT:  All right.  And then, we are ready to proceed.

The Court, in going forward, certainly has a history with this case that, perhaps, rivals any case that you could have of this nature and, that is, that I think I've written at least one or two memorandum opinions somewhere along the way expressing opinions about the case, which opinions don't have anything to do with the sentencing but it does let you know and state for the record that the Court has some familiarity with the factual basis underlying the indictment as well as the plea agreement; and the Court is ready to go forward.

In light of that, the Court will not adopt the factual statements contained in the presentence investigation

Gayle Dye, CSR, RDR, CRR - 713.250.5582

report, not because they're not true or accurate in some respects but because they -- they bring to the Court's attention some things that the Court is not prepared to accept as being true from the perspective of the Court from a sentencing perspective. But in terms of the work done and what is being presented, the Court accepts the report as it would any report from probation.

With that, I'd like to now address what I understand to be objections and/or arguments first; and then, I will hear you allocute as what you believe the appropriate sentence ought to be in this case.

Proceed, counsel.

MS. STELZIG: Thank you, your Honor. With respect to -- and I'll be brief. With respect to the -- we did include our objections to the presentence report in the addendum to our sentencing memorandum.

The Court already addressed the first one which was the objection to the description of the offense conduct. We would request that paragraphs 18 through 68 be replaced in the final version of the presentence report with the description of the offense conduct in the agreed statement of facts in the parties' plea agreement.

Number one, we believe that is a more accurate and current description of the offense. It doesn't contain a lot of extraneous information that could be very prejudicial to

Mr. Duran-Gomez when he is being designated and spending his time in the Bureau of Prisons. So, we would make -- we would make that request.

With respect -- we did have an objection, your Honor, to paragraph 75. We will rest on our papers on that.

THE COURT: Give me those paragraphs again. I believe you said 18 through --

MS. STELZIG: 18 through 68, your Honor.

THE COURT: -- 68 are the ones that you would seek to have replaced.

MS. STELZIG: That's correct, your Honor.

THE COURT: All right. Then, go forward.

MS. STELZIG: We did have an objection, and we do have an objection, to paragraph 75. This is the enhancement for the discharge of a firearm.

THE COURT: Let me just get there.

Okay. Go ahead. I've read through that. Then, go ahead.

MS. STELZIG: I'm not going to make additional argument, your Honor. We'll submit on our papers for that.

We have an objection to paragraph 80, which is the leader/organizer enhancement. And as we noted in our -- and I'll be addressing this more in my remarks. But our position, your Honor, is that Mr. Duran-Gomez was not the leader of all of the individuals who were involved in this case, specifically,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Mr. Bolanos-Garza and Mr. Rodriguez-Mendoza.

We recognize that he did direct the individuals who worked for his transportation company. So, our view is that if any leader/organizer enhancement is appropriate, it should be a two-level instead of a four-level.

THE COURT: All right.

MS. STELZIG: We have an objection to paragraph 81 with respect to the enhancement for obstruction of justice. Again, I'll submit on the papers on that.

We have an -- I'm sorry -- an objection to paragraph 84 which did not give Mr. Duran-Gomez an adjustment for acceptance of responsibility in this case.

THE COURT: I think that's a part of the plea agreement, is it not? Is there -- in the plea agreement, does it set out what the government's position is going to be?

MS. STELZIG: Your Honor, the plea agreement between the parties did not address anything about what the guideline calculation would be. We understand probation's position; and they -- it's correct, it was in the guidelines.

Typically, if there is an obstruction enhancement, the defendant does not receive acceptance for responsibility even in a plea setting. But the probation officer correctly notes that it's ultimately the Court's discretion in each individual case. And we think under the very unusual circumstances in this case that having an adjustment for

acceptance of responsibility is appropriate.

Your Honor, we --

THE COURT:  That was not included in the plea agreement is what you're suggesting?  I thought it was.  But anyway, go ahead.

MS. STELZIG:  Yes.  Your Honor, the plea agreement did not address the guidelines, yes.

THE COURT:  Did not address.  Okay.  Go ahead, please.  All right.  Thank you.

MS. STELZIG:  Again, I say all this, your Honor, understanding that the guidelines are probably not -- they're just one factor the Court has to consider.

THE COURT:  Sure.

MS. STELZIG:  And at some point, they have a limited utility given the other history in this case.  But those are the objections that we do maintain in this case.

THE COURT:  All right.  Do you want to respond to any or all of those, Ms. Stotts?

MS. STOTTS:  Judge, I agree with probation's assessment of all of the objections.  The objection with the leader role, you heard today from two witnesses -- and it's been stated numerous times, including, I believe, on the indictment -- that Duran is called "El Jefe."  And he was called "El Jefe" because he is the boss.

And you heard today from Mr. Espinoza and

Mr. Portillo that everybody listened to him.  He was the one in charge.  He was the one directing everyone else, not just his drivers but everyone in that warehouse, from them removing their clothing, to them being placed in rooms, to them being beat over a period of time.  The witnesses said that was at his direction.  He also participated in many of those activities, but they were all at his direction.  And so, that is appropriate in this case.

With regards to the obstruction, that is at the Court's discretion, whether he gets acceptance or not after the obstruction.  He actually pled to an obstruction charge with regards to this case back in -- oh, gosh.

THE COURT:  2005.

MS. STOTTS:  It was charged -- I think it was charged in 2006.  I'm not sure exactly --

MS. STELZIG:  Pled in 2007.

MS. STOTTS:  Pled in 2007.

And whether or not he gets acceptance is within the Court's discretion with regards to that.

I agree with probation on all of the others.

With regards to the 18 through 64, the Court has made clear that they don't want to accept that portion of the PSR as factual.  If a factual basis needs to be in the PSR, which it does in some form or fashion, I believe, if the Court is removing those based on your prior ruling, then I believe the next best option is to insert the factual basis from the plea

agreement.  Those are facts that were agreed upon at least.

It's not my position that that's an appropriate way to handle this, but the Court has already made his ruling on that and stated that you are not going to accept those facts as true.  So, if you're going to take those out --

THE COURT:  Let me just go ahead and speak to that.  I am going to do that, that is, I'm going to -- and what I found in finding is that the plea agreement itself speaks more accurately to what the parties, both sides, understand and can agree upon as being the factual basis underlying the indictment.  Although there are other factors that could be considered, the point is that these -- this is the basis of the agreement.  So, I will -- that is a part of my instruction to probation in that respect.

MS. STOTTS:  And just for the record on that -- I understand what you're saying --

THE COURT:  Yeah.

MS. STOTTS:  -- I just want to -- I'm sure the Court already knows this, but I'm just stating it for the record.  A factual basis is, obviously, a scaled-down version of the facts which can be agreed upon amongst the parties.

It doesn't mean that the other things in that PSR are untrue or that they did not occur in the way that they are presented.  But it is a scaled-down version because if we put in every fact about everything, that factual basis would be 20

pages long, and that's not something --

THE COURT:  It would never get done.

MS. STOTTS:  I'm sorry?

THE COURT:  It would never get done because --

MS. STOTTS:  Right.  It would never get done.

THE COURT:  Thank you.  That's my point.

MS. STOTTS:  Exactly.

THE COURT:  Because of the disputed fact circumstances, I'm not suggesting or saying as an officer that they -- that some of those things are not true.  I don't need to make that determination as to whether or not they're true or not because that would simply mean I'm lining up on something that I might not even have, and don't have, first-hand knowledge of.

As it relates to whether or not those facts might have some impact upon the -- upon the sentence to be imposed, they certainly might because they're in my head.  I've read them.  And I can't tell you what does and does not, but I know the factual basis going forward for sentencing purposes should be confined, in this instance -- and this is the only time I've done this and probably won't be the last.  But going forward should be on the basis of the parties' agreed facts.

And that doesn't mean that you couldn't agree to other facts, it simply means that these are sufficient for me to go forward with sentencing.

MS. STOTTS:  I understand your ruling.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

THE COURT:  Yes.  Anything else from the government?

MS. STOTTS:  No, your Honor.

THE COURT:  All right.  As it relates to the leader role, the objection is overruled.  As it relates to the firearm, the objection is overruled.  As it relates to the -- I've already dealt with the paragraphs 18 through 68 I believe the number is.

As it relates to the obstruction charge, the objection -- the -- that, in my judgment should be sustained.  I believe there's -- what is there -- maybe I should ask probation or one of the lawyers.  What are we looking at, a two-point increase?  Is that what it is?

PROBATION OFFICER CYNTHIA REYES:  It's --

THE COURT:  A four-point?

PROBATION OFFICER CYNTHIA REYES:  It was a two-point for obstruction.

THE COURT:  Okay.

PROBATION OFFICER CYNTHIA REYES:  Yes.

THE COURT:  Okay.  So, that will be a reduction of two points for the obstruction charge.  I have some serious judgment calls about that.  And they probably are expressed in one of my memorandums.  So, you can appreciate the fact that if there was an obstruction charge, it should have been brought at and during the time that that particular plea was made.  And I have serious concerns about how that plea was handled.  But that -- that

Gayle Dye, CSR, RDR, CRR - 713.250.5582

aside, it's just that it should not play a role in this sentencing. That's my sustaining the objection.

Now, as it relates to -- I do want to -- I do need to address this question. I don't know if it makes a difference in this case. The charge in the plea is conspiracy. So, as far as the underlying facts are concerned, this defendant is responsible for the conduct of the other defendants, as far as I'm concerned.

The question that I -- that I have concerns about is the, quote, either -- I don't know if they're errors or if they're correct. Are the records that suggest that neither of the testifying defendants today was able to identify the defendant by sight at the time that they -- they were asked about that, what does that do as far as the case is concerned?

It might have some bearing on their testimony, but it does not have a bearing, in my judgment, upon a determination of what an appropriate sentence ought to be in this case.

So, I'm not going to try to address that. I did notice that -- that there was a -- I did notice, and have a concern, that even at the time of the -- at the time of the interviews or early interviews that the defendant -- that the two witnesses, perhaps, others, struggled with the question of whether or not they were identifying the correct -- or the right person.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

He is a leader.  He led the pack.  And whether he was a leader for all of the parties, all of the illegals or other aliens in the warehouse, is not a concern of mine.  It was his warehouse, and he is -- was in charge.

What else do I need to address as far as objections are concerned?  I believe that --

PROBATION OFFICER CYNTHIA REYES:  A ruling on the acceptance.

THE COURT:  I'm sorry?

PROBATION OFFICER CYNTHIA REYES:  A ruling on the acceptance.

THE COURT:  Yeah.  That's not an objection yet.

Does the government -- the government has taken no position, I gather, on the question of acceptance of responsibility or not?

MS. STOTTS:  Judge, it's not that I haven't taken a position.  With the obstruction, he is not entitled necessarily to the acceptance.

THE COURT:  Uh-huh.

MS. STOTTS:  He has pled.  He has done the things that are typically required.  We did not work that into a plea agreement because it's a (C) plea.  So, it really --

THE COURT:  Because it's a what?

MS. STOTTS:  A (C) plea.  So, it didn't really affect guideline calculations --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

THE COURT: True, true.

MS. STOTTS: -- because we're not really looking at guideline calculations. But I don't object to him getting acceptance if you have sustained the obstruction charge, which you did.

THE COURT: I did.

All right. So, the question then is whether or not -- whether or not he should be entitled to that -- what do you call it? -- third point. And what is your statement in that regard? And we'll hear from the government.

MS. STELZIG: Your Honor, well, of course, the third point is at the discretion of the government and requires a motion under the guidelines. We do submit that we think it would be appropriate for the Court, if the Court agreed, to do the equivalent of that as a variance, if the government was not going to make a motion for the third level.

THE COURT: Uh-huh.

MS. STELZIG: Mr. Duran-Gomez, you know, has -- he's not only accepted responsibility in this case, he submitted an additional statement of personal responsibility and is bringing this case to a close. So, we do think the third level is appropriate, but we understand that for guidelines purposes the government would have to make that motion.

THE COURT: I get it.

And that's the government's position, as I

understand it?

MS. STOTTS:  Correct.

THE COURT:  All right.  Let me ask a member of probation to step up just a minute, please.  Let me look at some numbers or some -- a report, should I say, maybe that you gave me so I can know where I am on this.

Ask for one, get two.

(Side-bar discussion off the record between the Court and probation.)

THE COURT:  All right.  I think I've got the numbers right.  As I see -- as I understand going forward, so that the record is clear, the credit for those numbers would leave -- Criminal History Category I would remain the same and the total offense level I believe is going to be a 42 without -- without the, quote, additional point --

MS. STOTTS:  Correct.

THE COURT:  -- as I understand it from probation.

PROBATION OFFICER CYNTHIA REYES:  It would be 43.

THE COURT:  43, I'm sorry.  I got it wrong.  I wrote it down right, and then I changed it.  43.  43 without the additional point.  That would mean, I believe, if I understand, the sentencing guidelines would call for a life term sentence I believe is the way that should be interpreted.

Am I correct on my guideline calculations?

MS. STELZIG:  Yes, your Honor.  I suppose there is

another way that the Court --

THE COURT:  We're not talking about what the sentence is going to be.

MS. STELZIG:  Of course.

THE COURT:  I'm talking about the calculation right now.

MS. STELZIG:  Of course.  There is, I think, an argument to be made that under the guidelines, if the guidelines come out higher than 43, that the defendant would be capped at 43 and acceptance would come from -- from that.

THE COURT:  I see.

MS. STELZIG:  I understand there's two ways to look at that.  So, if the Court adopted that --

THE COURT:  I'll permit you to argue that in just a minute.

MS. STELZIG:  Yes.

THE COURT:  But I want to make sure my numbers are right in terms of the 43, meaning that the sentence itself becomes a sentence of life.

MS. STELZIG:  That would be the guidelines with a 43.

THE COURT:  Yeah.  Okay.

MS. STOTTS:  Yes.

THE COURT:  All right.  Now, I want to go ahead now and allocute.  So, I want to hear from you in behalf of the defendant, Mr. Gomez -- Duran-Gomez; and then, I'll hear from

the government.  And then, finally, I'll hear from Mr. Duran-Gomez.

MS. STELZIG:  Thank you, your Honor.

THE COURT:  Go ahead.

MS. STELZIG:  It's been a long time coming.  The Court has a number of very weighty decisions to make today.  And I would be remiss if I didn't start out by acknowledging how serious the conduct is that brings us here to court today.

This was a very tragic loss of two young men's lives, and they died in a brutal fashion.  And they should not have.  And there are other individuals who were hurt, as well; and for their pain and for their loss, we are sorry.  And Mr. Duran-Gomez has accepted responsibility for his role.

But the seriousness of that offense, of course, is just one thing we have to think about today.  It's very natural when the circumstances are so horrific to want to blame somebody; and Mr. Duran-Gomez is both responsible from the perspective of being involved in this conspiracy and he also is responsible because of choices and decisions that he made and actions he took, including being involved in some of the beatings as we -- that are described in the plea agreement.

But the circumstances of that offense and who did what are important, too; and we have to consider relative culpability and how much we can be certain about what happened in terms of assessing an appropriate sentence.  That's one thing

we need to talk about today.

And, you know, your Honor, we discussed a lot in our sentencing memorandum. But I did want to just touch on four things today: One is the circumstances of the offense in terms of what -- what the evidence suggests happened in that warehouse. That's number one.

Number two, I want to talk briefly about Mr. Duran-Gomez's background, his experiences, and the things that happened in his life before his arrest in this case.

Third, I want to very briefly just address other consequences that Mr. Duran-Gomez is going to be suffering as a result of this conviction.

And, finally, we need to consider the person who Mr. Duran-Gomez is today, just now nearly 19 years after the events that occurred in this case.

And when we get through those four factors, your Honor, we will be asking the Court to accept the plea agreement and to impose a sentence of 30 years.

So, number one, your Honor, Mr. Duran-Gomez's role in the offense. This Court has previously noted that the exact circumstances in this case I think are unknowable at this point. There has been -- there have been so many documents that have been lost, things like phone records, witness statements that have -- had gaps of time, have changed over time, honest mistakes, and recollection. And we have individuals who have an

incentive to point the finger at one another.

So, I think ultimately, as much as we tried, your Honor, that the ultimate truth is going to, I think, unfortunately, remain elusive.  But the work that we submitted, both in this case and in this sentencing submission, is the result of years of our investigation; and we do feel confident that, even if this is not hundred percent of everything that happened, that this is a reliable narrative.

And we have some reasons to have confidence, your Honor, in the narrative within our sentencing memorandum: Number one, it matches up with common sense.  So, we spent a fair amount of time in our memo, your Honor, describing the business and how Mr. Duran-Gomez's business began and how it evolved.

He started as a driver; and then, he had his own business with -- and eventually he hired other drivers and had vans; and it was a very profitable business, your Honor.  And make no mistake, that was an illegal business.  And it did facilitate other more dangerous criminal activity like smuggling.

But that was Mr. Duran-Gomez's business; and from his business, he had no incentive, he had no reason to want to have anyone be hurt because he relied on repeat referrals.  He was often being paid as people were being delivered to their family members.  And so, he would have no reason to hurt

anybody.  That would go -- that would be contrary to his business model.

Now, Mr. Duran-Gomez did allow this smuggler from Mexico, Miguel Garduno, who had been referring people to him for transportation purposes, he did allow this person -- when his own place was compromised, he let him come into his warehouse.

And that was meant to be a short period of time and to help this person out; and unfortunately, that was a terrible, terrible mistake, your Honor, because at that point the businesses which had been, you know, working together but separate started to overlap.

And so, there were individuals who were at the warehouse who hadn't yet paid their smuggling fees to Mr. Garduno.  And so, they were being guarded over by Mr. Bolanos and Mr. Rodriguez who worked for Mr. Garduno.  In fact, Mr. Rodriguez is his cousin.

So, that -- that's the business model where they want to hold people and make sure that they don't go anywhere until the families have finished paying off the very expensive smuggling fees.  And if an individual doesn't pay, that means that Miguel Garduno, he's going to owe that money to the cartels.  He's going to owe money to people who were walking people across the border and the people who were driving individuals to McAllen and to Houston.

And so, the incentives at that point were all

flowing towards Miguel Garduno as the one who was invested in what happened to these two young men who weren't paying their smuggling fees and trying to escape.

Now, Mr. Duran-Gomez, I don't want to -- you know, I want to acknowledge he also had some interest in this. This was his warehouse. There was an attempt to start a fire, and that was upsetting. But that's not the kind of upset that led to the rule beating and the death of these two young men.

So, that's just sort of the business model, kind of the logic, you know. There's -- you know, unlike the cartel, Mr. Duran-Gomez's business didn't have a need. There was no place for violence in his business. The narrative that we have in our sentencing memorandum, your Honor, is also consistent with what available objective evidence we do have.

Now, there are dozens and dozens of witness statements; and many of these individuals were witnessed multiple times. And there is -- it is simply not possible to reconcile them. The government has worked very hard to try to do that. We have worked very hard to try to do that. And it's understandable human nature. People are scared. They don't -- time passes. People's recollections are not perfect.

But we do have some objective things. We have phone records, for example. We have cell site location information, a little bit, for Mr. Duran-Gomez. We have the fact that individuals, Mr. Bolanos-Garza and Mr. Rodriguez, fled

the country and Mr. Duran-Gomez didn't.  We have the fact that the DNA and the prints that were associated with the crime scenes came back to Mr. Bolanos-Garza and Mr. Rodriguez-Mendoza and not to Mr. Duran-Gomez.  So, we do have some objective records.

And, your Honor, if you look at -- the phone records show and the cell site location shows that Mr. Duran-Gomez was, in fact, not -- he lived about 30 -- about a 30-minute drive from the warehouse.  He was not at the warehouse very often.  He was there on a regular basis but for short periods of time.  And we provided evidence from a witness that described that frequency.

And, finally, your Honor, referring to that witness -- and I am going -- I'm not going to refer to names just because I advised this witness that I would respect their privacy.  But there was a transcript that was provided to -- in the sentencing memorandum -- I believe it's Exhibit 13 -- which is a transcript with highlights.  This was an interview --

THE COURT:  I did read that, yes.

MS. STELZIG:  And we do have the other two portions of the transcript here and available if anyone would like to look at them because we did promise to make -- we want to be very transparent about the full extent of the conversation we had with this witness over the course of three days.

This was an investigator in our office who spoke

to this witness who had not otherwise been interviewed in over a decade. And this is a witness who had no incentive to help either side. And, again, there's a lot of time that had passed. So, I'm sure her recollection is not perfect either. But what's described in Defense Exhibit 13 is also consistent with the other evidence that we identified in our sentencing memo.

So -- now, your Honor put your finger on it in the beginning. This is a conspiracy. So, of course, as a legal matter, Mr. Duran-Gomez is responsible for these young men's death even if he had never put a finger on them, even if he had never given an order for anyone to put a finger on them.

But beyond that, he does have some moral responsibility, as well; and we're not trying to minimize that. What we do want to prevent, though, your Honor, is for Mr. Duran-Gomez being assigned more blame and more responsibility than we feel is appropriate and has been supported by the evidence.

And we believe that evidence shows that Mr. Duran-Gomez was not in the room when the worst and the final beatings took place in which these two young men died and that the individual who, in fact, bears the most moral responsibility for those deaths is Mr. Garduno.

Now, he was indicted in 2014 on a smuggling charge. That indictment remains pending in this district. He has never been arrested. I don't know if he will ever have to

answer for his role in this.  But the phone records, again, made clear that as events were happening, mostly Mr. Bolanos and also Mr. Duran-Gomez were contacting this individual and getting directions from him on what to do.

So, unless the Court has questions about the circumstances of the offense or issues that we raised in our sentencing memorandum, I'm happy to move on to the second point.

THE COURT:  No.  Move on.  I don't have any questions.

MS. STELZIG:  Next, I just wanted to touch on Mr. Duran-Gomez's background.  And here, I think there's kind of three things that stick out to me as being the most relevant here.  Number one is the abandonment he experienced as a child. Now, it is difficult for any child to grow up without one or both parents, even if there's an explanation that is -- you know, like, a parent dies or has to go away to work.

But in this case, Mr. Duran-Gomez grew up in a small rural town surrounded by family who wouldn't acknowledge him.  So, his father's family was there, but they didn't want to -- they just acted as if he didn't exist because he was a product of an affair.  The father was married to another woman who was in the United States.  So, they just shunned him completely.

And then, his mother's side of the family was simply overwhelmed caring for his mother's other children and other grandkids and great-grandkids.  So, here he is being

raised in the poorest of poor conditions, going to school with other family members and not talking to them, not being invited to family holidays, not being treated as a family member.

And he grew up, again, extremely poor.  I think if it had not been for the kindness of a few of the individuals in the church who took pity on Maria who took him in, he wouldn't have had enough to eat and he certainly wouldn't have had money to go to school.

And this was all happening against the backdrop of the civil war.  And this is not the aftermath of the civil war.  This is the war was happening when Mr. Duran-Gomez was a child.  And the soldiers and the guerillas were coming into Chirilagua, and there was shooting.  People were getting killed. There were bodies left on the street.  People were disappeared, and children were snatched to be recruited forcibly into working for the guerillas or the soldiers.

Twice they tried to get Mr. Duran-Gomez, and it was after the second -- when he was beaten badly, that's when his caregiver finally pleaded with his family -- his parents were now both in America -- please get him out of here because she was just concerned that at some point she was not going to be able to protect him any longer.

And, your Honor, this last point is -- you know, a person's background I think is always relevant in terms of what the appropriate sentence should be.  But here especially

so, your Honor, because one of the lessons that I think Mr. Duran-Gomez learned growing up is that when -- when violent people come, you run and you hide. You don't -- you avoid direct confrontation because that was the way to survive in Chirilagua in the '80s and the '90s.

So, then, he transitioned to the United States; and it was a difficult transition. He was a young man. He didn't know the language, he didn't know his family. But I do think it's notable, your Honor, that he took steps right away to try to do things the right way. He established his immigration status. He got a green card. He got work authorization. He was engaged in a number of jobs trying to support his family.

And eventually, he was led to the very lucrative transportation business; and for the first time in his life, your Honor, he was not only not dependent on other people but he was self-sufficient and he could now help his family. And I think that was a very powerful feeling for Mr. Duran-Gomez at the time.

And, again, we're -- even though his business did not directly involve violence, he did let the wolf in the door, your Honor. He let Mr. Garduno come into his warehouse, and these individuals were being kept there and being mistreated, and he participated in that.

And looking back now, your Honor, Mr. Duran-Gomez, if he had any inkling -- I believe this is

absolutely 100 percent.  If Mr. Duran-Gomez had had any inkling that these young men were going to die, he would have paid their smuggling fees, your Honor.

And I don't know -- I can't speak for the other individuals.  I don't know that anyone intended for these young men to die.  But it certainly was nothing that Mr. Duran-Gomez directly participated in or intended or wanted to happen.

If the Court doesn't have other questions, number three, your Honor, just briefly, on other consequences, there's the loss of his family.  Mr. Duran-Gomez -- and, again, partly through his own actions, but a number of his family members and loved ones were charged themselves with crimes and -- including the mother of his two youngest children.  So, he lost contact with all of his family -- almost all, and he hasn't seen his children in 17 years.

He has spent nearly 19 years in very harsh conditions of pretrial confinement, including during the pandemic where he was extremely ill with Covid before vaccines were available.  And 19 years in pretrial custody, a lot of that he was alone, your Honor, without family; and he had the prospect for more than half of that of the death penalty hanging over his head.

And so -- and, finally, your Honor, he's -- Mr. Duran-Gomez is and remains today a lawful permanent resident; but we do anticipate that there will be immigration

consequences at the end of his sentence; and that is another collateral consequence that is quite significant because he has not been in El Salvador since he was 16; and that country is a very changed place.

And, finally, your Honor -- and this is -- you know, I want to spend a little time on this as well, what Mr. Duran-Gomez has done since his arrest.  This case is, I think, really unusual in terms of how long it's been -- it's been pending.

But I guess one of the silver linings, your Honor, is that we get to see almost 19 years of how Mr. Duran-Gomez has conducted himself under very difficult circumstances since he was arrested.  And whatever choices Mr. Duran-Gomez made -- and they were bad choices -- he is not the person who is standing here today.

And he's -- again, like I said, he spent a lot of time alone.  The first several years when he was charged with the obstruction, he went years without even seeing his attorney.  So, he was completely alone.  And he then gets charged with these murders.  He's facing the death penalty.  He doesn't have family visiting him; and these are dark, long scary days.

And he could have responded in any number of ways.  And over time, Mr. Duran-Gomez decided to lean in and try to do good.  This was what he could control.  He could make good choices.  And so, he set about keeping his room clean, makes his

bed every day.  He takes pride in keeping his things organized. He takes pride in being polite to the correctional officers and to the other people in the facility.

He's learned how to make art.  He makes purses out of trash -- out of, like, a bag of trash from potato chips. He does beautiful drawings.  He's learned how to fix radios and headphones because he doesn't have anybody giving him money. So, he's had to figure out ways to support himself.  And he's learned how to play chess.  He's become the unbeatable chess person at the FDC.  But most importantly, your Honor, is the way he's conducted himself with other people.

Now, we included the summaries of the interviews we did of correctional officers and the warden at Joe Corley; and that's -- I have, frankly, never seen descriptions like that from professional correctional and law enforcement individuals who saw Mr. Duran-Gomez day in and day out and described him as being peaceful and respectful and avoiding conflict and advising others to avoid conflict, as well.

And, finally, your Honor, I think what's, perhaps, most significant is since he has been brought back to the FDC, which happened I believe in 2019, he has been housed in the unit that has the most vulnerable population.  This was addressed a little bit in our expert's report at Exhibit 22.

But he's in the unit, your Honor, that has individuals who have cooperated, who are sex offenders, who are

being evaluated for competency; and he is in that unit not just because FDC recognizes that Mr. Duran-Gomez is vulnerable but that he can be trusted. And we've been seeing Mr. Duran-Gomez now for years, and we've been hearing about some of his cellmates.

He's had a cellmate who was blind. He's had more than one cellmate who has autism. He's had multiple cellmates who were being evaluated for mental health conditions and were severely mentally ill. And he had several cellmates who were in for sex offenses and are very vulnerable because of the nature of their offenses.

So, Mr. Duran-Gomez was entrusted with some of the most vulnerable detainees at the Federal Detention Center, and I think that speaks volumes to the person he has become.

So, your Honor, for all of those reasons, we ask the Court to accept the (C) plea and impose a sentence of 30 years. And we would -- we would also request that Mr. Duran-Gomez receive credit for all of his time that he has been in custody since November of 2006.

And because, your Honor, the Bureau of Prisons does not typically award credit for time that has been applied to another sentence, we would ask that the judgment include an adjustment under 5K2.23 of the guidelines to account for the time that Mr. Duran-Gomez spent in custody in Criminal Case Number 06-459; and that credit, your Honor, is 4 years, 4

months, and 23 days.

THE COURT:  All right.

MS. STELZIG:  We have some other specific requests regarding designation and an attachment to the presentence report; but I can address those now or at a later time, whichever the Court prefers.

THE COURT:  No.  I have your -- I have the report. I've read what you've indicated in the -- and what the officer who did the evaluation's recommendation is.  I have read those.

MS. STELZIG:  Okay.  And we would ask, your Honor, if the Court is so inclined, to include a recommendation that Mr. Duran-Gomez be designated to a low facility and include a copy of Ms. Baird's report with the judgment that goes along to the Bureau of Prisons so they have access to that information, as well.

THE COURT:  Okay.  Thank you, ma'am.

MS. STELZIG:  Thank you.

MS. STOTTS:  Your Honor, I want to first address the Court's initial statement about your concerns with regards to identification of Mr. Duran, and I want you to think back to 2006 when these two individuals were being questioned about who the individuals in the warehouse were.

And I know that that's closer in time to when this occurred; but it's also a timeframe where these guys had been held for 22 days, according to Mr. Portillo, and Victor

about the same amount of time, being beaten, being threatened, being shot at. Horrific, horrific situation: watching two people die.

That's the situation they're in when they're being interviewed. Are they young? Yes. Are they terrified? Absolutely. Have they been threatened? A hundred percent. And are they scared? No doubt. And so, does it make sense that they wouldn't want to pick out the person who they just watched kill two other people and that they wouldn't do that until they were in a safe environment, established somewhere where they felt comfortable? Absolutely.

That's not something that's unusual. It's the same thing with sexual assault victims. Sometimes they won't identify their perpetrator immediately because they're scared. But once they get into a calmer situation where they feel -- where they can actually give the information, they do. They open up at that point.

The victims that you saw here today are 19 years older, wiser, and stronger than the people who were rescued back in 2006. And when you think about what happened to them and what they witnessed, it's horrific. We don't as individuals and as persons of this community and society want to believe that people can do or act in the manner that Duran, Bolanos, and Efrain Rodriguez-Mendoza acted.

We don't want to believe that those people exist,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

but they do.  They exist.  And they were, unfortunately, in the same place as Victor Espinoza, Pedro Portillo, Abelardo Sagastume, and Hector whose last name we don't even know.

Your Honor, Victor Garduno may have been a part of sending Bolanos-Garza and Efrain Rodriguez-Mendoza; but he wasn't here.  He wasn't a part of what happened in that warehouse.  He could have told anybody and everybody to beat these victims.  They didn't have to do it.  He wouldn't have known one way or the other if they did it.  He wasn't here.  He had no recollection or idea of what was actually occurring in that warehouse.

But the person who did was the leader of that warehouse, and that's the man standing in front of you.  And what he did during the 22 days that these individuals were kept is he initially kept them okay, right?  They were being treated as people normally are in a smuggling situation.  Not given a lot of food because there's not a lot of money but not being hurt.

But then, what happens?  There's a turn because Hector and Abelardo decide they're getting out of there, and they try, and do, set a fire in this man's warehouse.  And it makes him mad.  So, at that point, tides have changed.  Now, we have people who are trying to damage my property, who are trying to burn up my warehouse, and who are trying to escape.

So, what does he do?  Everything.  Makes them be

nude; ties them, hands and feet; bags over head; beats them; stomps on them with steel-toed boots; hits them with broomsticks; sodomizes; burns.  Tortures that no person should ever have to endure or even hear about.  That's what happened to these individuals.

And there's no way to say that he didn't know what was going on in that warehouse.  And as you've said, he's responsible for what's going on in that warehouse.  This is a conspiracy.

He also participated as a -- as you can see in the factual basis of the plea agreement, he admits that he was a part of the beatings.  Maybe not every single one, maybe not every single day; but he admits that he was a part of that.  He was in that warehouse off and on every day.  He could see these two individuals, Mr. -- Hector and Mr. Abelardo Sagastume, dying in agony and did nothing to help.

Not only did he help put them in that position, but he did nothing to help them.  And I know that his attorney said that he didn't want them to die.  Well, if you see someone in that position, you've helped put them in that state and you do nothing about it, the next step is death; and that's what we have.

And I want you to remember that these people came over here for a better life.  Yes, they were illegal.  Yes, they were here and they shouldn't have been.  But they didn't come

because they wanted to come over here and commit crimes.  They didn't come over here because they wanted to be bad people. They came over here for a better life.

And you heard from Abelardo's brother, saying his brother just wanted something better.  He wanted to do better. He was a generous person and that they had dreamed of coming to America.  And his dream ended in him dying at the hands of this man and two others over a period of time where he was beaten to death.  That's a terrible, terrible way to die.

You are beaten to death over a period of time, not even just in one instance.  We're talking about days of this type of behavior.  And you heard Pedro Portillo talk about how he watched as Duran sodomized with a beer bottle Hector and how he watched "Chino" pour alcohol on his back and set him on fire.

These are human beings being treated in a manner that is despicable and heinous and nobody is doing anything. They're just either participating or watching it happen and doing nothing about it.  And he should be held responsible for those acts.  He was there.  He knew they were happening and was participating.

Pedro Portillo, it was clear that there were times that he could see what was happening but times that he was also on his stomach while the beatings were occurring, especially when they're being stomped on and things like that where he didn't know who was doing what.  But he knew that the

man sitting at that table, Duran-Gomez, was one of the men participating in those acts.

So did Victor Espinoza.  He was clear this was happening at the hands of all three of them.  Not one, not two but three of them.  And he should be held responsible for that.

He also was responsible for taking the individuals out of the warehouse after they had died and taking them to a field.  Yes, his fingerprints weren't there because he's not the one that carried them.  We know that.  Nobody is saying that he did.

But what we do know is that he was a participant and he definitely told them to set that van -- or truck -- truck, sorry -- set that truck on fire which, again, didn't light, which is how we found the bodies of the two individuals.

He didn't go back to the warehouse after the murders happened, nor did Bolanos or Rodriguez-Mendoza because they knew stuff's about to go down, right?  "We've murdered two people.  We have all these people in the stash house, and we're about to get caught."  So, he leaves.  He didn't flee, but he fled from his environment so that he wouldn't get caught.

Your Honor, the fatal blows.  I don't know if we'll ever know exactly who delivered those fatal blows or if there were fatal blows.  Was it a combination of just weeks and weeks of beatings?  Or was it one blow that finally did it?  I don't -- nobody will know that because the two people that can

Gayle Dye, CSR, RDR, CRR - 713.250.5582

tell us are, unfortunately, no longer here.

I want you to remember, Judge, that this -- although it's a sentencing for Duran-Gomez, it's also 100 percent about the victims in this case, the victims who did not agree to be beaten, tortured, and killed; the victims who are still alive who are now survivors, who are now strong, contributing members of society who made it through this and are willing to come talk to you and tell you what happened even though it's hard.  It's hard to go back 19 years and talk about things that were horrific at the age of 16.  Pedro Portillo was 16 years old when all this was happening to him.

Your Honor, I want you to think about the trauma that these victims lived with forever.  You've heard from all three of the victim impact statements, including the brother of Abelardo and Victor and Pedro.  And this isn't something that just goes away.  It's a trauma that they live with for the rest of their lives.

It's a traumatic situation that causes nightmares.  It causes the inability to, as Victor said, sometimes trust people.  If somebody walks up behind him, he's still jumpy because it's awful.  And then, you heard from Jorge and how it affected his family, the death of his brother, how it affected his father, how it affected his mother, and how it continues to affect him and the rest of their family.

These are not crimes that just disappear.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

They're lasting forever crimes that change people.  It changes who people are.  It's changed Victor Espinoza.  It has changed Pedro Portillo.  And it's changed the family of Abelardo Sagastume.

Unfortunately, we couldn't even identify and notify the family of Hector because all we knew was that his name was Hector.  And that came from the victims who were there with him.  We don't even -- there's a family out there that doesn't know that their child, their brother, their son is dead because we can't even identify exactly who he is or where he came from.

Your Honor, these are terrible situations.  It's trauma.  And as Jorge Sagastume told you in his statement that this is for money.  They killed these people because they didn't pay a fee?  $1800 for his brother.  They didn't pay a fee?  Because they tried to escape?  Because they were afraid they couldn't pay the fee?  Because their family members called -- threatened to call Immigration and get him in trouble?  That's what we're talking about here, Judge.

And given his participation in these events, given his management of the warehouse where this occurred, it is our recommendation that he -- that you accept the plea agreement which gives a sentencing range of 30 to 40 years and that you sentence him to 40 years.

We also disagree that he should be given credit,

at least not full credit, for the time that he spent on the obstruction charge.  That was a totally different charge.  He obstructed justice.  There's no doubt about that.  He made phone calls to his family members to go get evidence out of his home so that it wouldn't be found.  We intercepted it because it's jail calls and we could listen to them, and he was charged.  He has to do time on that separate and apart from this crime.

And so, we would ask that he not be given the credit that he spent on that crime specifically.  If there's any additional time that he spent that should be credited to the murder case, then, obviously, he's entitled to that.  But we would ask that you sentence him to 40 years and not go below 30 years in order to keep the plea agreement intact and that you take into account the victims, their hardships, their families, and the actions of this defendant.

THE COURT:  All right.

MS. STELZIG:  Your Honor, I'm very sorry.  I just wanted to just briefly.  I don't want to belabor the point.  I did forget to submit these, and I did want the Court to have these exhibits.

MS. STOTTS:  And there's no objection, your Honor.

THE COURT:  Well, I'm not -- I heard the testimony. For you to submit them to me is for me to have to give them back to you because I don't have any place to keep those, and I understand what the -- I understand from the testimony what the

arguments have been from you as well as in your -- in your memorandum.

So, for purposes of the record, the Court admits your exhibits but the Court is not going to review those exhibits at this time.  The Court has heard the testimony associated with them.

MS. STELZIG:  Okay.  So, your Honor -- and I'm sorry -- because you asked for a description earlier -- I can make a brief proffer about the contents.

THE COURT:  You don't need to make a brief proffer.  I heard the testimony that you presented.  Is that what you're talking about, the photographs and the pictures?

MS. STELZIG:  Yes, your Honor.

THE COURT:  No.  I think we -- I need to hear from the defendant.

MS. STELZIG:  Okay.  Very well, your Honor.  I appreciate it.

THE COURT:  All right.  Just hold him there.  Just hold him there.  That's fine.

It's your turn, Mr. Duran.

THE DEFENDANT:  (In English)  Good afternoon, Judge Hoyt.

THE COURT:  By the way, let me just preface your remarks with I do have a letter, a copy of a letter that you forwarded to the Court that became a part of the memorandum that

Gayle Dye, CSR, RDR, CRR - 713.250.5582

your counsel submitted to the Court where you spoke about certain things.

I certainly have the information that you provided in your admissions and so forth in the plea agreement. And so, with that in mind, you may go -- and letters.  I do have the letters.  I've reviewed the -- a very comprehensive submission by your attorneys in this matter.

You may proceed.

THE DEFENDANT:  (In English)  Okay.  I'm nervous.  I'm not a public speaker.  I want to thank you for the chance to -- to speak to you.  I accept responsibility for my crimes.  I made terrible decisions.  I let smugglers into my warehouse and two men were killed.

THE COURT REPORTER:  I'm sorry?

THE COURT:  You let who in your warehouse?

INTERPRETER DE VILLAR, JR.:  I let smugglers into my warehouse and two men were killed.

THE COURT:  Pull that mike closer to you because you're speaking directly to the Court.  Go ahead.

THE DEFENDANT:  (In English)  I wish I could go back in time and change everything.  I should have just paid the debt to the smugglers, but I was afraid.  I am sorry for that.  I've been over 18 years in pretrial detention.  I have lost everything:  my work, my home, my family.  I've not seen my children for 17 years.

Now, I live in a housing unit at the Federal Detention Center.  That's my work.  I sleep and eat in one of those 52 metal cages there.

THE COURT REPORTER:  I'm sorry?

THE DEFENDANT:  (In English)  I sleep and eat in one of those 52 metal cages there.

I know every brick, every smell, every voice.  I had Covid twice.  I thought I was going to die alone in my cell.  My casualty will be my grave.  But I am a different man now than the one who arrive here 18 years ago.  I am a better person.  There is not a lot of hope in the Federal Detention Center, but I hope every day I woke up and try to be the best person I can be.

Many of the other men come to me for advice I think because I have been detained there for so long.  I counsel them to do their time the right way, to stay out of trouble, and to do everything they can to get home to their families.  I feel good that my experience can help others.

Judge Hoyt, if you give me the chance to return to the community, I will continue to counsel young men.  I will always help people and lead the best life I can.

Thank you for hearing my case and for being so fair to me.  Respectfully.

THE COURT:  All right.  Anyone else have anything to say why sentence shouldn't be imposed at this time?

MS. STOTTS:  No, your Honor.

MS. STELZIG:  No.

THE COURT:  There can be no reward, we might say, for becoming who you ought to be.  In other words, there is nothing to be gained except what you give; and you should never receive a reward for becoming who you should be or ought to be.

If you have studied any societies and how things happen in society, what we learn is that we lose society generally not by the things that are happening in society but by the failure of people who are in a position to do something about what is happening failed to do anything.  So, we sit and we wait for someone else to do it.

You were in a position to do that.  You were in a position to stop something from happening.  You were in a position to save these men's lives.  You cannot be rewarded for that, although in my judgment this is not a sentence that should be considered to be a sentence of retribution or somehow a sentence that is designed to, for lack of a better term, punish you for something you didn't do.  It is a sentence that is to be imposed upon conduct for which you engaged in and permitted others to engage in under your supervision.

In my judgment, Title 18 United States Code Section 3553(a) -- or 3553 and its subparts and considering the sentencing guidelines as they play out in this -- in this process, it seems to me that two things ought to happen:  First

of all, based upon my familiarity in handling of this case as it relates to the 06-459, I'm of the opinion that that is, in my judgment, a part of what the government did when it could have indicted you in the first instance.

I'm very concerned that the government would indict you for obstruction when they could have indicted you for what they did -- I mean, what they could have done and, that is, the death of these men.  To the extent that there is some parsing out and piecemeal sentencing, the Court -- in judgment the Court was concerned about that; and I think I might have written something to that effect.

Be that as it may, I'm of the opinion that the Bureau of Prisons should give you credit for the time that you served in Cause Number 06-459 because you have served the time for obstruction and that is something that the Court is of the opinion should be provided to you.

The fact that -- that the Court should provide it to you.  The Bureau of Prisons might see it differently, and it may be that there has to be something done on the Court's part to see that that happens.  But that's where I am in this situation.

With the reduction for acceptance of responsibility, the Court would be required to, and will, vary this sentence by one point so that I can sentence you to what I believe to be the appropriate sentence in this case.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

And this is a sentence that you're going to probably disagree with and, perhaps, even the victims of the circumstances. And I say "the victims" meaning not the persons who are deceased but the ones who watched and, in their own terror, went through their own death, as it may be said, during the time of these beatings and the consequences of these beatings.

It is the Court's opinion that you should be sentenced to 360 months' confinement -- I'm sorry -- 365 months' confinement, which is at the high end of the sentencing guidelines. I believe that would be the sentence under that -- under the numbering system that is in place.

365 months' confinement would give you credit for the two points and would also vary the sentence by one point -- or vary the calculation by one point to bring you within that range of 365 months' confinement. Giving credit for time served in Cause Number 06-459, BOP can figure out what that amounts to.

In this circumstance, the Court would sentence you to that term of confinement. As well, the Court sentences you to a term of five years supervised release to follow any term of confinement. And, of course, you're not to commit another federal, state, or local crime and comply with the standard conditions of supervised release that have been adopted by this Court.

You're to cooperate in the collection of a DNA

sample pursuant to the act.

The Court will -- there is -- you have no ability under the circumstances to pay a fine, and no fine will be imposed.  The special assessment is $100, and that's due and payable immediately.

There is no -- and I did not hear -- and, of course, maybe there isn't any basis to consider it at this point.  I did not hear any cost as it relates to -- associated with the cost of burial of these individuals.  But I think that under the circumstances, apparently, there is no data on that; otherwise, I would impose that as a sanction against you under the circumstances but not a fine to be imposed.

There are some additional requirements that the Court is going to require under the appendices to the presentence investigation report.  I'll ask the probation officer to speak to those appendices, one of which certainly might have to do with your -- I don't know that Immigration has a detainer.  They probably have not filed any detainer.

But in the event there is a detainer filed, I'm going to direct that you comply with all of the terms and conditions that are -- that you report to Immigration, ICE, and comply with all the conditions and circumstances set by them under whatever those circumstances may be, that is, after you serve your term of confinement.  And, of course, that will be an overlay of supervision in addition to what the probation office

might seek to impose.

Yes, ma'am.

PROBATION OFFICER CYNTHIA REYES:  Your Honor, the --

THE COURT:  Your name for the record.

PROBATION OFFICER CYNTHIA REYES.  The only other condition would be the mental health condition of the defendant.

Cynthia Reyes.

Your Honor, I just wanted to clarify on the supervision.

THE COURT:  Go ahead.

PROBATION OFFICER CYNTHIA REYES:  You said five years for the instant offense.

THE COURT:  Yes.

PROBATION OFFICER CYNTHIA REYES:  But because he's been in custody before he started the TSR with the other case --

THE COURT:  Yeah.  It will need to run -- yeah.  It will need to run concurrent.  It needs to run concurrent with -- I think that was a three-year term.  I don't recall.

PROBATION OFFICER CYNTHIA REYES:  Correct.

THE COURT:  But I think it needs to run concurrently with that three-year term of 06-459.

In the event probation determines that under -- at the time of supervision you require some mental health treatment, you are to certainly comply with that and pay the costs associated with any treatment to the extent of your

Gayle Dye, CSR, RDR, CRR - 713.250.5582

ability.

To the extent that a physician orders you to pay -- orders you to take medication, you are to pay for that medication; and that medication alone is the medication that you should be taking.  You are not to take other medications or self-medicate in any fashion or manner.

And all medication taken should be your medication, not someone else's medication.  And they certainly should not be taking your medication.  You should not be offering your own medication to individuals.  That would be a violation of federal law because you'd be trafficking at that point.

I believe that would cover the mental health concerns that the Court has.  It doesn't sound as though you need mental health treatment, but we don't know what those circumstances will be in the free world once you step outside the doors of your confinement.  And that's the reason for it.

Anything else, counsel?

MS. STOTTS:  No, your Honor.

THE COURT:  Was there any other -- there were no other counts?

THE CASE MANAGER:  Yes, your Honor.

MS. STOTTS:  Yes, there are.

THE COURT:  I don't know what those counts --

MS. STOTTS:  I'm not sure either, your Honor.  I'll

Gayle Dye, CSR, RDR, CRR - 713.250.5582

submit a motion.

THE CASE MANAGER:  Okay.

THE COURT:  Submit a written motion on that, and I will grant those.

Anything else from defense?

MS. STELZIG:  Your Honor, just very briefly.  We did have language that we would ask the Court to include in the judgment just to make sure that the Bureau of Prisons honors the Court's view that Mr. Duran-Gomez should receive credit.

THE COURT:  I did say that, and I am indicating in the judgment that the BOP should give credit for that time served against the time that I have entered -- that I have sentenced him to here.

MS. STELZIG:  Thank you, your Honor.  And did the Court want to include the specific amount of time that was calculated by our --

THE COURT:  Oh, I see what you mean.  Well, I think they have the ability to do that.  But if your numbers are correct, that would be 4 years, 4 months, and 23 days.

MS. STELZIG:  Yes, your Honor.  And we would also request that the Court directly reference 5K2.23 --

THE COURT:  All right.

MS. STELZIG:  -- to make it clear to the Bureau of Prisons.  Again, I've occasionally had issues where --

THE COURT:  And that would be 5K2 point --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

MS. STELZIG:  -- 23.

THE COURT:  -- 23 would the basis upon which that request is made.

MS. STELZIG:  Thank you, your Honor.

THE COURT:  Finally, the Court is going to -- I'm of the opinion that the defendant should be -- should be housed in a low-level institution under the circumstances, but I leave that classification to the BOP.  But that's just a recommendation.

Anything else?

MS. STELZIG:  Understood.  And, your Honor, just in terms of the request for designation of a facility, we included three in the report from Ms. Baird; but that was FCI Butner --

THE COURT:  I would not do that.  I think if those are the three low-level institutions, I'm suggesting and saying to the BOP you have the right to make this decision but also where you might locate him.

MS. STELZIG:  I appreciate that, your Honor.  I apologize.  Perhaps, this is a difference in practice.  Our -- this is partly because Mr. Duran-Gomez wanted to be closer to his family who he is still in contact with who are in Virginia.  So, we were -- we were looking for facilities that were close to his family in Virginia.  That's why we --

THE COURT:  Well, let me say it like this:  It is my -- it would be my recommendation -- and it certainly should be

the policy of the bureau to place the -- a defendant as close to his family as they can so, when the time comes for transition, he will be able to make that transition without having to go across the country to do it.

And so, whatever that facility is close to the Virginia area, I would recommend that facility.

MS. STELZIG:  Thank you, your Honor.

PROBATION OFFICER CYNTHIA REYES:  Your Honor, there was something she wanted attached to the judgment -- the PSR, I'm sorry.

MS. STELZIG:  Defense Exhibit 22 to the sentencing memorandum.  It's the report from Maureen Baird.

THE COURT:  That would be -- that would be the report of the evaluator --

MS. STELZIG:  Correct, your Honor.

THE COURT:  -- who made that determination as to the facilities and what his state of mind and all that is at this point?

MS. STELZIG:  That's correct, your Honor.

PROBATION OFFICER CYNTHIA REYES:  Just to be clear, it would be attached to the PSR, not the judgment.

THE COURT:  To the PSR.  Yeah, not the judgment.  The PSR.

MS. STELZIG:  Thank you, Ms. Reyes.

THE COURT:  Anything else?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

MS. STOTTS:  Nothing further.

MS. STELZIG:  Nothing further.

THE COURT:  All right.  Thank you very much, ladies.

Good luck, sir.

(Proceedings concluded at 4:36 p.m.)


C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter, to

the best of my ability.


By: /s/*Gayle L Dye*_____        *05-26-2025*_____

Gayle L. Dye, CSR, RDR, CRR        Date


Gayle Dye, CSR, RDR, CRR - 713.250.5582

| $ | | |
|---|---|---|
| **$100** [1] - 92:4 | **21201** [1] - 2:7 | **77002** [3] - 1:16, 2:12, 2:24 |
| **$1800** [3] - 41:11, 41:13, 84:15 | **21st** [1] - 45:17 | |

**21201** [1] - 2:7
**21st** [1] - 45:17
**22** [9] - 20:12, 20:19, 20:25, 21:12, 26:20, 75:23, 77:25, 79:14, 97:11
**23** [4] - 77:1, 95:19, 96:1, 96:2
**2300** [1] - 1:16
**24** [1] - 3:6
**26** [1] - 3:8
**28th** [1] - 48:5
**2:55** [1] - 44:11

**'**

**'80s** [1] - 72:5
**'90s** [1] - 72:5
**'El** [1] - 35:22

**77002** [3] - 1:16, 2:12, 2:24

# 8

**8** [1] - 1:6
**80** [1] - 51:21
**8004** [1] - 2:23
**81** [1] - 52:7
**84** [1] - 52:11

# /

**/s/Gayle** [1] - 98:15

# 3

**3** [1] - 45:4
**30** [5] - 64:18, 68:8, 76:16, 84:23, 85:12
**30-minute** [1] - 68:9
**301.344.0600** [1] - 1:23
**33** [1] - 3:8
**3553** [1] - 89:23
**3553(a** [1] - 89:23
**360** [1] - 91:9
**365** [3] - 91:9, 91:13, 91:16
**38** [1] - 3:9
**3:14** [1] - 44:12

# 9

**9** [1] - 3:5
**9th** [1] - 2:6

# 0

**05-26-2025** [1] - 98:15
**06-459** [5] - 76:25, 90:2, 90:14, 91:17, 93:21

# A

**abandonment** [1] - 70:12
**Abelardo** [23] - 7:1, 14:10, 15:23, 16:7, 16:14, 17:25, 25:6, 25:19, 27:21, 28:3, 30:10, 31:15, 31:19, 31:20, 32:16, 33:2, 40:3, 40:15, 79:2, 79:20, 80:15, 83:15, 84:3
**Abelardo's** [1] - 81:4
**ability** [4] - 92:2, 94:1, 95:18, 98:13
**able** [8] - 5:14, 11:5, 22:3, 22:7, 48:8, 58:12, 71:22, 97:3
**above-entitled** [1] - 98:12
**Abraham** [1] - 33:19
**absolutely** [3] - 73:1, 78:6, 78:11
**accept** [7] - 50:3, 54:21, 55:4, 64:17, 76:16, 84:22, 87:11
**acceptance** [12] - 52:12, 52:21, 53:1, 54:9, 54:17, 59:8, 59:11, 59:14, 59:18, 60:4, 62:10, 90:22
**accepted** [2] - 60:19, 63:13
**accepts** [1] - 50:6
**access** [1] - 77:14
**according** [3] - 20:22, 20:25, 77:25
**account** [2] - 76:23, 85:14
**accurate** [2] - 50:1, 50:23
**accurately** [1] - 55:9
**acknowledge** [2] - 67:5, 70:17
**acknowledging** [1] - 63:7
**act** [2] - 78:23, 92:1
**acted** [2] - 70:19, 78:24
**Action** [1] - 1:4
**actions** [3] - 63:20, 73:11, 85:15
**activities** [1] - 54:6
**activity** [1] - 65:19
**acts** [2] - 81:19, 82:2
**actual** [1] - 5:18
**addendum** [1] - 50:15
**addition** [1] - 92:25
**additional** [6] - 51:19, 60:20, 61:15, 61:21, 85:10, 92:13
**address** [13] - 4:20, 4:21, 46:6, 50:8, 52:17, 53:7, 53:8, 58:4, 58:19, 59:5, 64:10, 77:5, 77:18
**addressed** [2] - 50:17, 75:23

# 1

**1** [2] - 34:12, 44:22
**10** [3] - 4:3, 44:9
**10-459** [2] - 4:3, 47:4
**10-minute** [1] - 44:8
**100** [3] - 2:6, 73:1, 83:3
**1000** [1] - 1:15
**11-24** [1] - 34:14
**11-41** [1] - 34:15
**12** [3] - 9:21, 14:14, 29:9
**13** [2] - 68:17, 69:5
**15** [2] - 9:21, 44:9
**16** [4] - 43:24, 74:3, 83:10, 83:11
**16th** [1] - 34:20
**17** [2] - 73:15, 87:25
**18** [9] - 3:5, 50:19, 51:7, 51:8, 54:20, 57:6, 87:23, 88:10, 89:22
**19** [8] - 24:11, 24:13, 64:14, 73:16, 73:19, 74:11, 78:18, 83:9
**1:34** [1] - 1:7

# 4

**4** [5] - 45:15, 76:25, 95:19
**40** [4] - 3:11, 84:23, 84:24, 85:12
**410.962.0872** [1] - 2:8
**410.962.3962** [1] - 2:7
**42** [2] - 3:11, 61:14
**43** [9] - 3:12, 61:18, 61:19, 61:20, 62:9, 62:10, 62:18, 62:20
**440** [1] - 2:11
**4:36** [1] - 98:5

# 5

**5** [1] - 45:18
**515** [1] - 2:23
**52** [2] - 88:3, 88:6
**5K2** [1] - 95:25
**5K2.23** [2] - 76:23, 95:21

# 6

**6** [1] - 45:20
**64** [1] - 54:20
**6411** [1] - 1:22
**68** [4] - 50:19, 51:8, 51:9, 57:6

# 7

**710** [1] - 1:22
**713.223.5575** [1] - 2:12
**713.224.2815** [1] - 2:13
**713.250.5582** [1] - 2:24
**713.567.9691** [1] - 1:17
**75** [2] - 51:5, 51:14

# 2

**2** [1] - 45:1
**20** [3] - 4:3, 55:25
**200** [1] - 2:11
**2005** [1] - 54:12
**2006** [15] - 9:10, 9:22, 18:14, 20:12, 20:19, 20:25, 21:12, 24:12, 26:23, 40:24, 45:17, 54:14, 76:19, 77:21, 78:20
**2007** [4] - 33:10, 34:20, 54:15, 54:16
**2008** [3] - 22:12, 22:24, 36:20
**2014** [1] - 69:23
**2019** [2] - 37:23, 75:21
**2024** [1] - 47:17
**2025** [2] - 1:6, 48:5
**20770** [1] - 1:23

**addressing** [1] - 51:23
**adjustment** [4] - 8:10, 52:11, 52:25, 76:23
**admissions** [1] - 87:4
**admits** [3] - 80:11, 80:13, 86:3
**adopt** [1] - 49:24
**adopted** [2] - 62:13, 91:23
**advice** [1] - 88:14
**advised** [1] - 68:15
**advising** [1] - 75:17
**affair** [1] - 70:20
**affect** [2] - 59:24, 83:24
**affected** [4] - 41:4, 83:22, 83:23
**afraid** [2] - 84:16, 87:22
**aftermath** [1] - 71:10
**afternoon** [10] - 4:2, 4:6, 4:10, 4:18, 18:11, 33:9, 40:10, 43:3, 43:21, 86:21
**afterwards** [1] - 11:24
**age** [1] - 83:10
**agent** [3] - 22:23, 33:24, 45:18
**ago** [3] - 24:13, 36:12, 88:10
**agonizing** [3] - 16:5, 16:8, 18:1
**agony** [1] - 80:16
**agree** [5] - 53:19, 54:19, 55:10, 56:22, 83:5
**agreed** [5] - 50:21, 55:1, 55:21, 56:21, 60:14
**agreement** [20] - 47:14, 47:21, 47:23, 49:23, 50:22, 52:14, 52:16, 53:4, 53:6, 55:1, 55:8, 55:12, 59:22, 63:21, 64:17, 80:11, 84:22, 85:13, 87:4
**ahead** [12] - 4:21, 40:22, 45:14, 51:17, 51:18, 53:5, 53:8, 55:6, 62:23, 63:4, 87:19, 93:10
**AIDED** [1] - 1:25
**alcohol** [2] - 30:20, 81:14
**alien** [1] - 35:10
**aliens** [1] - 59:3
**alive** [1] - 83:6
**allocute** [3] - 49:10, 50:10, 62:24
**allocution** [1] - 46:21
**allow** [2] - 66:3, 66:5
**allowed** [1] - 24:24
**almost** [4] - 24:11, 24:13, 73:14, 74:11
**alone** [6] - 41:6, 73:20, 74:17, 74:19, 88:8, 94:4
**AMERICA** [3] - 1:4, 1:13, 3:3
**America** [4] - 4:4, 47:5, 71:20, 81:7
**amount** [3] - 65:12, 78:1, 95:15
**amounts** [1] - 91:17
**analyzing** [1] - 41:24
**animal** [2] - 40:17, 40:18
**ankles** [2] - 32:12, 32:13
**answer** [2] - 8:19, 70:1
**anticipate** [2] - 6:14, 73:25
**ANTONIO** [3] - 3:7, 26:3, 43:20
**Antonio** [2] - 3:12, 26:10
**anyway** [1] - 53:5
**apart** [3] - 39:15, 39:20, 85:7

**apologize** [2] - 20:6, 96:19
**appear** [3] - 16:9, 25:8, 25:18
**APPEARANCES** [1] - 2:1
**aPPEARANCES** [1] - 1:12
**appendices** [2] - 92:14, 92:16
**applied** [1] - 76:21
**apply** [2] - 43:3, 43:15
**appreciate** [4] - 4:18, 57:22, 86:17, 96:18
**appreciation** [1] - 41:10
**approach** [1] - 46:14
**appropriate** [13] - 5:15, 50:10, 52:4, 53:1, 54:7, 55:2, 58:17, 60:14, 60:22, 63:25, 69:16, 71:25, 90:25
**approximate** [1] - 26:19
**April** [2] - 33:10, 34:20
**area** [2] - 11:16, 97:6
**argue** [2] - 25:13, 62:14
**argument** [3] - 7:9, 51:20, 62:8
**arguments** [2] - 50:9, 86:1
**array** [2] - 19:20, 35:2
**arrays** [5] - 34:5, 36:17, 44:23, 45:2
**arrest** [2] - 64:9, 74:7
**arrested** [2] - 69:25, 74:13
**arrive** [1] - 88:10
**arrived** [4] - 10:2, 18:23, 32:6, 41:2
**art** [1] - 75:4
**aside** [1] - 58:1
**assault** [1] - 78:13
**assessing** [1] - 63:25
**assessment** [2] - 53:20, 92:4
**assigned** [1] - 69:15
**Assistant** [3] - 1:14, 1:20, 2:4
**associated** [5] - 38:15, 68:2, 86:6, 92:8, 93:25
**attached** [2] - 97:9, 97:21
**attachment** [1] - 77:4
**attempt** [1] - 67:6
**attempted** [1] - 9:22
**attention** [3] - 28:11, 36:6, 50:2
**attorney** [5] - 47:12, 48:9, 48:15, 74:18, 80:18
**Attorney** [1] - 1:14
**ATTORNEY'S** [1] - 1:15
**attorneys** [2] - 47:24, 87:7
**authorization** [1] - 72:11
**autism** [1] - 76:7
**available** [3] - 67:14, 68:21, 73:19
**avoid** [2] - 72:3, 75:18
**avoiding** [1] - 75:17
**award** [1] - 76:21
**awful** [1] - 83:21

**B**

**backdrop** [1] - 71:9
**background** [3] - 64:8, 70:10, 71:24
**bad** [3] - 31:21, 74:14, 81:2
**badly** [1] - 71:18

**bag** [9] - 15:12, 15:13, 15:16, 18:4, 23:17, 25:2, 25:4, 30:5, 75:5
**bags** [4] - 12:19, 24:25, 80:1
**baird** [1] - 96:13
**Baird** [1] - 97:12
**Baird's** [1] - 77:13
**Baltimore** [1] - 2:7
**bar** [1] - 61:8
**based** [2] - 54:24, 90:1
**basis** [13] - 49:22, 54:22, 54:25, 55:10, 55:12, 55:20, 55:25, 56:18, 56:21, 68:10, 80:11, 92:7, 96:2
**Bate** [1] - 34:14
**Bate-stamped** [1] - 34:14
**bearing** [2] - 58:15, 58:16
**bearings** [1] - 47:3
**bears** [1] - 69:21
**beast** [1] - 41:3
**beat** [31] - 11:14, 12:6, 12:11, 12:17, 12:22, 12:25, 14:2, 14:18, 15:16, 16:4, 19:11, 20:14, 20:15, 20:18, 21:5, 21:6, 21:7, 21:10, 21:13, 21:14, 29:10, 29:23, 29:25, 30:4, 32:10, 39:2, 39:3, 43:11, 54:4, 79:7
**beaten** [12] - 10:4, 11:21, 15:21, 23:18, 30:13, 32:3, 35:22, 71:18, 78:1, 81:8, 81:10, 83:5
**beating** [9] - 12:7, 12:9, 12:10, 12:15, 14:20, 16:15, 24:24, 30:18, 67:8
**beatings** [18] - 12:11, 12:20, 13:19, 14:8, 24:20, 25:8, 25:18, 29:12, 31:5, 46:3, 63:21, 69:20, 80:12, 81:23, 82:24, 91:6, 91:7
**beats** [1] - 80:1
**beautiful** [1] - 75:6
**became** [2] - 36:2, 86:25
**become** [2] - 75:9, 76:14
**becomes** [1] - 62:19
**becoming** [2] - 89:4, 89:6
**bed** [1] - 75:1
**beer** [1] - 81:13
**BEFORE** [1] - 1:10
**began** [1] - 65:13
**begging** [3] - 16:14, 16:16, 17:12
**beginning** [2] - 24:16, 69:8
**begun** [1] - 21:20
**behalf** [6] - 4:12, 9:1, 26:3, 46:18, 46:23, 62:24
**behavior** [1] - 81:12
**behind** [2] - 43:15, 83:20
**beings** [1] - 81:15
**belabor** [1] - 85:18
**below** [1] - 85:12
**best** [5] - 48:7, 54:25, 88:12, 88:21, 98:13
**better** [7] - 45:25, 80:24, 81:3, 81:5, 88:10, 89:18
**between** [2] - 52:16, 61:8
**beyond** [1] - 69:12

**big** [1] - 43:13
**bit** [4] - 26:21, 36:12, 67:24, 75:23
**blame** [2] - 63:16, 69:15
**blind** [1] - 76:6
**blow** [1] - 82:24
**blows** [3] - 82:21, 82:22, 82:23
**bodies** [2] - 71:14, 82:14
**body** [4] - 14:9, 19:5, 19:6, 38:7
**Bolanos** [8] - 52:1, 66:15, 67:25, 68:3, 70:2, 78:23, 79:5, 82:16
**Bolanos-Garza** [4] - 52:1, 67:25, 68:3, 79:5
**boots** [4] - 29:1, 32:12, 80:2
**BOP** [4] - 91:17, 95:11, 96:8, 96:16
**border** [1] - 66:23
**born** [1] - 40:19
**boss** [2] - 17:3, 53:24
**bottle** [8] - 13:3, 13:4, 13:5, 30:19, 30:20, 30:23, 30:25, 81:13
**break** [3] - 5:4, 32:13, 44:8
**brick** [1] - 88:7
**brief** [4] - 22:19, 50:14, 86:9, 86:10
**briefly** [7] - 22:19, 24:8, 64:7, 64:10, 73:9, 85:18, 95:6
**bring** [2] - 50:2, 91:15
**bringing** [2] - 18:4, 60:20
**brings** [1] - 63:8
**broke** [2] - 13:2, 30:19
**brooms** [1] - 12:17
**broomsticks** [3] - 12:17, 28:25, 80:3
**brother** [23] - 6:25, 39:7, 40:1, 40:2, 40:15, 40:22, 40:24, 41:1, 41:6, 41:8, 41:15, 41:19, 41:24, 42:9, 42:10, 43:7, 81:4, 81:5, 83:14, 83:22, 84:9, 84:15
**brother's** [1] - 41:11
**brought** [10] - 10:18, 10:20, 10:22, 23:2, 23:5, 27:4, 27:9, 57:23, 75:20
**brutal** [1] - 63:10
**bullet** [1] - 15:10
**bureau** [1] - 97:1
**Bureau** [7] - 51:2, 76:20, 77:14, 90:13, 90:18, 95:8, 95:23
**burial** [1] - 92:9
**burn** [2] - 30:21, 79:24
**burns** [1] - 80:3
**business** [14] - 65:13, 65:16, 65:17, 65:18, 65:21, 65:22, 66:2, 66:17, 67:9, 67:11, 67:12, 72:14, 72:19
**businesses** [1] - 66:10
**butner** [1] - 96:13
**BY** [21] - 1:25, 3:5, 3:5, 3:6, 3:8, 3:8, 3:9, 9:5, 18:10, 20:7, 22:10, 22:20, 24:1, 24:10, 25:17, 26:8, 33:8, 33:17, 34:17, 36:1, 38:23

## C

**cages** [2] - 88:3, 88:6
**calculated** [1] - 95:16
**calculation** [3] - 52:18, 62:5, 91:15

**calculations** [3] - 59:25, 60:3, 61:24
**California** [5] - 33:12, 33:14, 33:15, 37:14, 37:23
**calmer** [1] - 78:15
**cannot** [2] - 42:7, 89:15
**capped** [1] - 62:9
**card** [1] - 72:11
**caregiver** [1] - 71:19
**caring** [1] - 70:24
**carried** [1] - 82:9
**cartel** [1] - 67:10
**cartels** [1] - 66:22
**CASE** [2] - 94:22, 95:2
**case** [40] - 7:6, 7:18, 22:4, 22:23, 24:11, 33:10, 41:4, 45:18, 47:25, 49:16, 49:19, 50:11, 51:25, 52:12, 52:24, 52:25, 53:15, 53:16, 54:7, 54:11, 58:5, 58:14, 58:18, 60:19, 60:21, 64:9, 64:15, 64:21, 65:5, 70:16, 74:7, 76:24, 83:4, 85:11, 88:22, 90:1, 90:25, 93:15
**casing** [1] - 15:10
**casualty** [1] - 88:9
**category** [1] - 61:13
**caught** [2] - 82:19, 82:20
**caused** [2] - 11:14, 43:13
**causes** [2] - 83:18, 83:19
**cell** [3] - 67:23, 68:7, 88:8
**cellmate** [2] - 76:6, 76:7
**cellmates** [3] - 76:5, 76:7, 76:9
**center** [3] - 76:13, 88:2, 88:11
**certain** [2] - 63:24, 87:2
**certainly** [13] - 5:11, 7:17, 46:4, 46:24, 49:15, 56:16, 71:7, 73:6, 87:3, 92:16, 93:24, 94:8, 96:25
**certify** [1] - 98:11
**challenge** [1] - 45:25
**chance** [4] - 42:20, 48:21, 87:10, 88:19
**change** [4] - 10:14, 10:16, 84:1, 87:21
**changed** [7] - 61:20, 64:24, 74:4, 79:22, 84:2, 84:3
**changes** [1] - 84:1
**charge** [18] - 10:9, 16:21, 16:23, 17:1, 27:18, 28:8, 39:1, 54:2, 54:10, 57:8, 57:20, 57:23, 58:5, 59:4, 60:4, 69:24, 85:2
**charged** [6] - 54:13, 73:12, 74:17, 74:19, 85:6
**Charles** [1] - 2:6
**chess** [2] - 75:9
**Chester** [1] - 2:17
**child** [4] - 70:12, 70:13, 71:12, 84:9
**children** [5] - 70:24, 71:15, 73:13, 73:15, 87:25
**Chino** [10] - 28:7, 29:3, 29:19, 30:25, 32:4, 32:25, 33:1, 36:8, 36:11, 81:14
**Chino'** [1] - 35:22
**chips** [1] - 75:5
**Chirilagua** [2] - 71:13, 72:5
**choices** [4] - 63:19, 74:13, 74:14, 74:25

**church** [1] - 71:6
**circumstance** [1] - 91:18
**circumstances** [16] - 52:25, 56:9, 63:16, 63:22, 64:4, 64:21, 70:6, 74:13, 91:3, 92:3, 92:10, 92:12, 92:22, 92:23, 94:16, 96:7
**civil** [2] - 71:10
**clarify** [3] - 21:8, 38:8, 93:8
**classification** [1] - 96:8
**clean** [1] - 74:25
**clear** [8] - 20:22, 54:21, 61:12, 70:2, 81:21, 82:3, 95:23, 97:20
**client** [1] - 47:7
**close** [4] - 60:21, 96:22, 97:1, 97:5
**closer** [3] - 77:23, 87:18, 96:20
**clothes** [5] - 10:24, 10:25, 11:2, 27:10, 28:16
**clothing** [6] - 10:25, 11:5, 18:23, 18:25, 19:2, 54:4
**Code** [1] - 89:22
**collateral** [1] - 74:2
**collection** [1] - 91:25
**combination** [1] - 82:23
**comfortable** [1] - 78:11
**coming** [3] - 63:5, 71:12, 81:6
**commit** [2] - 81:1, 91:21
**committed** [3] - 24:19, 41:21, 42:17
**committing** [1] - 46:3
**common** [1] - 65:11
**community** [2] - 78:22, 88:20
**company** [2] - 37:18, 52:3
**compassion** [1] - 16:17
**compassionate** [1] - 42:5
**competency** [1] - 76:1
**completely** [3] - 24:17, 70:22, 74:19
**comply** [4] - 91:22, 92:20, 92:22, 93:24
**comprehensive** [1] - 87:6
**compromised** [1] - 66:6
**COMPUTER** [1] - 1:25
**COMPUTER-AIDED** [1] - 1:25
**concern** [2] - 58:21, 59:3
**concerned** [8] - 5:24, 58:6, 58:8, 58:14, 59:6, 71:21, 90:5, 90:10
**concerns** [5] - 4:24, 57:25, 58:9, 77:19, 94:14
**concluded** [1] - 98:5
**concluding** [2] - 45:8, 45:10
**concurrent** [2] - 93:17
**concurrently** [1] - 93:20
**condition** [5] - 16:7, 25:6, 25:7, 93:6
**conditions** [6] - 71:1, 73:17, 76:8, 91:23, 92:21, 92:22
**conduct** [5] - 50:18, 50:21, 58:7, 63:8, 89:20
**conducted** [2] - 74:12, 75:11
**confidence** [1] - 65:9
**confident** [1] - 65:6
**confined** [1] - 56:19
**confinement** [9] - 73:17, 91:9, 91:10,

91:13, 91:16, 91:19, 91:21, 92:24, 94:17
**conflict** [2] - 75:17, 75:18
**confrontation** [1] - 72:4
**consequence** [1] - 74:2
**consequences** [4] - 64:11, 73:9, 74:1, 91:6
**consider** [5] - 5:24, 53:12, 63:23, 64:13, 92:7
**consideration** [1] - 5:2
**considered** [2] - 55:11, 89:17
**considering** [1] - 89:23
**consistent** [2] - 67:13, 69:5
**conspiracy** [4] - 58:5, 63:18, 69:8, 80:9
**contact** [2] - 73:13, 96:21
**contacting** [1] - 70:3
**contain** [1] - 50:24
**contained** [1] - 49:25
**contents** [1] - 86:9
**continue** [1] - 88:20
**continued** [1] - 2:2
**continues** [1] - 83:24
**contrary** [1] - 66:1
**contributing** [1] - 83:7
**control** [1] - 74:24
**conversation** [1] - 68:23
**conviction** [1] - 64:12
**cook** [1] - 36:2
**cooperate** [1] - 91:25
**cooperated** [1] - 75:25
**cooperating** [1] - 22:4
**copy** [3] - 23:1, 77:13, 86:24
**Corley** [1] - 75:13
**correct** [81] - 16:3, 18:14, 18:24, 19:12, 19:18, 19:24, 20:10, 20:14, 21:21, 22:1, 22:5, 22:14, 23:12, 23:15, 23:18, 24:3, 26:15, 27:4, 27:5, 28:2, 28:4, 28:20, 29:11, 31:8, 31:9, 31:11, 31:15, 32:17, 33:10, 33:11, 33:13, 33:16, 33:19, 33:20, 33:22, 33:23, 33:25, 34:1, 34:3, 34:6, 34:7, 34:8, 34:21, 34:25, 35:1, 35:3, 35:4, 35:7, 35:8, 35:11, 35:12, 36:4, 36:9, 36:10, 36:12, 36:13, 36:15, 36:16, 36:19, 36:24, 36:25, 37:5, 37:10, 37:12, 37:15, 37:18, 37:21, 38:9, 47:15, 51:11, 52:19, 58:11, 58:24, 61:2, 61:16, 61:24, 93:19, 95:19, 97:15, 97:19, 98:11
**Correct** [1] - 8:14
**correctional** [3] - 75:2, 75:13, 75:15
**corrections** [2] - 48:9, 48:16
**correctly** [1] - 52:23
**cost** [4] - 41:11, 41:12, 92:8, 92:9
**costs** [1] - 93:25
**counsel** [9] - 4:12, 5:9, 25:10, 48:19, 50:12, 87:1, 88:15, 88:20, 94:18
**country** [7] - 22:1, 22:3, 40:24, 41:2, 68:1, 74:3, 97:4
**counts** [2] - 94:21, 94:24

**course** [16] - 12:24, 16:16, 21:6, 27:1, 37:20, 46:11, 60:11, 62:4, 62:7, 63:14, 68:24, 69:8, 91:21, 92:7, 92:24
**court** [2] - 44:11, 63:8
**COURT** [145] - 1:1, 2:22, 4:2, 4:8, 4:15, 4:17, 5:8, 5:23, 6:4, 6:7, 6:13, 6:17, 6:19, 6:21, 7:2, 7:20, 8:1, 8:4, 8:7, 8:15, 8:18, 18:8, 24:6, 25:10, 25:13, 25:16, 25:23, 25:25, 26:6, 33:6, 38:21, 39:5, 39:12, 39:17, 39:22, 39:25, 40:4, 40:7, 40:12, 41:12, 42:24, 43:18, 44:7, 44:13, 44:21, 45:7, 45:10, 45:14, 45:24, 46:8, 46:12, 46:14, 46:20, 46:24, 47:2, 47:11, 47:20, 48:4, 48:13, 48:19, 48:25, 49:3, 49:6, 49:10, 49:13, 51:6, 51:9, 51:12, 51:16, 52:6, 52:13, 53:3, 53:8, 53:13, 53:17, 54:12, 55:6, 55:17, 56:2, 56:4, 56:6, 56:8, 57:1, 57:3, 57:14, 57:17, 57:19, 59:9, 59:12, 59:19, 59:23, 60:1, 60:6, 60:17, 60:24, 61:3, 61:10, 61:17, 61:19, 62:2, 62:5, 62:11, 62:14, 62:17, 62:21, 62:23, 63:4, 68:19, 70:8, 77:2, 77:7, 77:16, 85:16, 85:22, 86:10, 86:14, 86:18, 86:23, 87:14, 87:15, 87:18, 88:4, 88:24, 89:3, 93:4, 93:10, 93:13, 93:16, 93:20, 94:20, 94:24, 95:3, 95:10, 95:17, 95:22, 95:25, 96:2, 96:14, 96:24, 97:13, 97:16, 97:22, 97:25, 98:3
**Court** [58] - 5:3, 12:5, 12:15, 26:16, 28:23, 32:5, 44:12, 46:6, 48:8, 48:16, 49:15, 49:21, 49:23, 49:24, 50:3, 50:4, 50:6, 50:17, 53:12, 54:20, 54:23, 55:3, 55:18, 60:14, 61:8, 62:1, 62:13, 63:5, 64:17, 64:20, 70:5, 73:8, 76:16, 77:6, 77:11, 85:19, 86:3, 86:4, 86:5, 86:25, 87:1, 87:19, 90:9, 90:10, 90:15, 90:17, 90:23, 91:18, 91:19, 91:24, 92:2, 92:14, 94:14, 95:7, 95:15, 95:21, 96:5
**Court's** [11] - 5:1, 22:9, 27:2, 50:2, 52:23, 54:9, 54:18, 77:19, 90:19, 91:8, 95:9
**cousin** [2] - 41:16, 66:16
**cover** [2] - 25:2, 94:13
**covered** [1] - 15:12
**Covid** [2] - 73:18, 88:8
**coyotes** [1] - 9:15
**credit** [12] - 61:12, 76:18, 76:21, 76:25, 84:25, 85:1, 85:9, 90:13, 91:13, 91:16, 95:9, 95:11
**credited** [1] - 85:10
**crime** [5] - 41:21, 68:2, 85:7, 85:9, 91:22
**crimes** [5] - 73:12, 81:1, 83:25, 84:1, 87:11
**criminal** [4] - 1:4, 61:13, 65:19, 76:24
**cross** [3] - 5:25, 6:3, 7:17
**CROSS** [4] - 3:5, 3:8, 18:9, 33:7
**cross-examination** [3] - 5:25, 6:3, 7:17
**CROSS-EXAMINATION** [4] - 3:5, 3:8,

18:9, 33:7
**CRR** [2] - 2:23, 98:16
**cry** [2] - 41:6
**crying** [1] - 32:2
**CSR** [2] - 2:23, 98:16
**culpability** [1] - 63:24
**current** [1] - 50:24
**custody** [5] - 21:23, 73:19, 76:19, 76:24, 93:15
**CYNTHIA** [13] - 57:13, 57:15, 57:18, 59:7, 59:10, 61:18, 93:3, 93:5, 93:11, 93:14, 93:19, 97:8, 97:20
**Cynthia** [2] - 2:17, 93:7

# D

**damage** [1] - 79:23
**dangerous** [1] - 65:19
**dark** [1] - 74:21
**data** [1] - 92:10
**date** [3] - 26:18, 26:19, 34:20
**Date** [1] - 98:16
**dated** [1] - 48:5
**Davis** [2] - 2:9, 4:14
**DAVIS** [1] - 2:10
**days** [11] - 26:20, 33:4, 39:2, 68:24, 74:21, 77:1, 77:25, 79:14, 81:11, 95:19
**DE** [4] - 47:10, 47:19, 48:3, 87:16
**de** [1] - 2:20
**dead** [5] - 18:5, 25:7, 43:6, 43:12, 84:9
**dealt** [1] - 57:6
**death** [11] - 41:5, 67:8, 69:10, 73:21, 74:20, 80:21, 81:9, 81:10, 83:22, 90:8, 91:5
**deaths** [2] - 32:23, 69:22
**debt** [1] - 87:21
**decade** [1] - 69:2
**deceased** [4] - 6:25, 40:2, 43:7, 91:4
**December** [2] - 26:22, 47:17
**decide** [2] - 44:4, 79:20
**decided** [1] - 74:23
**decision** [1] - 96:16
**decisions** [3] - 63:6, 63:19, 87:12
**defendant** [15] - 17:18, 46:3, 46:16, 46:18, 52:21, 58:6, 58:13, 58:22, 62:9, 62:25, 85:15, 86:15, 93:6, 96:6, 97:1
**Defendant** [1] - 1:7
**DEFENDANT** [11] - 1:19, 2:3, 47:9, 47:18, 48:2, 48:12, 48:18, 86:21, 87:9, 87:20, 88:5
**defendants** [2] - 58:7, 58:12
**defender** [1] - 4:11
**Defender** [2] - 1:20, 2:4
**defender's** [1] - 4:14
**DEFENDER'S** [2] - 1:21, 2:5
**defense** [19] - 5:11, 5:14, 5:19, 7:3, 7:13, 34:11, 38:1, 39:20, 44:15, 44:18, 44:22, 45:1, 45:4, 45:15, 45:18, 45:20, 69:5, 95:5, 97:11

**defer** [1] - 6:11
**definitely** [1] - 82:12
**delivered** [2] - 65:24, 82:22
**dependent** [1] - 72:15
**deported** [1] - 21:25
**describe** [2] - 40:17, 44:21
**described** [7] - 36:15, 38:6, 38:7, 63:21, 68:12, 69:5, 75:16
**describing** [2] - 36:18, 65:12
**description** [4] - 50:18, 50:20, 50:24, 86:8
**descriptions** [1] - 75:14
**deserve** [1] - 42:22
**deserves** [1] - 43:10
**designated** [2] - 51:1, 77:12
**designation** [2] - 77:4, 96:12
**designed** [1] - 89:18
**desire** [1] - 5:14
**despicable** [1] - 81:16
**detained** [1] - 88:15
**detainees** [1] - 76:13
**detainer** [3] - 92:18, 92:19
**detention** [4] - 76:13, 87:23, 88:2, 88:11
**determination** [3] - 56:11, 58:17, 97:16
**determined** [1] - 47:13
**determines** [1] - 93:22
**dialogue** [1] - 47:13
**DIAZ** [4] - 3:4, 7:25, 9:1, 43:2
**Diaz** [6] - 3:11, 9:7, 22:24, 45:3, 45:6, 45:16
**die** [9] - 25:7, 42:18, 42:20, 73:2, 73:6, 78:3, 80:19, 81:9, 88:8
**died** [9] - 13:3, 15:23, 32:2, 33:2, 41:5, 44:5, 63:10, 69:20, 82:7
**dies** [1] - 70:15
**difference** [2] - 58:5, 96:19
**different** [4] - 23:12, 31:15, 85:2, 88:9
**differently** [1] - 90:18
**difficult** [3] - 70:13, 72:7, 74:12
**difficulty** [1] - 31:23
**direct** [5] - 6:15, 36:6, 52:2, 72:4, 92:20
**DIRECT** [4] - 3:5, 3:8, 9:4, 26:7
**directed** [1] - 11:10
**directing** [1] - 54:2
**direction** [2] - 54:5, 54:7
**directions** [1] - 70:4
**directly** [5] - 7:12, 72:20, 73:7, 87:19, 95:21
**disagree** [2] - 84:25, 91:2
**disappear** [1] - 83:25
**disappeared** [1] - 71:14
**discharge** [1] - 51:15
**discovery** [3] - 34:15, 45:5, 45:21
**discretion** [4] - 52:24, 54:9, 54:18, 60:12
**discuss** [3] - 47:23, 47:24, 48:22
**discussed** [2] - 40:22, 64:2
**discussion** [1] - 61:8
**disputed** [1] - 56:8

**DISTRICT** [2] - 1:1, 1:2
**district** [1] - 69:24
**District** [2] - 1:21, 2:5
**DIVISION** [1] - 1:3
**DNA** [2] - 68:2, 91:25
**document** [2] - 47:16, 48:6
**documents** [3] - 34:14, 34:18, 64:22
**Donatti** [6] - 2:20, 8:2, 40:10, 41:15, 43:3, 43:21
**DONATTI** [6] - 8:14, 8:17, 20:5, 33:14, 35:24, 41:13
**done** [14] - 5:5, 17:21, 17:23, 22:24, 45:22, 50:5, 56:2, 56:4, 56:5, 56:20, 59:20, 74:7, 90:7, 90:19
**door** [1] - 72:20
**doors** [1] - 94:17
**doubt** [3] - 24:19, 78:7, 85:3
**doubts** [1] - 24:21
**down** [15] - 12:19, 13:18, 13:23, 15:3, 15:19, 15:21, 25:25, 28:18, 39:5, 55:20, 55:24, 61:20, 82:17
**dozens** [2] - 67:15
**drawings** [1] - 75:6
**dream** [2] - 41:25, 81:7
**dreamed** [2] - 40:21, 81:6
**dreamers** [1] - 40:20
**drive** [1] - 68:9
**driver** [1] - 65:15
**drivers** [2] - 54:3, 65:16
**driving** [1] - 66:23
**drunk** [1] - 13:4
**due** [1] - 92:4
**DURAN** [1] - 1:6
**Duran** [94] - 4:4, 4:9, 4:12, 13:14, 14:2, 17:8, 18:19, 19:21, 20:8, 20:14, 20:18, 21:1, 21:10, 22:16, 23:8, 24:23, 28:7, 28:9, 29:3, 29:15, 29:22, 29:25, 30:25, 32:4, 32:6, 32:7, 32:15, 32:21, 34:6, 38:2, 43:23, 45:22, 46:21, 47:5, 47:9, 47:10, 48:23, 51:1, 51:24, 52:11, 53:23, 60:18, 62:25, 63:2, 63:13, 63:17, 64:8, 64:11, 64:14, 64:19, 65:13, 65:21, 66:3, 67:4, 67:11, 67:24, 68:1, 68:4, 68:8, 69:9, 69:15, 69:19, 70:3, 70:10, 70:16, 71:11, 71:17, 72:2, 72:17, 72:25, 73:1, 73:6, 73:10, 73:24, 74:7, 74:12, 74:14, 74:23, 75:16, 76:2, 76:3, 76:12, 76:18, 76:24, 77:12, 77:20, 78:23, 81:13, 82:1, 83:3, 86:20, 95:9, 96:20
**Duran's** [1] - 37:17
**DURAN-GOMEZ** [1] - 1:6
**Duran-Gomez** [63] - 4:4, 4:9, 4:12, 18:19, 19:21, 20:8, 20:14, 20:18, 21:1, 21:10, 22:16, 23:8, 34:6, 38:2, 45:22, 46:21, 47:5, 48:23, 51:1, 51:24, 52:11, 60:18, 62:25, 63:2, 63:13, 63:17, 64:11, 64:14, 66:3, 67:4, 67:24, 68:1, 68:4, 68:8, 69:9, 69:15, 69:19, 70:3, 70:16, 71:11, 71:17, 72:2, 72:17,

72:25, 73:1, 73:6, 73:10, 73:24, 74:7, 74:12, 74:14, 74:23, 75:16, 76:2, 76:3, 76:12, 76:18, 76:24, 77:12, 82:1, 83:3, 95:9, 96:20
**Duran-Gomez's** [6] - 64:8, 64:19, 65:13, 65:21, 67:11, 70:10
**during** [7] - 37:4, 37:20, 44:20, 57:23, 73:17, 79:14, 91:5
**DYE** [1] - 2:23
**Dye** [2] - 98:15, 98:16
**dying** [4] - 14:16, 32:17, 80:15, 81:7

---

# E

**early** [1] - 58:22
**earth** [2] - 42:18, 43:10
**eat** [4] - 32:9, 71:7, 88:2, 88:5
**eating** [1] - 31:24
**effect** [1] - 90:11
**Efrain** [2] - 78:24, 79:5
**either** [7] - 30:15, 35:6, 58:10, 69:3, 69:4, 81:17, 94:25
**El** [12] - 36:8, 36:11, 36:15, 36:18, 38:4, 38:6, 38:7, 38:11, 38:14, 53:23, 74:3
**electrical** [2] - 12:18, 28:25
**elusive** [1] - 65:4
**email** [1] - 45:18
**end** [6] - 5:4, 14:7, 31:4, 46:22, 74:1, 91:10
**ended** [5] - 14:13, 14:15, 14:22, 81:7
**endure** [1] - 80:4
**enforcement** [17] - 18:14, 18:23, 19:1, 19:13, 20:13, 20:16, 20:19, 20:23, 20:25, 21:4, 21:9, 21:15, 33:10, 33:21, 36:14, 45:17, 75:15
**enforcement's** [1] - 45:6
**engage** [1] - 89:21
**engaged** [2] - 72:12, 89:20
**English** [13] - 19:16, 33:24, 34:24, 35:23, 47:9, 47:18, 48:2, 48:12, 48:18, 86:21, 87:9, 87:20, 88:5
**enhancement** [5] - 51:14, 51:22, 52:4, 52:8, 52:21
**entered** [3] - 47:14, 47:21, 95:12
**entering** [1] - 47:22
**entire** [1] - 19:5
**entitled** [5] - 6:2, 59:17, 60:8, 85:11, 98:12
**entitlement** [1] - 5:11
**entrusted** [1] - 76:12
**environment** [3] - 29:23, 78:10, 82:20
**equivalent** [1] - 60:15
**errors** [1] - 58:10
**escape** [3] - 67:3, 79:24, 84:16
**especially** [2] - 71:25, 81:24
**ESPINOZA** [4] - 3:4, 7:25, 9:1, 43:2
**Espinoza** [16] - 3:11, 8:6, 9:7, 22:24, 26:13, 26:25, 28:1, 37:2, 43:1, 45:3, 45:6, 45:16, 53:25, 79:2, 82:3, 84:2
**Espinoza's** [2] - 45:19, 46:1

**ESPINOZA-DIAZ** [4] - 3:4, 7:25, 9:1, 43:2
**Espinoza-Diaz** [6] - 3:11, 9:7, 22:24, 45:3, 45:6, 45:16
**established** [2] - 72:10, 78:10
**evaluated** [2] - 76:1, 76:8
**evaluation's** [1] - 77:9
**evaluator** [1] - 97:14
**event** [2] - 92:19, 93:22
**events** [4] - 23:21, 64:15, 70:2, 84:20
**eventually** [2] - 65:16, 72:13
**evidence** [7] - 64:5, 67:14, 68:11, 69:6, 69:17, 69:18, 85:4
**evolved** [1] - 65:14
**exact** [3] - 26:18, 27:12, 64:21
**exactly** [4] - 54:14, 56:7, 82:22, 84:10
**examination** [4] - 5:25, 6:3, 6:15, 7:17
**EXAMINATION** [12] - 3:5, 3:5, 3:6, 3:8, 3:8, 3:9, 9:4, 18:9, 24:9, 26:7, 33:7, 38:22
**example** [1] - 67:23
**except** [1] - 89:5
**Exhibit** [11] - 34:12, 44:22, 45:1, 45:4, 45:15, 45:18, 45:20, 68:17, 69:5, 75:23, 97:11
**exhibits** [6] - 44:19, 45:11, 45:24, 85:20, 86:4, 86:5
**exist** [3] - 70:19, 78:25, 79:1
**expected** [1] - 21:25
**expensive** [1] - 66:19
**experience** [1] - 88:18
**experienced** [1] - 70:12
**experiences** [1] - 64:8
**expert's** [1] - 75:23
**explain** [1] - 46:5
**explained** [1] - 48:8
**explanation** [1] - 70:14
**express** [1] - 46:8
**expressed** [2] - 48:15, 57:21
**expressing** [1] - 49:19
**extent** [5] - 48:25, 68:23, 90:8, 93:25, 94:2
**extraneous** [1] - 50:25
**extremely** [2] - 71:4, 73:18

## F

**face** [8] - 12:19, 13:18, 13:22, 15:3, 15:13, 28:17, 31:6
**faces** [1] - 15:11
**facilitate** [1] - 65:19
**facilities** [2] - 96:22, 97:17
**facility** [5] - 75:3, 77:12, 96:12, 97:5, 97:6
**facing** [1] - 74:20
**fact** [11] - 5:1, 19:1, 55:25, 56:8, 57:22, 66:16, 67:25, 68:1, 68:8, 69:21, 90:17
**factor** [1] - 53:12
**factors** [2] - 55:11, 64:16

**facts** [8] - 50:21, 55:1, 55:4, 55:20, 56:14, 56:21, 56:23, 58:6
**factual** [12] - 5:18, 6:10, 49:22, 49:25, 54:22, 54:25, 55:10, 55:20, 55:25, 56:18, 80:11
**failed** [1] - 89:11
**failure** [1] - 89:10
**fair** [3] - 23:20, 65:12, 88:23
**fall** [1] - 42:15
**familiarity** [2] - 49:21, 90:1
**families** [5] - 11:24, 12:7, 66:19, 85:14, 88:17
**family** [34] - 12:1, 12:7, 14:20, 37:11, 40:19, 41:4, 41:17, 65:25, 70:17, 70:18, 70:23, 71:2, 71:3, 71:19, 72:8, 72:12, 72:16, 73:10, 73:11, 73:14, 73:20, 74:21, 83:22, 83:24, 84:3, 84:6, 84:8, 84:17, 85:4, 87:24, 96:21, 96:23, 97:2
**far** [6] - 5:23, 25:10, 58:6, 58:7, 58:14, 59:5
**fashion** [3] - 54:23, 63:10, 94:6
**fatal** [3] - 82:21, 82:22, 82:23
**father** [3] - 41:6, 70:20, 83:23
**father's** [2] - 41:5, 70:18
**FAX** [2] - 2:8, 2:13
**FCI** [1] - 96:13
**FDC** [3] - 75:10, 75:21, 76:2
**February** [1] - 48:5
**Federal** [2] - 1:20, 2:4
**federal** [7] - 4:11, 4:13, 76:13, 88:1, 88:11, 91:22, 94:11
**FEDERAL** [2] - 1:21, 2:5
**fee** [3] - 84:15, 84:17
**fees** [5] - 37:12, 66:13, 66:20, 67:3, 73:3
**feet** [5] - 28:17, 28:24, 30:4, 32:7, 80:1
**fell** [1] - 41:2
**felt** [3] - 19:8, 43:25, 78:11
**few** [1] - 71:5
**field** [1] - 82:8
**fifteen** [2] - 6:16, 6:17
**figure** [2] - 75:8, 91:17
**filed** [3] - 47:16, 92:18, 92:19
**final** [2] - 50:20, 69:19
**finally** [10] - 45:20, 63:1, 64:13, 68:13, 71:19, 73:23, 74:5, 75:19, 82:24, 96:5
**fine** [4] - 86:19, 92:3, 92:12
**finger** [4] - 65:1, 69:7, 69:10, 69:11
**fingerprints** [1] - 82:8
**finish** [1] - 44:10
**finished** [2] - 37:11, 66:19
**fire** [29] - 9:23, 10:1, 10:4, 10:14, 10:18, 10:23, 11:5, 11:8, 11:14, 11:21, 11:25, 13:7, 27:2, 27:6, 27:9, 27:11, 27:14, 27:19, 27:22, 27:24, 28:12, 28:19, 30:13, 30:15, 30:24, 67:6, 79:21, 81:14, 82:13
**firearm** [2] - 51:15, 57:4
**first** [19] - 7:20, 8:5, 11:20, 18:14, 21:11,

21:19, 21:20, 33:9, 35:2, 37:8, 42:14, 50:9, 50:17, 56:13, 72:14, 74:17, 77:18, 89:25, 90:4
**first-hand** [1] - 56:13
**five** [3] - 40:20, 91:20, 93:11
**fix** [1] - 75:6
**fled** [3] - 36:2, 67:25, 82:20
**flee** [1] - 82:19
**floor** [1] - 12:19
**Floor** [1] - 2:6
**flowing** [1] - 67:1
**follow** [1] - 91:20
**food** [1] - 79:17
**FOR** [4] - 1:13, 1:19, 2:3, 3:3
**forcibly** [1] - 71:15
**foregoing** [1] - 98:11
**forever** [2] - 83:13, 84:1
**forget** [1] - 85:19
**forgive** [1] - 43:8
**forgiveness** [1] - 42:17
**form** [1] - 54:23
**forth** [3] - 5:13, 7:15, 87:4
**forty** [1] - 9:9
**forty-nine** [1] - 9:9
**forward** [11] - 26:2, 44:16, 46:15, 49:4, 49:15, 49:23, 51:12, 56:18, 56:20, 56:24, 61:11
**forwarded** [1] - 86:25
**four** [6] - 26:12, 33:4, 52:5, 57:14, 64:3, 64:16
**four-level** [1] - 52:5
**four-point** [1] - 57:14
**frankly** [1] - 75:14
**free** [1] - 94:16
**frequency** [1] - 68:12
**friend** [1] - 41:15
**FROM** [1] - 1:25
**front** [3] - 7:16, 36:22, 79:13
**full** [4] - 43:4, 43:16, 68:23, 85:1

## G

**gained** [1] - 89:5
**gaps** [1] - 64:24
**garage** [1] - 27:10
**Garduno** [8] - 66:4, 66:14, 66:15, 66:21, 67:1, 69:22, 72:21, 79:4
**Garza** [4] - 52:1, 67:25, 68:3, 79:5
**gather** [2] - 39:8, 59:14
**Gayle** [1] - 98:16
**GAYLE** [1] - 2:23
**generally** [2] - 47:3, 89:9
**generous** [2] - 42:11, 81:6
**gentlemen** [2] - 4:2, 4:17
**given** [10] - 30:3, 32:7, 48:8, 53:15, 69:11, 79:16, 84:20, 84:21, 84:25, 85:8
**God** [3] - 42:16, 42:17, 43:8
**GOMEZ** [1] - 1:6

**Gomez** [64] - 4:4, 4:9, 4:12, 18:19, 19:21, 20:8, 20:14, 20:18, 21:1, 21:10, 22:16, 23:8, 34:6, 38:2, 45:22, 46:21, 47:5, 48:23, 51:1, 51:24, 52:11, 60:18, 62:25, 63:2, 63:13, 63:17, 64:11, 64:14, 66:3, 67:4, 67:24, 68:1, 68:4, 68:8, 69:9, 69:15, 69:19, 70:3, 70:16, 71:11, 71:17, 72:2, 72:17, 72:25, 73:1, 73:6, 73:10, 73:24, 74:7, 74:12, 74:14, 74:23, 75:16, 76:2, 76:3, 76:12, 76:18, 76:24, 77:12, 82:1, 83:3, 95:9, 96:20
**Gomez's** [6] - 64:8, 64:19, 65:13, 65:21, 67:11, 70:10
**Gordo** [4] - 36:15, 36:18, 38:6, 38:7
**Gordos** [3] - 38:5, 38:12, 38:14
**gosh** [1] - 54:11
**government** [20] - 4:5, 4:20, 6:12, 9:2, 22:4, 26:4, 47:13, 47:15, 49:3, 57:1, 59:13, 60:10, 60:12, 60:15, 60:23, 63:1, 67:18, 90:3, 90:5
**government's** [4] - 44:24, 45:2, 52:15, 60:25
**grandkids** [2] - 70:25
**grant** [1] - 95:4
**grave** [2] - 42:14, 88:9
**great** [2] - 31:23, 70:25
**great-grandkids** [1] - 70:25
**green** [1] - 72:11
**Greenbelt** [1] - 1:23
**grew** [2] - 70:16, 71:4
**ground** [2] - 15:1, 15:4
**group** [1] - 16:6
**grow** [1] - 70:13
**growing** [1] - 72:2
**guarded** [1] - 66:14
**guards** [2] - 10:6, 36:2
**guerillas** [2] - 71:12, 71:16
**guess** [1] - 74:10
**guideline** [4] - 52:17, 59:25, 60:3, 61:24
**guidelines** [12] - 52:19, 53:7, 53:11, 60:13, 60:22, 61:22, 62:8, 62:20, 76:23, 89:24, 91:11
**gun** [1] - 15:4
**guy** [2] - 38:24, 39:1
**guys** [5] - 16:11, 16:20, 27:3, 29:23, 77:24

## H

**H-10-CR-459** [1] - 1:5
**half** [1] - 73:21
**hand** [1] - 56:13
**handed** [1] - 34:18
**handle** [2] - 5:3, 55:3
**handled** [1] - 57:25
**handling** [1] - 90:1
**hands** [9] - 7:22, 28:17, 28:24, 30:4, 32:7, 41:3, 80:1, 81:7, 82:4
**handwritten** [1] - 20:1
**hanging** [1] - 73:21

**happy** [4] - 20:23, 44:19, 46:5, 70:7
**hard** [7] - 12:9, 40:20, 42:11, 67:18, 67:19, 83:9
**hard-working** [1] - 42:11
**hardships** [1] - 85:14
**harm** [1] - 32:11
**harmed** [1] - 37:20
**harsh** [1] - 73:16
**head** [10] - 15:17, 15:22, 23:18, 24:25, 25:4, 30:6, 38:9, 56:16, 73:22, 80:1
**headphones** [1] - 75:7
**health** [5] - 76:8, 93:6, 93:23, 94:13, 94:15
**hear** [15] - 15:8, 16:11, 16:14, 32:1, 40:16, 42:21, 50:10, 60:10, 62:24, 62:25, 63:1, 80:4, 86:14, 92:6, 92:8
**heard** [12] - 27:2, 32:2, 39:14, 53:21, 53:25, 81:4, 81:12, 83:13, 83:21, 85:22, 86:5, 86:11
**hearing** [2] - 76:4, 88:22
**hears** [2] - 8:18, 8:19
**heart** [1] - 41:5
**hector** [1] - 84:7
**Hector** [24] - 13:10, 14:10, 15:23, 16:7, 16:14, 17:25, 25:6, 25:19, 27:17, 27:19, 28:3, 30:10, 30:16, 30:18, 31:14, 31:18, 31:20, 32:16, 33:2, 79:3, 79:20, 80:15, 81:13, 84:6
**Hector's** [1] - 30:19
**heinous** [1] - 81:16
**held** [3] - 77:25, 81:18, 82:5
**hell** [1] - 42:21
**help** [12] - 20:24, 42:4, 42:11, 66:8, 69:2, 72:16, 80:16, 80:17, 80:18, 88:18, 88:21
**helped** [1] - 80:20
**hi** [1] - 18:12
**hide** [1] - 72:3
**high** [1] - 91:10
**higher** [1] - 62:9
**highlights** [1] - 68:18
**himself** [3] - 74:12, 75:8, 75:11
**hired** [1] - 65:16
**history** [3] - 49:16, 53:15, 61:13
**hit** [9] - 13:2, 13:3, 13:6, 13:17, 15:6, 15:22, 20:14, 20:18, 21:5
**hits** [1] - 80:2
**hitting** [2] - 15:2, 28:25
**hold** [3] - 66:18, 86:18, 86:19
**holidays** [1] - 71:3
**home** [3] - 85:4, 87:24, 88:17
**Honduras** [3] - 40:19, 40:25, 41:1
**honest** [1] - 64:24
**Honor** [104] - 4:6, 4:10, 6:6, 6:18, 6:20, 6:24, 7:19, 8:21, 18:7, 24:8, 25:15, 38:20, 39:11, 40:2, 42:5, 43:3, 43:21, 44:18, 44:22, 45:12, 46:5, 46:11, 46:19, 47:1, 48:2, 48:3, 48:18, 48:24, 49:2, 49:5, 49:9, 49:12, 50:13, 51:5, 51:8, 51:11, 51:20, 51:24, 52:16, 53:2,

53:6, 53:10, 57:2, 60:11, 61:25, 63:3, 64:2, 64:17, 64:19, 65:3, 65:10, 65:12, 65:17, 66:9, 67:13, 68:6, 68:13, 69:7, 69:14, 71:23, 72:1, 72:9, 72:15, 72:21, 72:24, 73:3, 73:9, 73:20, 73:23, 74:5, 74:11, 75:10, 75:19, 75:24, 76:15, 76:20, 76:25, 77:10, 77:18, 79:4, 82:21, 83:12, 84:12, 85:17, 85:21, 86:7, 86:13, 86:16, 89:1, 93:3, 93:8, 94:19, 94:22, 94:25, 95:6, 95:14, 95:20, 96:4, 96:11, 96:18, 97:7, 97:8, 97:15, 97:19
**HONORABLE** [1] - 1:10
**honors** [1] - 95:8
**hope** [7] - 42:7, 42:16, 43:7, 43:9, 43:15, 88:11, 88:12
**horrific** [5] - 63:16, 78:2, 78:21, 83:10
**hours** [2] - 29:7, 39:2
**house** [1] - 82:18
**housed** [2] - 75:21, 96:6
**housing** [1] - 88:1
**HOUSTON** [1] - 1:3
**Houston** [6] - 1:6, 1:16, 2:12, 2:24, 9:10, 66:24
**Hoyt** [2] - 86:22, 88:19
**HOYT** [1] - 1:10
**hugging** [1] - 42:1
**human** [2] - 67:20, 81:15
**humble** [1] - 40:19
**hundred** [2] - 65:7, 78:6
**hurt** [5] - 28:21, 63:11, 65:23, 65:25, 79:18
**hurting** [1] - 36:15

## I

**ICE** [1] - 92:21
**idea** [2] - 39:9, 79:10
**identification** [3] - 22:12, 24:2, 77:20
**identified** [5] - 7:6, 23:7, 35:3, 36:8, 69:6
**identify** [11] - 22:14, 22:16, 22:24, 34:8, 36:17, 37:4, 46:2, 58:12, 78:14, 84:5, 84:10
**identifying** [1] - 58:24
**identity** [2] - 45:25, 46:1
**leda** [1] - 37:24
**II** [1] - 2:6
**III** [2] - 2:9, 2:10
**ill** [2] - 73:18, 76:9
**illegal** [3] - 35:10, 65:18, 80:24
**illegals** [1] - 59:2
**imagine** [1] - 42:4
**immediately** [2] - 78:14, 92:5
**immigrants** [3] - 18:22, 23:14, 27:25
**immigration** [9] - 12:8, 14:21, 21:20, 21:23, 72:10, 73:25, 84:18, 92:17, 92:21
**IMPACT** [1] - 3:10
**impact** [13] - 5:2, 5:7, 5:15, 5:16, 5:20,

6:11, 6:21, 39:8, 39:14, 39:19, 39:21, 56:15, 83:14
**impacted** [1] - 39:15
**important** [1] - 63:23
**importantly** [1] - 75:10
**impose** [4] - 64:18, 76:16, 92:11, 93:1
**imposed** [5] - 56:15, 88:25, 89:20, 92:4, 92:12
**in-person** [2] - 22:11, 22:12
**inability** [1] - 83:19
**incentive** [3] - 65:1, 65:22, 69:2
**incentives** [1] - 66:25
**inclined** [1] - 77:11
**include** [6] - 50:14, 76:22, 77:11, 77:12, 95:7, 95:15
**included** [7] - 19:21, 34:5, 45:22, 53:3, 75:12, 96:12
**including** [8] - 18:18, 21:10, 46:15, 53:22, 63:20, 73:12, 73:17, 83:14
**increase** [1] - 57:12
**INDEX** [1] - 3:1
**indicate** [1] - 39:7
**indicated** [1] - 77:8
**indicating** [1] - 95:10
**indict** [1] - 90:6
**indicted** [3] - 69:23, 90:4, 90:6
**indictment** [4] - 49:22, 53:22, 55:10, 69:24
**indirectly** [1] - 7:12
**individual** [8] - 33:18, 35:14, 35:16, 39:6, 52:24, 66:20, 69:21, 70:3
**individuals** [28] - 9:17, 23:5, 32:4, 36:21, 36:23, 51:25, 52:2, 63:11, 64:25, 66:12, 66:24, 67:16, 67:25, 71:5, 72:22, 73:5, 75:15, 75:25, 77:21, 77:22, 78:21, 79:14, 80:5, 80:15, 82:7, 82:14, 92:9, 94:10
**indulgence** [2] - 22:9, 22:19
**information** [5] - 50:25, 67:24, 77:14, 78:16, 87:3
**initial** [3] - 4:20, 45:6, 77:19
**initials** [1] - 35:11
**injuries** [7] - 14:7, 19:7, 19:9, 19:11, 31:4, 31:6, 31:12
**inkling** [2] - 72:25, 73:1
**insert** [1] - 54:25
**inserted** [1] - 30:23
**inside** [1] - 11:6
**instance** [3] - 56:19, 81:11, 90:4
**instant** [1] - 93:12
**instead** [1] - 52:5
**institution** [1] - 96:7
**institutions** [1] - 96:15
**instruction** [1] - 55:13
**instructions** [1] - 28:13
**intact** [1] - 85:13
**intended** [2] - 73:5, 73:7
**intention** [1] - 15:2
**intercepted** [1] - 85:5

**interest** [1] - 67:5
**interpreted** [1] - 61:23
**Interpreter** [3] - 41:14, 43:2, 43:20
**interpreter** [3] - 8:2, 9:3, 40:9
**INTERPRETER** [10] - 8:14, 8:17, 20:5, 33:14, 35:24, 41:13, 47:10, 47:19, 48:3, 87:16
**interpreter)** [1] - 26:5
**INTERPRETERS** [1] - 2:19
**interview** [2] - 45:6, 68:18
**interviewed** [13] - 19:12, 20:24, 21:1, 21:11, 21:19, 33:9, 33:12, 33:18, 33:21, 36:14, 37:23, 69:1, 78:5
**interviews** [4] - 21:8, 58:22, 75:12
**introduced** [1] - 30:19
**invested** [1] - 67:1
**investigation** [7] - 45:5, 47:25, 48:5, 48:22, 49:25, 65:6, 92:15
**investigative** [1] - 45:21
**investigator** [3] - 37:24, 38:1, 68:25
**invited** [1] - 71:2
**involve** [1] - 72:20
**involved** [4] - 27:19, 51:25, 63:18, 63:20
**issue** [2] - 45:25, 46:1
**issues** [2] - 70:6, 95:24
**itself** [4] - 6:10, 48:10, 55:8, 62:18
**Ivy** [1] - 1:22

## J

**jail** [3] - 17:16, 17:20, 85:6
**James** [2] - 2:4, 4:13
**Jefe** [2] - 53:23
**jefe** [1] - 17:3
**Jill** [2] - 1:14, 4:6
**jill.stotts@usdoj.gov** [1] - 1:17
**jim_wyda@fd.org** [1] - 2:8
**job** [2] - 17:21, 17:23
**jobs** [1] - 72:12
**Joe** [1] - 75:13
**joined** [1] - 4:12
**Jorge** [8] - 3:11, 7:1, 39:24, 40:2, 40:10, 40:14, 83:21, 84:13
**JORGE** [3] - 40:9, 40:14, 41:14
**JR** [4] - 47:10, 47:19, 48:3, 87:16
**Jr** [1] - 2:20
**Judge** [2] - 86:21, 88:19
**judge** [9] - 4:25, 5:18, 6:2, 43:15, 44:3, 53:19, 59:16, 83:2, 84:19
**judgment** [15] - 48:20, 57:9, 57:20, 58:16, 76:22, 77:13, 89:16, 89:22, 90:3, 90:9, 95:8, 95:11, 97:9, 97:21, 97:22
**Julie** [2] - 1:20, 4:10
**julie_stelzig@fd.org** [1] - 1:24
**jump** [1] - 43:15
**jumpy** [1] - 83:21
**justice** [2] - 52:8, 85:3

## K

**keep** [3] - 11:15, 85:13, 85:24
**keeping** [2] - 74:25, 75:1
**KENNETH** [1] - 1:10
**kept** [4] - 32:6, 72:22, 79:14, 79:15
**kick** [1] - 12:18
**kidnapped** [1] - 41:9
**kill** [2] - 41:10, 78:9
**killed** [14] - 12:3, 16:17, 17:11, 17:14, 17:24, 41:15, 41:19, 43:4, 71:13, 83:5, 84:14, 87:13, 87:17
**killing** [1] - 14:22
**kind** [4] - 48:11, 67:7, 67:9, 70:10
**kindness** [1] - 71:5
**knowledge** [1] - 56:13
**known** [1] - 79:9
**knows** [1] - 55:19

## L

**L.B** [1] - 1:20
**lack** [2] - 45:24, 89:18
**ladies** [3] - 4:2, 4:17, 98:3
**Lane** [1] - 1:22
**language** [2] - 72:8, 95:7
**last** [6] - 29:6, 36:6, 43:19, 56:20, 71:23, 79:3
**lasting** [1] - 84:1
**LAW** [1] - 2:10
**law** [23] - 18:14, 18:23, 19:1, 19:12, 20:13, 20:16, 20:19, 20:23, 20:25, 21:4, 21:9, 21:15, 33:9, 33:21, 36:14, 42:15, 42:19, 43:4, 43:16, 45:5, 45:16, 75:15, 94:11
**lawful** [1] - 73:24
**lawyers** [3] - 7:6, 48:20, 57:11
**laying** [1] - 15:19
**lead** [1] - 88:21
**leader** [6] - 51:24, 53:21, 57:3, 59:1, 59:2, 79:12
**leader/organizer** [2] - 51:22, 52:4
**leaders** [1] - 10:6
**lean** [1] - 74:23
**learn** [1] - 89:8
**learned** [4] - 72:2, 75:4, 75:6, 75:9
**least** [5] - 7:5, 7:16, 49:18, 55:1, 85:1
**leave** [4] - 20:3, 20:10, 61:12, 96:7
**leaves** [2] - 44:4, 82:19
**led** [3] - 59:1, 67:8, 72:13
**left** [8] - 8:9, 17:25, 31:20, 32:16, 35:15, 37:7, 37:9, 71:14
**legal** [1] - 69:8
**legs** [1] - 31:6
**length** [2] - 6:15, 39:10
**less** [1] - 42:12
**lessons** [1] - 72:1
**letter** [2] - 86:24
**letters** [2] - 87:5, 87:6

**level** [7] - 52:5, 60:16, 60:21, 61:14, 96:7, 96:15
**life** [18] - 39:16, 41:11, 41:21, 41:24, 42:7, 42:8, 43:8, 43:9, 43:10, 61:22, 62:19, 64:9, 72:14, 80:24, 81:3, 88:21
**life's** [1] - 40:25
**light** [2] - 49:24, 82:14
**lighter** [2] - 30:21, 31:1
**limited** [1] - 53:14
**lineup** [7] - 22:12, 22:23, 22:25, 23:5, 36:21, 37:4, 45:22
**lineups** [1] - 23:7
**lining** [1] - 56:12
**linings** [1] - 74:10
**listen** [1] - 85:6
**listened** [1] - 54:1
**listening** [2] - 40:16, 41:22
**lit** [2] - 30:21, 31:1
**live** [7] - 16:9, 22:25, 36:21, 37:4, 45:21, 83:16, 88:1
**lived** [3] - 44:5, 68:8, 83:13
**lives** [3] - 63:10, 83:17, 89:15
**living** [1] - 43:6
**local** [1] - 91:22
**locate** [1] - 96:17
**location** [2] - 67:23, 68:7
**logic** [1] - 67:10
**look** [7] - 23:5, 31:20, 36:7, 61:4, 62:12, 68:6, 68:21
**looking** [6] - 47:16, 48:4, 57:11, 60:2, 72:24, 96:22
**looks** [1] - 36:8
**Lopez** [2] - 37:24, 38:11
**lose** [1] - 89:8
**loss** [3] - 63:9, 63:12, 73:10
**lost** [3] - 64:23, 73:13, 87:23
**Louisiana** [2] - 1:15, 2:11
**loved** [1] - 73:12
**low** [3] - 77:12, 96:7, 96:15
**low-level** [2] - 96:7, 96:15
**luck** [1] - 98:4
**lucrative** [1] - 72:13
**lying** [4] - 12:19, 15:3, 15:21

# M

**ma'am** [4] - 6:5, 8:5, 77:16, 93:2
**mad** [2] - 14:23, 79:22
**Madrid** [2] - 3:11, 40:15
**MADRID** [3] - 40:9, 40:14, 41:14
**main** [1] - 11:15
**maintain** [1] - 53:16
**man** [23] - 12:23, 13:13, 14:2, 16:15, 17:8, 20:1, 20:8, 24:23, 39:2, 39:3, 40:16, 40:17, 41:20, 42:6, 42:10, 42:11, 44:3, 72:7, 79:13, 81:8, 82:1, 88:9
**man's** [1] - 79:21
**management** [1] - 84:21

**MANAGER** [2] - 94:22, 95:2
**manner** [4] - 7:4, 78:23, 81:15, 94:6
**MANUEL** [4] - 3:4, 7:25, 9:1, 43:2
**manuel** [1] - 9:7
**Manuel** [1] - 3:11
**March** [1] - 36:20
**Maria** [1] - 71:6
**mark** [1] - 34:11
**married** [1] - 70:20
**Maryland** [6] - 1:21, 1:23, 2:5, 2:7, 4:11, 4:13
**matches** [1] - 65:11
**material** [1] - 7:10
**matter** [10] - 4:5, 4:19, 4:20, 44:17, 47:15, 47:23, 48:17, 69:9, 87:7, 98:12
**Maureen** [1] - 97:12
**McAllen** [1] - 66:24
**mean** [12] - 12:15, 12:23, 17:22, 48:6, 48:13, 48:14, 55:22, 56:12, 56:22, 61:21, 90:7, 95:17
**meaning** [2] - 62:18, 91:3
**means** [2] - 56:23, 66:20
**MEANS** [1] - 1:25
**meant** [2] - 16:2, 66:7
**medicate** [1] - 94:6
**medication** [9] - 94:3, 94:4, 94:7, 94:8, 94:9, 94:10
**medications** [1] - 94:5
**Megan** [1] - 2:17
**Melendez** [1] - 33:19
**member** [2] - 61:3, 71:3
**members** [6] - 65:25, 71:2, 73:11, 83:7, 84:17, 85:4
**memo** [2] - 65:12, 69:6
**memorandum** [10] - 49:18, 50:16, 64:3, 65:10, 67:13, 68:17, 70:7, 86:2, 86:25, 97:12
**memorandums** [1] - 57:22
**men** [13] - 24:2, 40:21, 67:2, 67:8, 69:20, 73:2, 73:6, 82:1, 87:13, 87:17, 88:14, 88:20, 90:8
**men's** [3] - 63:9, 69:9, 89:15
**Mendoza** [5] - 52:1, 68:3, 78:24, 79:5, 82:16
**mental** [5] - 76:8, 93:6, 93:23, 94:13, 94:15
**mentally** [1] - 76:9
**mentioned** [4] - 18:18, 23:17, 37:7, 37:8
**metal** [2] - 88:3, 88:6
**Mexico** [1] - 66:4
**microphone** [3] - 8:11, 8:13, 40:12
**middle** [1] - 36:7
**might** [16] - 4:20, 7:11, 20:23, 23:2, 48:10, 48:17, 56:13, 56:14, 56:16, 58:15, 89:3, 90:10, 90:18, 92:17, 93:1, 96:17
**Miguel** [3] - 66:4, 66:21, 67:1
**mike** [1] - 87:18
**mind** [4] - 22:2, 24:19, 87:5, 97:17

**mine** [1] - 59:3
**minimize** [1] - 69:13
**minute** [2] - 61:4, 62:15
**minutes** [1] - 6:16
**mistake** [4] - 20:20, 21:16, 65:18, 66:9
**mistakes** [1] - 64:25
**mistreated** [1] - 72:22
**model** [3] - 66:2, 66:17, 67:9
**moment** [1] - 22:21
**money** [8] - 11:25, 12:1, 66:21, 66:22, 71:8, 75:7, 79:17, 84:14
**month** [1] - 9:13
**months** [2] - 77:1, 95:19
**months'** [4] - 91:9, 91:13, 91:16
**moral** [2] - 69:12, 69:21
**most** [6] - 69:21, 70:11, 75:10, 75:20, 75:22, 76:13
**mostly** [1] - 70:2
**mother** [4] - 41:17, 44:1, 73:13, 83:23
**mother's** [3] - 42:13, 70:23, 70:24
**motion** [5] - 60:13, 60:16, 60:23, 95:1, 95:3
**move** [4] - 7:16, 7:17, 70:7, 70:8
**moved** [7] - 16:1, 18:2, 28:5, 31:14, 31:16, 31:18, 37:8
**MR** [7] - 7:25, 8:2, 40:9, 40:14, 41:14, 43:2, 43:20
**MS** [145] - 3:5, 3:5, 3:6, 3:8, 3:8, 3:9, 4:6, 4:10, 4:16, 4:25, 5:18, 6:2, 6:6, 6:8, 6:16, 6:18, 6:20, 6:24, 7:19, 8:6, 8:21, 9:5, 18:7, 18:10, 20:6, 20:7, 22:9, 22:10, 22:19, 22:20, 23:24, 24:1, 24:5, 24:8, 24:10, 25:12, 25:15, 25:17, 25:22, 25:24, 26:8, 33:5, 33:8, 33:15, 33:17, 34:11, 34:17, 36:1, 38:19, 38:20, 38:23, 39:4, 39:11, 39:13, 39:19, 39:24, 40:1, 40:6, 43:1, 43:19, 44:18, 44:22, 45:9, 45:12, 45:15, 46:4, 46:11, 46:13, 46:19, 46:21, 46:25, 48:24, 49:2, 49:5, 49:9, 49:12, 50:13, 51:8, 51:11, 51:13, 51:19, 52:7, 52:16, 53:6, 53:10, 53:14, 53:19, 54:13, 54:15, 54:16, 55:15, 55:18, 56:3, 56:5, 56:7, 56:25, 57:2, 59:16, 59:20, 59:24, 60:2, 60:11, 60:18, 61:2, 61:16, 61:25, 62:4, 62:7, 62:12, 62:16, 62:20, 62:22, 63:3, 63:5, 68:20, 70:9, 77:3, 77:10, 77:17, 77:18, 85:17, 85:21, 86:7, 86:13, 86:16, 89:1, 89:2, 94:19, 94:23, 94:25, 95:6, 95:14, 95:20, 95:23, 96:1, 96:4, 96:11, 96:18, 97:7, 97:11, 97:15, 97:19, 97:24, 98:1, 98:2
**multiple** [2] - 67:17, 76:7
**murder** [1] - 85:11
**murdered** [1] - 82:17
**murders** [2] - 74:20, 82:16
**mushroom** [1] - 10:3

## N

**name** [9] - 7:1, 9:6, 26:9, 40:10, 40:14, 47:8, 79:3, 84:7, 93:4
**named** [1] - 37:24
**names** [3] - 20:2, 20:9, 68:14
**narrative** [3] - 65:8, 65:10, 67:12
**natural** [1] - 63:16
**nature** [3] - 49:17, 67:20, 76:10
**Neal** [2] - 2:9, 4:14
**NEAL** [1] - 2:10
**neal.davis3@sbcglobal.net** [1] - 2:13
**nearly** [2] - 64:14, 73:16
**necessarily** [1] - 59:17
**need** [14] - 4:21, 26:18, 49:7, 56:10, 58:4, 59:5, 64:1, 64:13, 67:11, 86:10, 86:14, 93:16, 93:17, 94:15
**needs** [6] - 8:12, 40:5, 44:16, 54:22, 93:17, 93:20
**nervous** [1] - 87:9
**never** [10] - 32:8, 44:4, 56:2, 56:4, 56:5, 69:10, 69:11, 69:25, 75:14, 89:5
**next** [7] - 25:23, 35:9, 35:13, 42:25, 54:25, 70:9, 80:21
**nickname** [1] - 38:8
**night** [2] - 41:23, 43:25
**nightmare** [1] - 43:6
**nightmares** [1] - 83:19
**nine** [1] - 9:9
**nobody** [3] - 81:16, 82:9, 82:25
**noises** [1] - 32:1
**normally** [1] - 79:16
**notable** [1] - 72:9
**notation** [3] - 20:8, 35:2, 35:6
**note** [2] - 4:19, 35:21
**noted** [2] - 51:22, 64:20
**notes** [5] - 20:1, 20:16, 21:15, 33:25, 52:23
**nothing** [12] - 22:2, 39:4, 41:16, 43:14, 73:6, 80:16, 80:18, 80:21, 81:18, 89:4, 98:1, 98:2
**notice** [2] - 58:20
**notify** [1] - 84:6
**November** [11] - 9:13, 9:22, 18:13, 20:12, 20:19, 20:25, 21:12, 26:21, 26:22, 45:17, 76:19
**nude** [2] - 11:3, 80:1
**number** [19] - 4:3, 6:22, 41:20, 47:4, 50:23, 57:7, 63:6, 64:6, 64:7, 64:19, 65:11, 70:12, 72:12, 73:8, 73:11, 74:22, 76:25, 90:14, 91:17
**Number** [1] - 45:4
**numbering** [1] - 91:12
**numbers** [5] - 61:5, 61:10, 61:12, 62:17, 95:18
**numerous** [1] - 53:22
**nylon** [1] - 12:19

## O

**object** [1] - 60:3
**objection** [14] - 50:18, 51:4, 51:13, 51:14, 51:21, 52:7, 52:10, 53:20, 57:4, 57:5, 57:9, 58:2, 59:12, 85:21
**objections** [9] - 48:9, 48:15, 48:16, 48:17, 50:9, 50:15, 53:16, 53:20, 59:6
**objective** [3] - 67:14, 67:22, 68:4
**obstructed** [1] - 85:3
**obstruction** [15] - 52:8, 52:20, 54:8, 54:10, 57:8, 57:16, 57:20, 57:23, 59:17, 60:4, 74:18, 85:2, 90:6, 90:15
**obviously** [3] - 7:11, 55:20, 85:11
**occasionally** [1] - 95:24
**occasions** [1] - 46:2
**occur** [2] - 30:8, 55:23
**occurred** [3] - 64:15, 77:24, 84:21
**occurring** [4] - 23:21, 25:18, 79:10, 81:23
**ODOM** [1] - 2:10
**Odom** [1] - 4:14
**Odom,Jr** [1] - 2:10
**OF** [7] - 1:2, 1:4, 1:9, 1:13, 2:10, 3:1, 3:3
**offenders** [1] - 75:25
**offense** [10] - 50:18, 50:21, 50:24, 61:14, 63:14, 63:22, 64:4, 64:20, 70:6, 93:12
**offenses** [2] - 76:10, 76:11
**offering** [1] - 94:10
**OFFICE** [3] - 1:15, 1:21, 2:5
**office** [4] - 4:11, 4:14, 68:25, 92:25
**officer** [4] - 52:23, 56:9, 77:8, 92:16
**OFFICER** [13] - 57:13, 57:15, 57:18, 59:7, 59:10, 61:18, 93:3, 93:5, 93:11, 93:14, 93:19, 97:8, 97:20
**officers** [4] - 17:5, 31:7, 75:2, 75:13
**OFFICERS** [1] - 2:16
**OFFICES** [1] - 2:10
**officials** [1] - 21:15
**often** [7] - 13:13, 13:14, 13:15, 29:12, 65:24, 68:10
**old** [7] - 9:8, 9:9, 24:12, 26:11, 26:12, 43:24, 83:11
**older** [1] - 78:19
**once** [4] - 28:5, 35:22, 78:15, 94:16
**one** [67] - 5:6, 10:3, 10:7, 10:11, 10:12, 13:3, 16:1, 16:25, 23:7, 23:25, 24:2, 25:12, 25:15, 30:15, 30:18, 31:1, 32:11, 34:5, 36:6, 36:25, 37:17, 38:6, 38:12, 38:14, 38:20, 39:7, 40:1, 40:22, 42:25, 49:18, 50:17, 50:23, 53:12, 54:1, 54:2, 57:11, 57:21, 61:7, 63:15, 63:25, 64:4, 64:6, 64:19, 65:1, 65:11, 67:1, 70:12, 70:13, 72:1, 74:10, 76:7, 79:9, 80:12, 81:11, 82:1, 82:4, 82:9, 82:24, 88:2, 88:5, 88:10, 90:24, 91:14, 91:15, 92:16
**ones** [7] - 13:3, 14:13, 14:15, 30:13, 51:9, 73:12, 91:4

## P

**open** [1] - 78:17
**opinion** [5] - 90:2, 90:12, 90:16, 91:8, 96:6
**opinions** [3] - 49:18, 49:19
**opportunity** [4] - 46:2, 47:12, 48:1, 48:21
**opposing** [1] - 5:8
**option** [1] - 54:25
**order** [3] - 32:7, 69:11, 85:13
**orders** [4] - 12:21, 12:25, 94:2, 94:3
**organized** [1] - 75:1
**otherwise** [2] - 69:1, 92:11
**ought** [5] - 50:11, 58:17, 89:4, 89:6, 89:25
**outside** [1] - 94:16
**overlap** [1] - 66:11
**overlay** [1] - 92:25
**overruled** [2] - 57:4, 57:5
**overwhelmed** [1] - 70:24
**owe** [2] - 66:21, 66:22
**own** [7] - 48:7, 65:15, 66:6, 73:11, 91:4, 91:5, 94:10

## P

**p.m** [4] - 1:7, 44:11, 44:12, 98:5
**Pablo** [1] - 2:20
**pack** [1] - 59:1
**page** [7] - 6:5, 35:5, 35:6, 35:9, 35:13, 36:7
**Page** [1] - 3:2
**pages** [1] - 56:1
**paid** [5] - 28:11, 65:24, 66:13, 73:2, 87:21
**pain** [2] - 19:8, 63:12
**painful** [1] - 42:13
**pandemic** [1] - 73:18
**papers** [3] - 51:5, 51:20, 52:9
**paragraph** [5] - 51:5, 51:14, 51:21, 52:7, 52:11
**paragraphs** [3] - 50:19, 51:6, 57:6
**parent** [1] - 70:15
**parents** [2] - 70:14, 71:19
**parsing** [1] - 90:9
**part** [16] - 6:19, 12:10, 13:11, 14:5, 27:22, 31:4, 31:5, 52:13, 55:13, 79:4, 79:6, 80:12, 80:13, 86:25, 90:3, 90:19
**participant** [1] - 82:11
**participated** [5] - 36:20, 54:6, 72:23, 73:7, 80:10
**participating** [3] - 81:17, 81:20, 82:2
**participation** [1] - 84:20
**particular** [2] - 7:4, 57:24
**particularly** [1] - 47:24
**parties** [5] - 46:15, 52:17, 55:9, 55:21, 59:2
**parties'** [2] - 50:22, 56:21
**partly** [2] - 73:10, 96:20
**pass** [2] - 18:7, 33:5

**passed** [1] - 69:3
**passes** [1] - 67:21
**pay** [16] - 11:25, 12:1, 41:20, 41:21, 42:7, 42:9, 43:9, 66:20, 84:15, 84:17, 92:3, 93:24, 94:2, 94:3
**payable** [1] - 92:5
**paying** [3] - 37:11, 66:19, 67:2
**peaceful** [1] - 75:17
**PEDRO** [4] - 3:7, 8:2, 26:3, 43:20
**Pedro** [11] - 3:12, 25:24, 26:10, 34:22, 43:19, 79:2, 81:12, 81:21, 83:10, 83:15, 84:3
**Pelon** [7] - 28:7, 29:3, 29:19, 32:4, 32:25, 38:7, 38:8
**penalty** [2] - 73:21, 74:20
**pending** [2] - 69:24, 74:9
**people** [60] - 9:21, 10:10, 11:18, 11:19, 12:4, 14:11, 18:16, 18:17, 18:18, 19:17, 20:3, 20:10, 21:10, 23:10, 23:11, 23:12, 23:13, 23:14, 25:3, 27:18, 29:8, 29:9, 34:3, 41:9, 42:12, 43:4, 43:5, 43:11, 65:24, 66:4, 66:18, 66:22, 66:23, 67:20, 71:13, 71:14, 72:3, 72:15, 75:3, 75:11, 78:3, 78:9, 78:19, 78:23, 78:25, 79:16, 79:23, 80:23, 81:2, 82:18, 82:25, 83:20, 84:1, 84:2, 84:14, 88:21, 89:10
**people's** [1] - 67:21
**percent** [4] - 65:7, 73:1, 78:6, 83:4
**perfect** [2] - 67:21, 69:4
**perhaps** [6] - 21:18, 49:16, 58:23, 75:20, 91:2, 96:19
**period** [4] - 54:5, 66:7, 81:8, 81:10
**periods** [1] - 68:11
**permanent** [1] - 73:24
**permit** [1] - 62:14
**permitted** [2] - 6:1, 89:20
**perpetrator** [1] - 78:14
**person** [24] - 6:22, 22:11, 22:12, 36:8, 36:15, 36:18, 36:22, 43:4, 43:16, 43:23, 46:3, 58:25, 64:13, 66:5, 66:8, 74:15, 75:10, 76:14, 78:8, 79:12, 80:3, 81:6, 88:10, 88:12
**person's** [1] - 71:24
**personal** [1] - 60:20
**persons** [5] - 7:6, 10:7, 17:11, 78:22, 91:3
**perspective** [3] - 50:4, 50:5, 63:18
**phone** [6] - 41:7, 64:23, 67:23, 68:6, 70:1, 85:3
**phonetic** [1] - 37:24
**photo** [6] - 22:11, 34:5, 35:2, 36:17, 44:23, 45:1
**photographs** [9] - 19:2, 19:7, 19:15, 19:17, 19:20, 34:2, 34:3, 45:15, 86:12
**photos** [1] - 19:5
**photospread** [2] - 35:5, 36:7
**photospreads** [1] - 34:16
**physically** [1] - 15:15
**physician** [1] - 94:2

**pick** [1] - 78:8
**picture** [4] - 19:21, 19:24, 34:6, 36:7
**pictures** [1] - 86:12
**piecemeal** [1] - 90:9
**pity** [1] - 71:6
**place** [8] - 66:6, 67:12, 69:20, 74:4, 79:2, 85:24, 91:12, 97:1
**placed** [4] - 27:24, 28:17, 30:5, 54:4
**plastic** [5] - 12:19, 15:12, 15:13, 18:4, 25:2
**play** [3] - 58:1, 75:9, 89:24
**plea** [26] - 47:14, 47:21, 47:23, 49:23, 50:22, 52:13, 52:14, 52:16, 52:22, 53:3, 53:6, 54:25, 55:8, 57:24, 57:25, 58:5, 59:21, 59:22, 59:24, 63:21, 64:17, 76:16, 80:11, 84:22, 85:13, 87:4
**pleaded** [1] - 71:19
**pled** [4] - 54:10, 54:15, 54:16, 59:20
**plus** [1] - 10:7
**podium** [1] - 40:8
**point** [37] - 9:16, 9:22, 11:3, 14:25, 16:20, 24:25, 27:13, 31:10, 31:14, 32:12, 53:14, 55:12, 56:6, 57:11, 57:14, 57:15, 60:9, 60:12, 61:15, 61:21, 64:22, 65:1, 66:9, 66:25, 70:7, 71:21, 71:23, 78:17, 79:22, 85:18, 90:24, 91:14, 91:15, 92:8, 94:12, 95:25, 97:18
**points** [2] - 57:20, 91:14
**policy** [1] - 97:1
**polite** [1] - 75:2
**poor** [2] - 71:1, 71:4
**poorest** [1] - 71:1
**population** [1] - 75:22
**PORTILLO** [4] - 3:7, 8:2, 26:3, 43:20
**portillo** [1] - 26:10
**Portillo** [12] - 3:12, 25:24, 26:9, 43:19, 44:24, 54:1, 77:25, 79:2, 81:12, 81:21, 83:10, 84:3
**portion** [3] - 7:18, 27:3, 54:21
**portions** [1] - 68:20
**position** [13] - 51:23, 52:15, 52:18, 55:2, 59:14, 59:17, 60:25, 80:17, 80:20, 89:10, 89:13, 89:14, 89:15
**possible** [2] - 24:15, 67:17
**potato** [1] - 75:5
**pour** [1] - 81:14
**poured** [1] - 30:20
**poverty** [1] - 40:23
**powerful** [1] - 72:17
**practice** [1] - 96:19
**preface** [1] - 86:23
**prefer** [4] - 5:9, 6:12, 7:8, 46:7
**preference** [1] - 6:9
**prefers** [1] - 77:6
**prejudicial** [1] - 50:25
**prepared** [4] - 22:23, 47:25, 49:4, 50:3
**presence** [1] - 4:18

**present** [10] - 10:7, 16:25, 25:1, 28:7, 30:1, 30:2, 30:3, 32:10, 43:22, 44:16
**presentations** [1] - 49:7
**presented** [6] - 5:1, 6:9, 6:10, 50:6, 55:24, 86:11
**presentence** [8] - 47:24, 48:4, 48:22, 49:25, 50:15, 50:20, 77:4, 92:15
**presenting** [1] - 48:14
**pretrial** [3] - 73:17, 73:19, 87:23
**prevent** [1] - 69:14
**previously** [3] - 9:2, 26:4, 64:20
**pride** [2] - 75:1, 75:2
**principal** [1] - 10:11
**prints** [1] - 68:2
**prison** [3] - 42:19, 43:11, 44:4
**Prisons** [7] - 51:2, 76:20, 77:14, 90:13, 90:18, 95:8, 95:24
**privacy** [1] - 68:16
**PROBATION** [14] - 2:16, 57:13, 57:15, 57:18, 59:7, 59:10, 61:18, 93:3, 93:5, 93:11, 93:14, 93:19, 97:8, 97:20
**probation** [11] - 50:7, 52:22, 54:19, 55:13, 57:10, 61:4, 61:9, 61:17, 92:15, 92:25, 93:22
**probation's** [2] - 52:18, 53:19
**problem** [1] - 43:13
**problems** [1] - 41:5
**proceed** [11] - 4:19, 7:4, 8:20, 26:6, 44:16, 46:16, 46:25, 49:1, 49:14, 50:12, 87:8
**PROCEEDINGS** [3] - 1:9, 1:25, 4:1
**proceedings** [4] - 21:20, 44:10, 98:5, 98:12
**process** [2] - 5:12, 89:25
**produced** [3] - 34:15, 45:5, 45:21
**PRODUCED** [1] - 1:25
**product** [1] - 70:20
**professional** [1] - 75:15
**proffer** [2] - 86:9, 86:10
**profitable** [1] - 65:17
**promise** [1] - 68:22
**property** [1] - 79:23
**prosecutor** [1] - 42:6
**prospect** [1] - 73:21
**protect** [1] - 71:22
**provide** [1] - 90:17
**provided** [4] - 68:11, 68:16, 87:4, 90:16
**PSR** [7] - 54:22, 55:22, 97:9, 97:21, 97:22, 97:23
**public** [2] - 4:11, 87:10
**Public** [2] - 1:20, 2:4
**PUBLIC** [2] - 1:21, 2:5
**pull** [2] - 8:11, 87:18
**punish** [2] - 42:19, 89:18
**purpose** [1] - 13:16
**purposes** [5] - 34:13, 56:18, 60:22, 66:5, 86:3
**purses** [1] - 75:4
**pursuant** [1] - 92:1

**put** [16] - 10:2, 10:18, 10:24, 11:15, 13:17, 21:15, 27:8, 28:16, 30:25, 35:10, 55:24, 69:7, 69:10, 69:11, 80:17, 80:20

## Q

**questioned** [1] - 77:21
**questions** [9] - 8:18, 24:5, 25:22, 38:19, 39:20, 47:6, 70:5, 70:8, 73:8
**quite** [1] - 74:2
**quote** [2] - 58:10, 61:15

## R

**radios** [1] - 75:6
**raise** [1] - 7:22
**raised** [2] - 70:6, 71:1
**Ramon** [1] - 2:20
**range** [2] - 84:23, 91:16
**RDR** [2] - 2:23, 98:16
**read** [5] - 51:17, 56:16, 68:19, 77:8, 77:9
**ready** [6] - 4:19, 49:1, 49:4, 49:10, 49:13, 49:23
**really** [7] - 7:14, 8:12, 24:18, 59:22, 59:24, 60:2, 74:8
**reason** [3] - 65:22, 65:25, 94:17
**reasons** [2] - 65:9, 76:15
**receive** [4] - 52:21, 76:18, 89:5, 95:9
**recessed** [1] - 44:11
**recognize** [7] - 15:14, 17:10, 34:18, 35:10, 35:16, 38:24, 52:2
**recognized** [10] - 13:20, 17:15, 19:17, 19:23, 21:1, 34:3, 35:6, 35:14, 36:22
**recognizes** [1] - 76:2
**recollection** [5] - 20:24, 22:22, 64:25, 69:4, 79:10
**recollections** [1] - 67:21
**recommend** [1] - 97:6
**recommendation** [5] - 77:9, 77:11, 84:22, 96:9, 96:25
**reconcile** [1] - 67:18
**record** [13] - 6:23, 9:6, 26:9, 34:13, 49:8, 49:21, 55:15, 55:19, 61:8, 61:12, 86:3, 93:4, 98:12
**RECORDED** [1] - 1:25
**records** [6] - 58:11, 64:23, 67:23, 68:5, 68:7, 70:1
**recruited** [1] - 71:15
**rectum** [3] - 30:19, 30:24, 30:25
**REDIRECT** [4] - 3:6, 3:9, 24:9, 38:22
**redirect** [1] - 24:7
**reduction** [2] - 57:19, 90:22
**refer** [2] - 44:20, 68:14
**reference** [1] - 95:21
**referrals** [1] - 65:23
**referred** [1] - 45:23
**referring** [2] - 66:4, 68:13
**refresh** [2] - 20:24, 22:22
**regard** [4] - 5:18, 5:20, 6:12, 60:10

**regarding** [6] - 5:9, 45:11, 45:19, 45:21, 47:7, 77:4
**regards** [5] - 54:8, 54:11, 54:18, 54:20, 77:19
**regret** [1] - 17:20
**regretted** [1] - 17:21
**regular** [1] - 68:10
**relates** [8] - 56:14, 57:3, 57:4, 57:5, 57:8, 58:3, 90:2, 92:8
**relative** [1] - 63:23
**relatives** [1] - 43:6
**release** [5] - 31:12, 32:8, 91:20, 91:23
**released** [4] - 17:4, 31:10, 33:3
**relevance** [2] - 46:4, 46:5
**relevant** [2] - 70:11, 71:24
**reliable** [1] - 65:8
**relied** [1] - 65:23
**remain** [2] - 61:13, 65:4
**remains** [2] - 69:24, 73:24
**remarks** [3] - 46:6, 51:23, 86:24
**remember** [10] - 9:12, 17:11, 19:3, 20:4, 22:11, 29:8, 41:8, 42:2, 80:23, 83:2
**remiss** [1] - 63:7
**remove** [1] - 19:1
**removed** [3] - 14:25, 16:6, 27:3
**removing** [2] - 54:3, 54:24
**Rene** [2] - 4:4, 47:5
**RENE** [1] - 1:6
**repeat** [2] - 20:5, 65:23
**repent** [3] - 42:16, 42:20, 43:8
**replaced** [2] - 50:19, 51:10
**report** [30] - 4:24, 20:16, 20:23, 21:16, 22:21, 22:22, 23:1, 45:4, 45:20, 45:21, 47:25, 48:5, 48:10, 48:11, 48:22, 50:1, 50:6, 50:15, 50:20, 61:5, 75:23, 77:5, 77:7, 77:13, 92:15, 92:21, 96:13, 97:12, 97:13
**REPORTER** [3] - 2:22, 87:14, 88:4
**representing** [2] - 4:5, 4:8
**request** [6] - 50:19, 51:3, 76:17, 95:21, 96:3, 96:12
**requests** [1] - 77:3
**require** [3] - 4:20, 92:14, 93:23
**required** [2] - 59:21, 90:23
**requirements** [1] - 92:13
**requires** [1] - 60:12
**rescued** [2] - 17:9, 78:19
**resident** [1] - 73:25
**respect** [6] - 50:13, 50:14, 51:4, 52:8, 55:14, 68:15
**respectful** [1] - 75:17
**respectfully** [1] - 88:23
**respects** [1] - 50:2
**respond** [5] - 5:15, 5:19, 5:21, 8:1, 53:17
**responded** [2] - 7:12, 74:22
**response** [4] - 5:11, 5:24, 6:1, 48:6
**responsibility** [12] - 52:12, 52:22, 53:1, 59:15, 60:19, 60:20, 63:13, 69:13,

69:16, 69:21, 87:11, 90:23
**responsible** [8] - 58:7, 63:17, 63:19, 69:9, 80:8, 81:18, 82:5, 82:6
**rest** [3] - 51:5, 83:16, 83:24
**result** [2] - 64:12, 65:6
**resulted** [1] - 47:14
**resumed** [1] - 44:12
**retract** [1] - 23:24
**retribution** [1] - 89:17
**return** [1] - 88:19
**review** [1] - 86:4
**reviewed** [2] - 45:2, 87:6
**reward** [2] - 89:3, 89:6
**rewarded** [1] - 89:15
**REYES** [13] - 57:13, 57:15, 57:18, 59:7, 59:10, 61:18, 93:3, 93:5, 93:11, 93:14, 93:19, 97:8, 97:20
**Reyes** [3] - 2:17, 93:7, 97:24
**ride** [1] - 37:14
**rivals** [1] - 49:16
**Rodriguez** [8] - 52:1, 66:15, 66:16, 67:25, 68:3, 78:24, 79:5, 82:16
**Rodriguez-Mendoza** [5] - 52:1, 68:3, 78:24, 79:5, 82:16
**role** [6] - 53:21, 57:4, 58:1, 63:13, 64:20, 70:1
**Room** [1] - 2:23
**room** [41] - 9:21, 10:3, 10:24, 11:15, 11:17, 11:18, 12:5, 12:13, 13:8, 13:13, 13:14, 14:11, 14:25, 16:1, 16:3, 16:7, 16:18, 16:20, 18:1, 18:2, 24:24, 25:2, 25:3, 25:20, 27:24, 27:25, 28:1, 28:6, 28:16, 29:8, 29:23, 30:8, 31:14, 31:15, 31:16, 31:18, 32:5, 32:16, 37:9, 69:19, 74:25
**roommates** [1] - 42:3
**rooms** [2] - 9:20, 54:4
**rule** [1] - 67:8
**ruling** [5] - 54:24, 55:3, 56:25, 59:7, 59:10
**run** [5] - 72:3, 93:16, 93:17, 93:20
**rural** [1] - 70:17
**Rusk** [1] - 2:23

## S

**safe** [1] - 78:10
**SAGASTUME** [3] - 40:9, 40:14, 41:14
**Sagastume** [13] - 3:11, 7:1, 27:21, 40:2, 40:3, 40:11, 40:15, 79:3, 80:15, 84:4, 84:13
**SAGASTUME-MADRID** [3] - 40:9, 40:14, 41:14
**Sagastume-Madrid** [2] - 3:11, 40:15
**Salvador** [1] - 74:3
**sample** [1] - 92:1
**sanction** [1] - 92:11
**satisfied** [2] - 47:22, 48:25
**save** [1] - 89:15
**saw** [8] - 17:18, 18:3, 19:23, 31:2,

41:16, 42:22, 75:16, 78:18
**scaled** [2] - 55:20, 55:24
**scaled-down** [2] - 55:20, 55:24
**scared** [5] - 16:18, 43:14, 67:20, 78:7, 78:14
**scary** [1] - 74:21
**scenes** [1] - 68:3
**school** [2] - 71:1, 71:8
**seat** [2] - 8:10, 26:2
**seated** [1] - 8:4
**second** [5] - 9:25, 23:25, 35:5, 70:7, 71:18
**section** [1] - 89:23
**see** [38] - 13:7, 13:9, 13:11, 13:18, 13:22, 14:10, 17:8, 17:9, 17:17, 17:25, 18:3, 20:13, 20:21, 21:4, 23:1, 23:3, 23:20, 25:3, 30:15, 32:19, 32:21, 32:23, 32:25, 34:20, 34:23, 35:21, 36:3, 42:13, 61:11, 62:11, 74:11, 80:10, 80:14, 80:19, 81:22, 90:18, 90:20, 95:17
**seeing** [2] - 74:18, 76:3
**seek** [2] - 51:9, 93:1
**self** [2] - 72:16, 94:6
**self-medicate** [1] - 94:6
**self-sufficient** [1] - 72:16
**sending** [1] - 79:5
**sense** [2] - 65:11, 78:7
**sentence** [27] - 50:11, 56:15, 58:17, 61:22, 62:2, 62:18, 62:19, 63:25, 64:18, 71:25, 74:1, 76:16, 76:22, 84:24, 85:12, 88:25, 89:16, 89:17, 89:18, 89:19, 90:24, 90:25, 91:1, 91:11, 91:14, 91:18
**sentenced** [2] - 91:9, 95:12
**sentences** [1] - 91:19
**sentencing** [25] - 5:2, 7:18, 44:16, 49:1, 49:4, 49:20, 50:4, 50:16, 56:18, 56:24, 58:2, 61:22, 64:3, 65:5, 65:10, 67:13, 68:17, 69:6, 70:7, 83:3, 84:23, 89:24, 90:9, 91:10, 97:11
**SENTENCING** [1] - 1:11
**separate** [5] - 31:18, 39:15, 39:19, 66:11, 85:7
**separated** [1] - 6:10
**separately** [1] - 7:16
**separation** [1] - 5:21
**series** [1] - 44:23
**serious** [3] - 57:20, 57:24, 63:8
**seriousness** [1] - 63:14
**serve** [1] - 92:24
**served** [4] - 90:14, 91:16, 95:11
**set** [10] - 13:7, 30:15, 30:24, 52:15, 74:25, 79:21, 81:14, 82:12, 82:13, 92:22
**setting** [1] - 52:22
**seven** [1] - 40:20
**several** [4] - 9:20, 39:2, 74:17, 76:9
**severely** [1] - 76:9
**sex** [2] - 75:25, 76:10

**sexual** [1] - 78:13
**shape** [1] - 38:7
**share** [1] - 47:12
**shaved** [1] - 38:9
**shoes** [2] - 15:22, 29:1
**shooting** [1] - 71:13
**short** [2] - 66:7, 68:11
**shorter** [1] - 38:12
**shot** [3] - 15:1, 15:4, 78:2
**show** [4] - 20:23, 22:21, 34:10, 68:7
**showed** [1] - 19:15
**showing** [1] - 34:13
**shown** [2] - 19:20, 34:2
**shows** [2] - 68:7, 69:18
**shunned** [1] - 70:21
**siblings** [1] - 40:20
**sick** [1] - 44:1
**side** [3] - 61:8, 69:3, 70:23
**side-bar** [1] - 61:8
**sides** [1] - 55:9
**sight** [1] - 58:13
**significant** [2] - 74:2, 75:20
**silver** [1] - 74:10
**simple** [1] - 42:10
**simply** [6] - 6:1, 6:22, 56:12, 56:23, 67:17, 70:24
**single** [2] - 80:12, 80:13
**sins** [1] - 42:17
**sit** [2] - 47:12, 89:11
**site** [2] - 67:23, 68:7
**sitting** [4] - 15:19, 29:24, 38:24, 82:1
**situation** [6] - 78:2, 78:4, 78:15, 79:16, 83:18, 90:21
**situations** [1] - 84:12
**six** [1] - 44:18
**sleep** [4] - 41:23, 43:25, 88:2, 88:5
**small** [1] - 70:17
**smell** [1] - 88:7
**smiling** [1] - 41:16
**smuggler** [1] - 66:3
**smugglers** [3] - 87:12, 87:16, 87:22
**smuggling** [8] - 37:12, 65:20, 66:13, 66:20, 67:3, 69:23, 73:3, 79:16
**snatched** [1] - 71:15
**societies** [1] - 89:7
**society** [5] - 78:22, 83:7, 89:8, 89:9
**sodomized** [1] - 81:13
**sodomizes** [1] - 80:3
**soldiers** [2] - 71:12, 71:16
**someone** [5] - 33:25, 35:10, 80:19, 89:12, 94:8
**sometimes** [4] - 23:15, 43:14, 78:13, 83:20
**somewhere** [2] - 49:18, 78:10
**son** [2] - 41:15, 84:9
**sore** [1] - 14:9
**Sorry** [1] - 23:25
**sorry** [26] - 4:3, 16:13, 20:22, 22:11, 22:19, 23:4, 23:23, 26:22, 34:11,

41:12, 45:7, 45:9, 45:12, 52:10, 56:3, 59:9, 61:19, 63:12, 82:13, 85:17, 86:8, 87:14, 87:22, 88:4, 91:9, 97:10
**sort** [1] - 67:9
**sound** [1] - 94:14
**soup** [1] - 10:3
**South** [1] - 2:6
**SOUTHERN** [1] - 1:2
**Spanish** [1] - 33:21
**speaker** [1] - 87:10
**speaking** [7] - 4:8, 7:7, 8:15, 46:17, 46:22, 47:3, 87:19
**speaks** [2] - 55:8, 76:14
**special** [1] - 92:4
**specific** [3] - 19:9, 77:3, 95:15
**specifically** [3] - 32:5, 51:25, 85:9
**spelling** [1] - 37:24
**spend** [1] - 74:6
**spending** [1] - 51:1
**spent** [7] - 65:11, 73:16, 74:16, 76:24, 85:1, 85:9, 85:10
**spoken** [1] - 5:8
**spread** [2] - 35:9, 44:25
**stamped** [1] - 34:14
**stand** [3] - 7:21, 8:8, 40:5
**standard** [1] - 91:23
**standing** [2] - 74:15, 79:13
**start** [8] - 11:23, 39:23, 39:24, 41:23, 41:24, 47:6, 63:7, 67:6
**started** [8] - 12:9, 27:11, 27:13, 28:25, 30:13, 65:15, 66:11, 93:15
**starting** [2] - 27:19, 27:22
**stash** [1] - 82:18
**state** [7] - 9:6, 25:3, 26:9, 49:21, 80:20, 91:22, 97:17
**statement** [13] - 5:7, 7:9, 20:17, 39:8, 39:9, 39:19, 39:21, 45:10, 50:21, 60:9, 60:20, 77:19, 84:13
**STATEMENTS** [1] - 3:10
**statements** [8] - 5:3, 5:16, 39:14, 49:25, 64:23, 67:16, 83:14
**STATES** [5] - 1:1, 1:4, 1:13, 1:15, 3:3
**States** [7] - 1:14, 4:4, 4:7, 47:5, 70:21, 72:6, 89:22
**stating** [1] - 55:19
**status** [3] - 4:23, 45:19, 72:11
**stay** [5] - 22:3, 29:17, 29:20, 29:21, 88:16
**staying** [1] - 41:1
**steel** [4] - 29:1, 32:12, 80:2
**steel-toed** [2] - 32:12, 80:2
**STELZIG** [81] - 3:5, 3:8, 4:10, 4:16, 6:6, 6:8, 18:10, 20:6, 20:7, 22:9, 22:10, 22:19, 22:20, 23:24, 24:1, 24:5, 33:8, 33:15, 33:17, 34:11, 34:17, 36:1, 38:19, 44:18, 44:22, 45:9, 45:12, 45:15, 46:4, 46:11, 46:13, 46:19, 46:21, 46:25, 48:24, 49:2, 50:13, 51:8, 51:11, 51:13, 51:19, 52:7, 52:16, 53:6, 53:10, 53:14, 54:15, 60:11, 60:18,

61:25, 62:4, 62:7, 62:12, 62:16, 62:20, 63:3, 63:5, 68:20, 70:9, 77:3, 77:10, 77:17, 85:17, 86:7, 86:13, 86:16, 89:2, 95:6, 95:14, 95:20, 95:23, 96:1, 96:4, 96:11, 96:18, 97:7, 97:11, 97:15, 97:19, 97:24, 98:2

**Stelzig** [5] - 1:20, 4:11, 5:9, 5:25, 46:17

**STENOGRAPHIC** [1] - 1:25

**step** [5] - 25:25, 39:5, 61:4, 80:21, 94:16

**steps** [1] - 72:9

**stick** [2] - 44:9, 70:11

**still** [5] - 18:1, 47:4, 83:6, 83:21, 96:21

**stomach** [1] - 81:23

**stomped** [1] - 81:24

**stomps** [1] - 80:2

**stood** [1] - 32:12

**stop** [5] - 12:7, 14:20, 16:11, 16:15, 89:14

**Stotts** [7] - 1:14, 4:6, 4:23, 6:14, 42:25, 49:3, 53:18

**STOTTS** [64] - 3:5, 3:6, 3:8, 3:9, 4:6, 4:25, 5:18, 6:2, 6:16, 6:18, 6:20, 6:24, 7:19, 8:6, 8:21, 9:5, 18:7, 24:8, 24:10, 25:12, 25:15, 25:17, 25:22, 25:24, 26:8, 33:5, 38:20, 38:23, 39:4, 39:11, 39:13, 39:19, 39:24, 40:1, 40:6, 43:1, 43:19, 49:5, 49:9, 49:12, 53:19, 54:13, 54:16, 55:15, 55:18, 56:3, 56:5, 56:7, 56:25, 57:2, 59:16, 59:20, 59:24, 60:2, 61:2, 61:16, 62:22, 77:18, 85:21, 89:1, 94:19, 94:23, 94:25, 98:1

**street** [1] - 71:14

**Street** [1] - 2:6

**strong** [2] - 6:9, 83:6

**stronger** [1] - 78:19

**struggled** [1] - 58:23

**studied** [1] - 89:7

**stuff's** [1] - 82:17

**submission** [2] - 65:5, 87:7

**submit** [8] - 44:19, 51:20, 52:9, 60:13, 85:19, 85:23, 95:1, 95:3

**submitted** [3] - 60:19, 65:4, 87:1

**subparts** [1] - 89:23

**suffer** [2] - 41:18, 43:22

**suffering** [1] - 64:11

**suffers** [2] - 41:17, 41:18

**sufficient** [3] - 48:21, 56:23, 72:16

**sufficiently** [1] - 48:7

**suggest** [1] - 58:11

**suggesting** [3] - 53:4, 56:9, 96:15

**suggests** [1] - 64:5

**Suite** [3] - 1:16, 1:22, 2:11

**summaries** [1] - 75:12

**summarizes** [1] - 45:5

**supervised** [2] - 91:20, 91:23

**supervision** [4] - 89:21, 92:25, 93:9, 93:23

**support** [2] - 72:12, 75:8

**supported** [1] - 69:17

**suppose** [1] - 61:25

**supposedly** [1] - 13:9

**surrounded** [1] - 70:17

**survive** [1] - 72:4

**survivors** [1] - 83:6

**suspects** [2] - 30:12

**suspicion** [2] - 27:11, 27:13

**sustained** [2] - 57:9, 60:4

**sustaining** [1] - 58:2

**swear** [2] - 8:3, 26:1

**sworn** [3] - 7:24, 9:2, 26:4

**system** [1] - 91:12

## T

**table** [2] - 4:13, 82:1

**talks** [1] - 43:14

**taller** [1] - 38:12

**team** [2] - 38:1, 48:20

**tears** [1] - 42:13

**ten** [2] - 6:16, 6:17

**term** [9] - 45:25, 61:22, 89:18, 91:19, 91:20, 91:21, 92:24, 93:18, 93:21

**terms** [9] - 6:9, 50:5, 62:18, 63:25, 64:4, 71:24, 74:8, 92:20, 96:12

**terrible** [6] - 66:9, 81:9, 84:12, 87:12

**terrified** [1] - 78:5

**terror** [1] - 91:5

**testified** [4] - 7:11, 9:2, 21:9, 26:4

**testifying** [6] - 5:5, 7:23, 17:24, 36:11, 58:12

**testimonial** [1] - 49:7

**testimony** [20] - 5:7, 5:19, 6:1, 6:9, 6:10, 6:11, 7:8, 7:15, 21:17, 22:16, 23:4, 39:15, 39:17, 40:17, 41:22, 58:15, 85:22, 85:25, 86:5, 86:11

**TEXAS** [1] - 1:2

**Texas** [4] - 1:6, 1:16, 2:12, 2:24

**THE** [160] - 1:10, 1:13, 1:19, 2:3, 3:3, 4:2, 4:8, 4:15, 4:17, 5:8, 5:23, 6:4, 6:7, 6:13, 6:17, 6:19, 6:21, 7:2, 7:20, 8:1, 8:4, 8:7, 8:15, 8:18, 18:8, 24:6, 25:10, 25:13, 25:16, 25:23, 25:25, 26:6, 33:6, 33:16, 38:21, 39:5, 39:12, 39:17, 39:22, 39:25, 40:4, 40:7, 40:12, 41:12, 42:24, 43:18, 44:7, 44:13, 44:21, 45:7, 45:10, 45:14, 45:24, 46:8, 46:12, 46:14, 46:20, 46:24, 47:2, 47:9, 47:11, 47:18, 47:20, 48:2, 48:4, 48:12, 48:13, 48:18, 48:19, 48:25, 49:3, 49:6, 49:10, 49:13, 51:6, 51:9, 51:12, 51:16, 52:6, 52:13, 53:3, 53:8, 53:13, 53:17, 54:12, 55:6, 55:17, 56:2, 56:4, 56:6, 56:8, 57:1, 57:3, 57:14, 57:17, 57:19, 59:9, 59:12, 59:19, 59:23, 60:1, 60:6, 60:17, 60:24, 61:3, 61:10, 61:17, 61:19, 62:2, 62:5, 62:11, 62:14, 62:17, 62:21, 62:23, 63:4, 68:19, 70:8, 77:2, 77:7, 77:16, 85:16, 85:22, 86:10, 86:14, 86:18, 86:21, 86:23, 87:9, 87:14, 87:15, 87:18, 87:20, 88:4, 88:5, 88:24,

89:3, 93:4, 93:10, 93:13, 93:16, 93:20, 94:20, 94:22, 94:24, 95:2, 95:3, 95:10, 95:17, 95:22, 95:25, 96:2, 96:5, 96:14, 96:24, 97:13, 97:16, 97:22, 97:25, 98:3

**themselves** [1] - 73:12

**thinking** [3] - 22:2, 41:23, 41:24

**third** [5] - 60:9, 60:11, 60:16, 60:21, 64:10

**threatened** [3] - 78:1, 78:6, 84:18

**three** [31] - 6:22, 10:7, 10:9, 10:21, 12:21, 13:21, 15:14, 16:11, 16:22, 16:23, 18:18, 18:21, 21:6, 21:7, 23:22, 25:1, 29:4, 32:3, 45:1, 45:13, 46:1, 68:24, 70:11, 73:9, 82:4, 82:5, 83:14, 93:18, 93:21, 96:13, 96:15

**three-year** [2] - 93:18, 93:21

**tides** [1] - 79:22

**tie** [1] - 30:4

**tied** [4] - 28:17, 28:24, 32:6, 32:7

**ties** [2] - 32:8, 80:1

**timeframe** [1] - 77:24

**title** [1] - 89:22

**today** [22] - 10:12, 12:23, 13:14, 14:2, 16:15, 17:8, 18:19, 21:9, 38:24, 41:25, 53:21, 53:25, 58:12, 63:6, 63:8, 63:15, 64:1, 64:4, 64:14, 73:24, 74:15, 78:18

**toe** [2] - 29:1

**toe-steel** [2] - 29:1

**toed** [2] - 32:12, 80:2

**together** [2] - 42:2, 66:10

**took** [12] - 10:17, 10:24, 10:25, 15:25, 16:5, 19:5, 27:8, 63:20, 69:20, 71:6, 72:9

**top** [2] - 35:14, 36:7

**tortured** [1] - 83:5

**tortures** [1] - 80:3

**total** [2] - 48:17, 61:13

**totally** [1] - 85:2

**touch** [2] - 64:3, 70:9

**toward** [1] - 8:16

**towards** [1] - 67:1

**Tower** [1] - 2:6

**town** [1] - 70:17

**trafficking** [1] - 94:11

**tragedy** [1] - 12:3

**tragic** [1] - 63:9

**TRANSCRIPT** [2] - 1:9, 1:25

**transcript** [4] - 68:16, 68:18, 68:21, 98:11

**TRANSCRIPTION** [1] - 1:25

**transition** [3] - 72:7, 97:2, 97:3

**transitioned** [1] - 72:6

**translated** [1] - 33:24

**transparent** [1] - 68:23

**transportation** [4] - 37:18, 52:3, 66:5, 72:14

**trash** [2] - 75:5

**trauma** [5] - 43:13, 43:23, 83:12, 83:16,

84:13
**traumatic** [1] - 83:18
**traumatized** [1] - 14:9
**treated** [4] - 10:1, 71:3, 79:15, 81:15
**treatment** [3] - 93:24, 93:25, 94:15
**trial** [1] - 25:14
**tried** [3] - 65:2, 71:17, 84:16
**trip** [1] - 37:20
**trouble** [2] - 84:18, 88:16
**truck** [3] - 82:12, 82:13
**true** [8] - 39:21, 50:1, 50:4, 55:5, 56:10, 56:11, 60:1
**trust** [1] - 83:20
**trusted** [1] - 76:3
**truth** [1] - 65:3
**try** [9] - 22:12, 44:9, 58:19, 67:18, 67:19, 72:10, 74:23, 79:21, 88:12
**trying** [10] - 32:12, 41:9, 46:9, 47:2, 67:3, 69:13, 72:12, 79:23, 79:24
**TSR** [1] - 93:15
**turn** [4] - 8:15, 40:12, 79:19, 86:20
**turns** [1] - 40:25
**twelve** [1] - 11:19
**twenty** [2] - 24:11, 26:12
**twenty-four** [1] - 26:12
**twice** [3] - 23:3, 71:17, 88:8
**two** [56] - 4:25, 7:23, 10:7, 10:21, 11:11, 12:22, 12:25, 14:11, 16:15, 18:16, 18:17, 18:21, 23:4, 23:5, 24:2, 24:4, 24:21, 24:23, 29:7, 38:4, 38:11, 39:13, 40:21, 43:4, 43:11, 46:1, 49:18, 52:5, 53:21, 57:11, 57:15, 57:19, 58:23, 61:7, 62:12, 63:9, 64:7, 67:2, 67:8, 68:20, 69:20, 73:13, 77:21, 78:2, 78:9, 80:15, 81:8, 82:4, 82:14, 82:17, 82:25, 87:12, 87:17, 89:25, 91:14
**Two** [1] - 7:24
**two-level** [1] - 52:5
**two-point** [2] - 57:11, 57:15
**type** [3] - 31:4, 32:11, 81:12
**types** [1] - 14:7
**typically** [3] - 52:20, 59:21, 76:21

# U

**ultimate** [1] - 65:3
**ultimately** [2] - 52:23, 65:2
**unbeatable** [1] - 75:9
**under** [15] - 52:24, 60:13, 62:8, 74:12, 76:23, 89:21, 91:11, 91:12, 92:3, 92:10, 92:11, 92:14, 92:23, 93:22, 96:7
**underlying** [3] - 49:22, 55:10, 58:6
**understandable** [1] - 67:20
**understood** [3] - 17:23, 46:9, 96:11
**undress** [2] - 11:10, 11:13
**unfortunately** [6] - 41:2, 65:4, 66:8, 79:1, 83:1, 84:5
**unit** [4] - 75:22, 75:24, 76:1, 88:1
**UNITED** [5] - 1:1, 1:4, 1:13, 1:15, 3:3

**United** [7] - 1:14, 4:4, 4:7, 47:5, 70:21, 72:6, 89:22
**unknowable** [1] - 64:21
**unless** [1] - 70:5
**unlike** [1] - 67:10
**untrue** [1] - 55:23
**unusual** [3] - 52:25, 74:8, 78:12
**up** [40] - 11:14, 12:6, 12:7, 12:9, 12:10, 12:17, 12:18, 12:22, 14:7, 14:13, 14:15, 14:20, 14:22, 15:19, 15:21, 16:4, 19:11, 20:17, 30:18, 30:21, 30:25, 31:1, 31:4, 32:11, 32:12, 37:8, 39:3, 43:11, 56:12, 61:4, 65:11, 70:13, 70:16, 71:4, 72:2, 78:17, 79:24, 83:20, 88:12
**upset** [1] - 67:7
**upsetting** [1] - 67:7
**utility** [1] - 53:15

# V

**vaccines** [1] - 73:18
**van** [1] - 82:12
**vans** [6] - 10:17, 27:8, 37:17, 38:15, 39:1, 65:17
**variance** [1] - 60:15
**vary** [3] - 90:23, 91:14, 91:15
**verbal** [1] - 39:8
**version** [3] - 50:20, 55:20, 55:24
**VERSUS** [1] - 1:5
**versus** [2] - 4:4, 47:5
**VICTIM** [1] - 3:10
**victim** [12] - 5:2, 5:7, 5:20, 6:11, 6:21, 6:25, 20:21, 39:14, 39:21, 40:16, 45:19, 83:14
**victims** [14] - 39:7, 40:2, 43:22, 78:13, 78:18, 79:8, 83:4, 83:5, 83:13, 84:7, 85:14, 91:2, 91:3
**victims'** [2] - 5:15, 5:16
**VICTOR** [4] - 3:4, 7:25, 9:1, 43:2
**Victor** [17] - 3:11, 8:6, 9:7, 26:25, 28:1, 35:19, 35:20, 37:2, 43:1, 45:2, 77:25, 79:2, 79:4, 82:3, 83:15, 83:19, 84:2
**view** [2] - 52:3, 95:9
**viewed** [2] - 34:22, 44:24
**Villar** [1] - 2:20
**VILLAR** [4] - 47:10, 47:19, 48:3, 87:16
**violation** [1] - 94:11
**violence** [2] - 67:12, 72:20
**violent** [1] - 72:2
**Virginia** [3] - 96:21, 96:23, 97:6
**visiting** [1] - 74:21
**voice** [1] - 88:7
**voices** [2] - 13:20, 23:22
**volume** [1] - 7:10
**volumes** [1] - 76:14
**voluminous** [1] - 7:10
**vulnerable** [4] - 75:22, 76:2, 76:10, 76:13

# W

**wait** [1] - 89:12
**walk** [1] - 31:22
**walking** [1] - 66:22
**walks** [1] - 83:20
**wants** [2] - 5:3, 39:9
**war** [3] - 71:10, 71:11
**warden** [1] - 75:13
**warehouse** [63] - 9:10, 9:14, 9:23, 10:1, 10:2, 10:6, 10:17, 10:23, 11:6, 14:3, 16:2, 17:5, 17:9, 18:13, 18:14, 18:19, 18:24, 20:2, 20:9, 21:2, 23:10, 23:15, 24:3, 24:20, 26:13, 27:3, 27:4, 27:7, 27:18, 28:5, 29:15, 29:22, 31:7, 33:3, 37:7, 37:9, 38:5, 45:17, 54:3, 59:3, 59:4, 64:6, 66:6, 66:13, 67:6, 68:9, 68:10, 72:21, 77:22, 79:7, 79:11, 79:13, 79:21, 79:24, 80:7, 80:8, 80:14, 82:7, 82:15, 84:21, 87:12, 87:15, 87:17
**watched** [4] - 78:8, 81:13, 81:14, 91:4
**watching** [2] - 78:2, 81:17
**ways** [3] - 62:12, 74:23, 75:8
**wear** [1] - 11:5
**wearing** [1] - 11:2
**weeks** [2] - 82:23, 82:24
**weight** [3] - 42:14, 43:4, 43:16
**weighty** [1] - 63:6
**Wendell** [2] - 2:10, 4:14
**WENDELL** [1] - 2:10
**wendellodom@aol.com** [1] - 2:14
**whichever** [1] - 77:6
**whole** [2] - 19:6, 42:14
**willing** [1] - 83:8
**Wilmar** [4] - 4:4, 47:5, 47:9, 47:10
**WILMAR** [1] - 1:6
**window** [1] - 18:3
**wires** [2] - 12:18, 28:25
**wiser** [1] - 78:19
**wish** [1] - 87:20
**WITNESS** [1] - 33:16
**witness** [23] - 5:6, 5:16, 7:15, 7:20, 8:5, 8:8, 9:1, 18:7, 25:23, 26:3, 33:5, 34:14, 40:5, 44:24, 45:2, 64:23, 67:15, 68:11, 68:14, 68:15, 68:24, 69:1, 69:2
**witnessed** [2] - 67:16, 78:21
**WITNESSES** [1] - 3:1
**witnesses** [14] - 4:23, 4:25, 5:1, 5:23, 6:12, 7:21, 7:24, 39:13, 40:17, 42:21, 45:23, 53:21, 54:5, 58:23
**woke** [1] - 88:12
**wolf** [1] - 72:20
**woman** [2] - 23:16, 70:20
**women** [1] - 40:20
**words** [2] - 43:17, 89:4
**workers** [1] - 40:20
**world** [1] - 94:16
**worrying** [1] - 44:2

**worse** [2] - 25:19, 40:18
**worst** [1] - 69:19
**writing** [3] - 6:23, 6:25, 20:17
**written** [3] - 49:18, 90:11, 95:3
**wrote** [1] - 61:19
**Wyda** [2] - 2:4, 4:13

## Y

**year** [5] - 9:12, 43:24, 48:5, 93:18, 93:21
**years** [30] - 9:9, 24:12, 24:13, 26:12, 41:20, 64:14, 64:18, 65:6, 73:15, 73:16, 73:19, 74:11, 74:17, 74:18, 76:4, 76:17, 76:25, 78:18, 83:9, 83:11, 84:23, 84:24, 85:12, 85:13, 87:23, 87:25, 88:10, 91:20, 93:11, 95:19
**young** [11] - 43:24, 63:9, 67:2, 67:8, 69:9, 69:20, 72:7, 73:2, 73:5, 78:5, 88:20
**youngest** [1] - 73:13
**yourself** [2] - 46:18, 48:14